ACCEPTED
05-18-00647-CV
FIFTH COURT OF APPEALS
DALLAS, TEXAS
6/4/2018 2:36 PM
LISA MATZ
CLERK

05-18-00647-CV

**Part 3 of 5**

No. 05-18-00647-CV

In the Court of Appeals

Fifth District of Texas at Dallas

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS

6/4/2018 2:36:42 PM

LISA MATZ
Clerk

**In re JOHN CALCE**
*Relator*

# RECORD FOR PETITION FOR WRIT OF MANDAMUS

Relator John Calce submits this record of trial court proceedings in support of his petition for writ of mandamus.

## Index of Documents

| # | Date | Description | Record Pages |
|---|------|-------------|--------------|
| 1 | 6/26/16 | Plaintiff's Original Petition | 001-023 |
| 2 | 7/31/17 | John Calce's Original Counterclaim Against Centurion Logistics LLC and Centurion Pecos Terminal LLC | 024-172 |
| 3 | 11/22/17 | John Calce's First Amended Counterclaim Against Centurion Logistics LLC and Centurion Pecos Terminal LLC | 173-321 |
| 4 | 11/22/17 | John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC | 322-393 |

10000280.1/SP/38371/0105/060118

| 5 | 11/27/17 | John Calce's Supplemental Evidence in Support of Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC | 394-405 |
|---|---|---|---|
| 6 | 12/8/17 | Plaintiff's Response to John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC | 406-858 |
| 7 | 12/12/17 | John Calce's Reply Brief in Support of Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC | 859-865 |
| 8 | 12/15/17 | Notice of Trial Setting | 866 |
| 9 | 5/2/18 | Plaintiffs' Second Amended Petition | 867-903 |
| 10 | 5/21/18 | Order Denying John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Againt Centurion Logistics LLC | 904-905 |

# <u>Declaration of Chase J. Potter</u>

STATE OF TEXAS      §
COUNTY OF DALLAS     §

   My name is Chase J. Potter. My date of birth is May 12, 1986. My address is 901 Main Street, Suite 6000, Dallas, Texas 75202. I hereby declare under penalty of perjury as follows:

   1. I am over eighteen years of age and am fully competent to make this declaration. I am an attorney licensed by the Supreme Court of Texas and am counsel for Relator John Calce in this case.

   2. The factual statements contained within this instrument are within my personal knowledge and are true and correct.

   3. The copies of pleadings, motions, and other documents included in this Record for Petition for Writ of Mandamus are true and correct copies of these documents as filed in the trial court.

   Executed in Dallas County, Texas, on June 4, 2018.

          */s/ Chase J. Potter*
          Chase J. Potter, Declarant

10000280.1/SP/38371/0105/060118

income, gain, loss, or deduction required to be stated separately pursuant to I.R.C. Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(i) Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profit or Net Loss shall be added to such taxable income or loss.

(ii) Any expenditures of the Company described in I.R.C. Section 705(a)(2)(B) or treated as I.R.C. Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profit or Net Loss, shall be subtracted from such taxable income or loss.

(iii) If the Gross Asset Value of any Company asset is adjusted pursuant to subparagraph (ii) or (iii) of the Section A.2 definition of Gross Asset Value, the amount of such adjustment shall be taken into account as gain or loss from disposition of the asset for purposes of computing Net Profit and Net Loss.

(iv) Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of (unreduced by any liabilities attributable thereto), notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value.

(v) In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation computed in accordance with the definition of Depreciation in Section A.2.

(vi) To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to I.R.C. Section 734(b) is required pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Membership Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Net Profit or Net Loss.

"Nonrecourse Deductions" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(1) and shall be determined according to the provisions of Treasury Regulations Section 1.704-2(c).

"Nonrecourse Liability" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

11508-8v2 2/12/2014

MR.380

"Partner Nonrecourse Debt" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(4).

"Partner Nonrecourse Debt Minimum Gain" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(2) and shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

"Partner Nonrecourse Deductions" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(1) and shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(2).

"Partnership Minimum Gain" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(2) and shall be determined in accordance with Treasury Regulations Section 1.704-2(d).

A.3    Capital Accounts. The Company shall determine and maintain Capital Accounts. "Capital Account" means an account of each Member determined and maintained throughout the full term of the Company in accordance with the capital accounting rules of Treasury Regulations Section 1.704-1(b)(2)(iv). Without limiting the generality of the foregoing, the following rules apply:

(a)    The Capital Account of each Member shall be credited with (i) an amount equal to such Member's Capital Contributions and the Fair Value of property contributed (if permitted hereunder) to the Company by such Member, (ii) such Member's share of the Company's Net Profit, and (iii) the amount of any Company liabilities assumed by such Member or that are secured by property distributed to such Member.

(b)    The Capital Account of each Member shall be debited by (i) the amount of cash and the Fair Value of property distributed to such Member, (ii) such Member's share of the Company's Net Loss, and (iii) the amount of any liabilities of such Member assumed by the Company or that are secured by any property contributed by such Member to the Company.

(c)    Upon the transfer by a Member of all or part of an interest in the Company after the Effective Date, the Capital Account of the transferor that is attributable to the transferred interest carries over to the transferee and the Capital Accounts of the Members shall be adjusted to the extent provided in Treasury Regulations Section 1.704-1(b)(2)(iv)(m).

(d)    In determining the amount of any liability for purposes of Sections A.3.1(a) and A.3.1(b), I.R.C. Section 752(c) and any other applicable provisions of the I.R.C. and the Treasury Regulations shall be taken into account.

(e)    Except as otherwise required by Treasury Regulations Section 1.704-1(b)(2)(iv), adjustment to Capital Accounts in respect of Company income, gain, loss, deduction, and I.R.C. Section 705(a)(2)(B) expenditures (or items thereof) shall be made with reference to the federal tax treatment of such items (and, in the case of book items, with reference to the federal tax

1150848v2 2/12/2014

MR.381

treatment of the corresponding tax items) at the Company level, without regard to any mandatory or elective tax treatment of such items at the Member level.

(f)     The provisions of this Appendix and of the Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b)(2)(iv), and shall be interpreted and applied in a manner consistent with such Treasury Regulations. If the Managers determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including debits or credits relating to liabilities that are secured by contributions or distributed property or that are assumed by the Company or any Member), are computed in order to comply with such Treasury Regulations, the Managers may make such modification if it is not likely to have a material effect on the amounts distributed or to be distributed to any Member pursuant to the Agreement. The Managers shall make any adjustments that are necessary or appropriate (i) to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g), and (ii) if unanticipated events (for example, the acquisition by the Company of oil or gas properties) might otherwise cause this Agreement not to comply with Treasury Regulations Section 1.704-1(b).

(g)     The provisions of the proposed Treasury Regulations published on January 22, 2003 (68 Fed. Reg. 2930), as they may subsequently be modified or adopted as temporary or final Treasury Regulations, shall apply with respect to any noncompensatory options issued by the Company.

A.4     Allocations of Net Profit and Net Loss

A.4.1  In General. Subject to Section 3.6, Company Net Profit and Net Loss shall be allocated to the Members as follows:

(a)     Net Profit. Net Profit for any period (excluding tax items allocated pursuant to Sections A.4.2 and A.4.3) shall be allocated as follows:

(i)     First, Net Profit shall be allocated to the Members to the extent of and in proportion to the excess, if any, of (i) the cumulative Net Loss allocated pursuant to Section A.4.1(b) for all prior periods, over (ii) the cumulative Net Profit allocated pursuant to this Section A4.1(a) for all prior periods.

(ii)    Second, any remaining Net Profit shall be allocated to the Members pro rata in accordance with their respective Percentage Interests.

(b)     Net Loss. Net Loss for any period (excluding tax items allocated pursuant to Sections A.4.2 and A.4.3) shall be allocated as follows:

(i)     Net Loss shall be allocated to the Members pro rata in accordance with their respective Percentage Interests, subject to the limitation in Section A.4.1(b)(ii).

MR.382

(ii)     No Member may receive an allocation of Net Loss that would cause the Member to have an Adjusted Capital Account Deficit at the end of the taxable year. Net Loss not allocated to a Member pursuant to this subparagraph (ii) shall be allocated to other Members according to their relative positive Capital Account balances (calculated taking into account the adjustments described in the definition of Adjusted Capital Account Deficit).

A.4.2   Regulatory Allocations.  The following special allocations shall be applied in the order in which they are listed.  Such ordering is intended to comply with the ordering rules in Treasury Regulations Section 1.704-2(j) and shall be applied consistently therewith.

(a)     Minimum Gain Chargeback.   Except as otherwise provided in Treasury Regulations Section 1.704-2(f), notwithstanding anything to the contrary in this Section A.4, if there is a net decrease in Partnership Minimum Gain during any taxable year, each Member shall be allocated items of income and gain for that taxable year (and, if necessary, subsequent taxable years) equal to that Member's share of the net decrease in Partnership Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g)(2).   This Section A.4.2(a) is intended to comply with the minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith, including that no chargeback shall be required to the extent the requirements for requesting a waiver described in Treasury Regulations Section 1.704-2(f)(4) are met or the requirements for any other exception prescribed by or pursuant to Treasury Regulations Section 1.704-2(f) are met.

(b)     Partner Nonrecourse Debt Minimum Gain Chargeback.   Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), notwithstanding anything to the contrary in this Section, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain during a taxable year, then, in addition to the amounts, if any, allocated pursuant to paragraph 4.2(a), any Member with a share of that Partner Nonrecourse Debt Minimum Gain (determined in accordance with Treasury Regulations Section 1.704-2(i)(5)) as of the beginning of the taxable year shall be allocated items of Company income and gain for that taxable year (and, if necessary, for subsequent taxable years) equal to that Member's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(i)(4).   This Section A.4.2(b) is intended to comply with the chargeback of partner nonrecourse debt minimum gain required by Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith, including that no chargeback shall be required to the extent the requirements for any exceptions provided in Treasury Regulation Section 1.704-2(i)(4) are met.

(c)     Qualified Income Offset.  If any Member unexpectedly receives any adjustment, allocation, or distribution described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5), or (6), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible.  An allocation pursuant to the foregoing sentence shall be made only to the extent that such Member would

1150848v2 2/12/2014

MR.383

have an Adjusted Capital Account Deficit after all other allocations provided for in Section A.4 have been tentatively made as if this Section A.4.2(c) were not in this Appendix. This allocation is intended to constitute a "qualified income offset" within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(3) and shall be construed in accordance with the requirements thereof.

(d)     Gross Income Allocation.  In the event a Member has an Adjusted Capital Account Deficit at the end of any taxable year, each such Member shall be specially allocated items of Company income and gain in the amount of such Adjusted Capital Account Deficit as quickly as possible; provided that an allocation pursuant to this clause shall be made only if and to the extent that the Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section A.4 have been made as if this Section A.4.2(d) were not in this Appendix.

(e)     Nonrecourse Deductions.  Nonrecourse Deductions for any taxable year shall be allocated among the Members in accordance with their Percentage Interests.

(f)     Partner Nonrecourse Deductions.  Partner Nonrecourse Deductions for any taxable year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i)(1).

(g)     Basis Adjustments.  To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to I.R.C. Section 734(b) or I.R.C. Section 743(b) is required under Treasury Regulations Section 1.704-1(b)(2)(iv)(m) to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Treasury Regulations.

A.4.3  Curative Allocations.  The allocations set forth in Section A.4.2 hereof (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations. The Members intend that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section A.4.3.  Therefore, notwithstanding any other provisions of this Section A.4 (other than the Regulatory Allocations), the Managers shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner the Managers determine appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section A.4.1.  In exercising their discretion under this Section A.4.3, the Managers shall take into account future Regulatory Allocations under Sections A.4.2(a) and A.4.2(b) that, although not yet made, are

1150848v2 2/12/2014

MR.384

likely to offset other Regulatory Allocations previously made under Sections A.4.2(e) and A.4.2(f).

A.4.4 Other Allocation Rules

(a) Net Profit, Net Loss, and other items shall be allocated to the Members pursuant to this Appendix A as of the last day of each taxable year, and at such times as the Gross Asset Values of Company Property are adjusted pursuant to subparagraph (ii) of the definition of Gross Asset Value.

(b) If during any taxable year any Member's Percentage Interest changes, each Member's share of Net Profit, Net Loss, and other items for such taxable year shall be determined according to their varying interests and I.R.C. Section 706(d), using any conventions permitted by law and selected by the Managers.

(c) All allocations pursuant to this Appendix shall, except as otherwise provided in this Agreement, be divided among the Members in proportion to the Percentage Interests held by each.

(d) For purposes of determining a Member's share of Company "excess nonrecourse liabilities" within the meaning of Treasury Regulations Section 1.752-3(a)(3), the Members' shares of Company profits shall be deemed to be in proportion to their respective Percentage Interests.

(e) To the extent permitted by Treasury Regulations Section 1.704-2(h)(3), the Managers may treat any distribution of the proceeds of a Nonrecourse Liability or a Partner Nonrecourse Debt (that would otherwise be allocable to an increase in Partnership Minimum Gain) as a distribution that is not allocable to an increase in Partnership Minimum Gain to the extent the distribution does not cause or increase an Adjusted Capital Account Deficit for any Member.

A.5 Tax Allocations

(a) In General. Except as otherwise provided in this Section A.5, each item of income, gain, loss, and deduction of the Company for federal income tax purposes shall be allocated among the Members in the same manner as such items are allocated for book purposes under the Agreement and this Appendix.

(b) Contributed or Revalued Property. In accordance with I.R.C. Section 704(c) and the related Treasury Regulations, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Gross Asset Value. If the Gross Asset Value of any Company asset is adjusted pursuant to subparagraph (ii) of the definition of Gross Asset Value in Section A.2 hereof, subsequent allocations of income, gain, loss, and deductions

1150848v2 2/12/2014

MR.385

with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under I.R.C. Section 704(c) and the related Treasury Regulations. Any elections or other decisions relating to allocations pursuant to this Section A.5 shall be made by the Managers in any manner that reasonably reflects the purpose and intention of this Appendix and the Agreement.

(c)     Credits. Except as otherwise required by Treasury Regulations Section 1.704-1(b)(4)(ii), items of tax credit and tax credit recapture shall be allocated among the Members in accordance with their Percentage Interests.

(d)     Effect of Tax Allocations. Allocations pursuant to this Section are solely for purposes of U.S. federal, state, and local taxes and shall not affect any Member's Capital Account or share of Net Profit, Net Loss, or other items or distributions pursuant to any provision of this Appendix and the Agreement.

1150848v2 2/12/2011

MR.386

# EXHIBIT B

MR.387



August 22, 2017

CHASE J. POTTER
Direct Phone: 214.651.2026
Direct Fax: 214.659.4145
chase.potter@strasburger.com

**Via Email Only: bkn@snlegal.com**

Brian K. Norman
Shamoun & Norman, LLP
1800 Valley View Lane, Suite 200
Farmers Branch, Texas 75234

RE:    Cause No. DC-16-07706; *Centurion Logistics LLC, individually and derivatively on behalf of Centurion Pecos Terminal LLC v. James Ballengee, et al.* in the 44th Judicial District Court of Dallas County (the "Lawsuit").

Dear Mr. Norman:

As you know, we represent John Calce in the Lawsuit. Mr. Calce has been named as a defendant in the Lawsuit by Centurion Logistics LLC ("Centurion Logistics"). Mr. Calce is a manager of Centurion Logistics and, therefore, is entitled to indemnification from Centurion Logistics pursuant to Section 6.2 of the Company Agreement of Centurion Logistics (the "Agreement"). A true and correct copy of the Agreement is attached hereto as Exhibit A.

The Agreement specifically provides that Centurion Logistics "indemnifies and holds harmless each Indemnified Person from and against any Damages arising from any Proceeding relating to the conduct of [Centurion Logistics'] business or to any act or omission by such Indemnified Person within the scope of the Indemnified Person's authority in the course of [Centurion Logistics'] business . . . ." *See* Ex. A § 6.2. The Agreement further provides that "[a]n Indemnified Person's expenses paid or incurred in defending itself against any Proceeding shall be reimbursed as paid or incurred." *See id.*

Mr. Calce is an Indemnified Person under the Agreement. *See* Ex. A § 1.1. Moreover, the Lawsuit constitutes a Proceeding under the Agreement. *See id.* Centurion Logistics is therefore required to reimburse Mr. Calce the expenses he pays or incurs in defending himself in the Lawsuit, including attorneys' fees, as such expenses are paid or incurred.

As of July 31, 2017, Mr. Calce had been billed a total of $114,440.99 in expenses related to his defense of the Lawsuit. Mr. Calce hereby demands that, on or before August 28, 2017, Centurion Logistics (1) reimburse him the full amount of expenses that he has been invoiced ($114,440.99) plus an additional $50,000 that will be applied to future expenses as they are incurred; and (2) agree to reimburse Mr. Calce the additional expenses, in excess of the

9253092.2/SP/38371/0105/082217

**Strasburger & Price, LLP**

901 Main Street, Suite 4400  |  Dallas, Texas 75202.3794  |  214.651.4300 tel  |  214.651.4330 fax  |  www.strasburger.com
Austin  |  Collin County  |  Dallas  |  Houston  |  San Antonio  |  New York, N.Y.  |  Washington, D.C.  |  Mexico City - Strasburger & Price, SC

MR.388



additional $50,000 referenced above, that he pays or incurs in his defense of the Lawsuit as such expenses are paid or incurred.

Pursuant to Section 6.3 of the Agreement, Mr. Calce hereby affirms that it is his good faith belief that he has met the standard of conduct necessary for indemnification under Section 6.3. Mr. Calce further agrees to repay any amount that is paid or reimbursed by Centurion Logistics, pursuant to Section 6.2, if it is determined by a court of competent jurisdiction that Mr. Calce did not meet the aforementioned standard or if indemnification is otherwise determined to be prohibited by law.

If you would like to discuss this matter further, please do not hesitate to contact me.

Sincerely,

Chase J. Potter

9253092.2/SP/38371/0105/082217

MR.389

# EXHIBIT C

MR.390



GREGORY SHAMOUN
g@snlegal.com

Member of the State Bar of
Texas | New York

September 5, 2017

**VIA ELECTRONIC MAIL (DAVID.KITNER@STRASBURGER.COM):**
David N. Kitner
STRASBURGER & PRICE, LLP
901 Main Street, Suite 6000
Dallas, Texas 75202
Tel. (214) 651-4618
Fax. (214) 659-4079

Re:     John Calce's Request for Indemnification for claims related to Cause No. DC-16-07706; *Centuirion Logistics LLC, individually and derivatively on behalf of Centruion Pecos Terminal LLC v. James Ballengee, et al.* in the 44th Judicial District Court of Dallas County (the "Litigation") from Centurion Logistics pursuant to the Company Agreement of Centurion Logsitics (the "Company Agreement").

Dear Mr. Kitner:

Centurion Logistics, LLC ("Centurion Logistics") is in receipt of your August 22, 2017 correspondence (the "Indemnification Request"), sent on behalf of John Calce ("Calce") claiming that Mr. Calce is entitled to indemnification from Centurion Logistics based on his status as a manager of Centurion Logistics pursuant to Section 6.2 of the Company Agreement.

Although the Company Agreement grants Calce indemnification for "any act or omission . . . . within the scope of [his] authority in the course of the Company's business. . ."[1] the Company does not indemnify Calce from any act or omission that is not within the scope of his authority or in the course of the Company's business. Moreover, the Company Agreement specifically excludes "intentional misconduct, or a knowing violation of law" from the scope of Centurion Logistics' indemnification obligations.[2]

In the present case, as stated in *Plaintiff's Original Petition*, (the "Petition"), the active pleading on file in the Litigation, Centurion Logistics alleges that Calce signed a deed of trust in his capacity as manager of Centurion Pecos to secure a promissory note for Ballenge Interests, LLC and later signed an extension of that same note as a manager of Centurion Pecos.[3] Obviously, Calce was neither acting nor purporting to act "within the scope of [his] authority in course of the Company's business," and was engaging in "intentional misconduct" and "knowing

---

[1] Company Agreement Section 6.2
[2] Company Agreement Section 6.3(a)(1).
[3] Petition ¶¶25-26.

violation of law."[4] Accordingly, Centurion Logistics must deny Calce's indemnification request as to liability arising from this conduct.

The Petition also alleges that Calce, along with Stampede, "purported to obligate Centurion Pecos to assume Ballengee Interests' obligations under the notes from Ballengee Interessts to TCB . . ."[5] Calce was neither acting nor purporting to act "within the scope of [his] authority in course of the Company's business,"[6] and was engaging in "intentional misconduct" and "knowing violation of law."[7] Accordingly, Centurion Logistics must deny Calce's indemnification request as to liability arising from this conduct.

Further, the Petition alleges that "Calce created a note . . . purporting to obligate Centurion Pecos to make payments to Centrion Terminals."[8] As before, Calce was neither acting nor purporting to act "within the scope of [his] authority in course of the Company's business,"[9] and was engaged in "intentional misconduct" and a "knowing violation of law."[10] Accordingly, Centurion Logistics must deny Calce's indemnification request as to liability arising from this conduct.

Finally, the Petition alleges that Calce, along with Ballengee Interests, "created fraudulent notes by Centurrion Pecos to Ballengee Interests . . ."[11] As before, Calce was neither acting nor purporting to act "within the scope of [his] authority in course of the Company's business,"[12] and was engaging in "intentional misconduct" and "knowing violation of law."[13] Accordingly, Centurion Logistics must deny Calce's indemnification request as to liability arising from this conduct.

Your contentions that Mr. Calce is an "Indemnified Person"[14] and that the referenced Litigation is a "Proceeding"[15] under the Company Agreement are not contested by Centurion Logistics. However, the claims and factual allegations raised in the Litigation are unrelated to Calce's conduct as a manager of Centurion Logistics. Centurion Logistics' claims for breach of fiduciary duty and aiding and abetting fraudulent concealment are based upon intentional misconduct and knowing violations of law by Calce, where he was purporting to act with the authority of Centurion Pecos. Accordingly, Centurion Logistics must deny Calce's indemnification request as to liability arising from this conduct.

---

[4] Company Agreement Section 6.3(a)(1).
[5] Petition ¶ 27.
[6] Company Agreement Section 6.2.
[7] Company Agreement Section 6.3(a)(1).
[8] Petition ¶ 28.
[9] Company Agreement Section 6.2.
[10] Company Agreement Section 6.3(a)(1).
[11] Petition ¶ 29.
[12] Company Agreement Section 6.2.
[13] Company Agreement Section 6.3(a)(1).
[14] Company Agreement Section 1.1.
[15] Company Agreement Section 1.1.

SHAMOUN & NORMAN, LLP
1800 Valley View Lane, Suite 200 | Farmers Branch, TX 75234
Phone 214.987.1745 | Fax 214.521.9033 | www.snlegal.com

MR.392

For the reasons set forth above, we believe that your request for indemnification from Centurion Logistics on behalf of Calce is improper, and that no indemnification is owed to Calce pursuant to the terms of the Company Agreement.

If you have any questions regarding this letter, please telephone me at (214) 987-1745.

Sincerely,

*/s/ C. Gregory Shamoun*
C. GREGORY SHAMOUN

MR.393

CAUSE NO. DC-16-07706

| | | |
|---|---|---|
| CENTURION LOGISTICS LLC, | § | IN THE DISTRICT COURT OF |
| individually and derivatively on behalf of | § | |
| CENTURION PECOS TERMINAL LLC, | § | |
| a Texas Limited Liability Company, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| JAMES BALLENGEE, BALLENGEE | § | |
| INTERESTS, LLC, JOHN CALCE, | § | DALLAS COUNTY, TEXAS |
| STAMPEDE TX ENERGY, LLC, | § | |
| CENTURION MIDSTREAM GROUP, | § | |
| LLC, CENTURION TERMINALS, LLC | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and CENTURION PECOS TERMINAL | § | |
| LLC, a Texas Limited Liability Company | § | |
| | § | |
| Nominal Defendant. | § | 44th JUDICIAL DISTRICT |

**JOHN CALCE'S SUPPLEMENTAL EVIDENCE IN SUPPORT OF CALCE'S
AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING
<u>COUNTERCLAIM AGAINST CENTURION LOGISTICS LLC</u>**

TO THE HONORABLE COURT:

Pursuant to Rule 166a(c)-(d) of the Texas Rules of Civil Procedure, Defendant/Counter-

Plaintiff John Calce ("Calce") files the Declaration of Chase J. Potter (the "Declaration"), which

is attached hereto as Exhibit 1. Calce hereby provides notice to all parties of his intention to rely

on the Declaration as summary judgment evidence in support of his Amended Motion for Partial

Summary Judgment against Centurion Logistics LLC.

MR.394

The Declaration is being filed and served at least twenty-one (21) days before the hearing on Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim against Centurion Logistics LLC and, therefore, is timely.

Respectfully submitted,

/s/ David N. Kitner
**DAVID N. KITNER**
State Bar No. 11541500
david.kitner@strasburger.com
**CHASE J. POTTER**
State Bar No. 24088245
chase.potter@strasburger.com
**STRASBURGER & PRICE, LLP**
901 Main Street, Suite 6000
Dallas, TX 75202-3794
(214) 651-4300
(214) 651-4330 Fax

**ATTORNEYS FOR JOHN CALCE, CENTURION MIDSTREAM GROUP, LLC, CENTURION TERMINALS, LLC, AND STAMPEDE TX ENERGY, LLC**

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that on the 24th day of November, 2017, a true and correct copy of the foregoing was forwarded to all known counsel in compliance with the Texas Rules of Civil Procedure.

/s/ Chase J. Potter
Chase J. Potter

**JOHN CALCE'S SUPPLEMENTAL EVIDENCE IN SUPPORT OF CALCE'S AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING COUNTERCLAIM AGAINST CENTURION LOGISTICS LLC**
9519157.1/SP/40086/0102/112417
**PAGE 2**

MR.395

# EXHIBIT 1

MR.396

| | | |
|---|---|---|
| CENTURION LOGISTICS LLC, | § | IN THE DISTRICT COURT OF |
| individually and derivatively on behalf of | § | |
| CENTURION PECOS TERMINAL LLC, | § | |
| a Texas Limited Liability Company, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| JAMES BALLENGEE, BALLENGEE | § | |
| INTERESTS, LLC, JOHN CALCE, | § | DALLAS COUNTY, TEXAS |
| STAMPEDE TX ENERGY, LLC, | § | |
| CENTURION MIDSTREAM GROUP, | § | |
| LLC, CENTURION TERMINALS, LLC | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and CENTURION PECOS TERMINAL | § | |
| LLC, a Texas Limited Liability Company | § | |
| | § | |
| Nominal Defendant. | § | 44th JUDICIAL DISTRICT |

## <u>DECLARATION OF CHASE J. POTTER</u>

1.      My name is Chase J. Potter.  I have personal knowledge of every statement made herein, and they are all true and correct.  I am over twenty-one (21) years of age and have never been convicted of a felony and am able to make this Declaration in support of Defendant/Counter-Plaintiff John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim against Centurion Logistics LLC (the "Motion").

2.      I am an associate attorney with the law firm Strasburger & Price, LLP and one of the attorneys who has been retained to represent Defendant/Counter-Plaintiff John Calce ("Calce") in the above-entitled action.  On November 22, 2017, acting on behalf of Calce, I caused the Motion to be filed in the above-entitled action.

MR.397

3. Attached to the Motion as Exhibit B is a true and correct copy of the letter, which is dated August 22, 2017, that was sent by the undersigned on behalf of Calce to Centurion Logistics LLC ("Centurion Logistics"), through its counsel, requesting reimbursement/advancement of (1) the expenses Calce had paid or incurred in defending himself in this lawsuit (plus an additional $50,000 to be applied to future expenses as they are incurred); and (2) any additional expenses he pays or incurs in his defense of this lawsuit as such expenses are paid or incurred pursuant to the Company Agreement of Centurion Logistics (the "Reimbursement Request"). A true and correct copy of the Reimbursement Request is also attached hereto as Exhibit 1-A.

4. Attached to the Motion as Exhibit C is a true and correct copy of the letter dated September 5, 2017, that was sent by counsel for Centurion Logistics to counsel for Calce denying Calce's request for reimbursement of his defense costs (the "Reimbursement Denial"). A true and correct copy of the Reimbursement Denial is also attached hereto as Exhibit 1-B.

My date of birth is May 12, 1986. My business address is 901 Main Street, Suite 6000, Dallas, Texas 75202. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Tarrant County, State of Texas, on November 24, 2017.

_____
Chase J. Potter

# EXHIBIT 1-A

MR.399



August 22, 2017

CHASE J. POTTER
Direct Phone: 214.651.2026
Direct Fax: 214.659.4145
chase.potter@strasburger.com

**Via Email Only: bkn@snlegal.com**

Brian K. Norman
Shamoun & Norman, LLP
1800 Valley View Lane, Suite 200
Farmers Branch, Texas 75234

RE:    Cause No. DC-16-07706; *Centurion Logistics LLC, individually and derivatively on behalf of Centurion Pecos Terminal LLC v. James Ballengee, et al.* in the 44th Judicial District Court of Dallas County (the "Lawsuit").

Dear Mr. Norman:

As you know, we represent John Calce in the Lawsuit. Mr. Calce has been named as a defendant in the Lawsuit by Centurion Logistics LLC ("Centurion Logistics"). Mr. Calce is a manager of Centurion Logistics and, therefore, is entitled to indemnification from Centurion Logistics pursuant to Section 6.2 of the Company Agreement of Centurion Logistics (the "Agreement"). A true and correct copy of the Agreement is attached hereto as Exhibit A.

The Agreement specifically provides that Centurion Logistics "indemnifies and holds harmless each Indemnified Person from and against any Damages arising from any Proceeding relating to the conduct of [Centurion Logistics'] business or to any act or omission by such Indemnified Person within the scope of the Indemnified Person's authority in the course of [Centurion Logistics'] business . . . ." *See* Ex. A § 6.2. The Agreement further provides that "[a]n Indemnified Person's expenses paid or incurred in defending itself against any Proceeding shall be reimbursed as paid or incurred." *See id.*

Mr. Calce is an Indemnified Person under the Agreement. *See* Ex. A § 1.1. Moreover, the Lawsuit constitutes a Proceeding under the Agreement. *See id.* Centurion Logistics is therefore required to reimburse Mr. Calce the expenses he pays or incurs in defending himself in the Lawsuit, including attorneys' fees, as such expenses are paid or incurred.

As of July 31, 2017, Mr. Calce had been billed a total of $114,440.99 in expenses related to his defense of the Lawsuit. Mr. Calce hereby demands that, on or before August 28, 2017, Centurion Logistics (1) reimburse him the full amount of expenses that he has been invoiced ($114,440.99) plus an additional $50,000 that will be applied to future expenses as they are incurred; and (2) agree to reimburse Mr. Calce the additional expenses, in excess of the

9253092.2/SP/38371/0105/082217

**Strasburger & Price, LLP**

901 Main Street, Suite 4400 | Dallas, Texas 75202.3794 | 214.651.4300 tel | 214.651.4330 fax | www.strasburger.com
Austin | Collin County | Dallas | Houston | San Antonio | New York, N.Y. | Washington, D.C. | Mexico City - Strasburger & Price, SC

MR.400



additional $50,000 referenced above, that he pays or incurs in his defense of the Lawsuit as such expenses are paid or incurred.

Pursuant to Section 6.3 of the Agreement, Mr. Calce hereby affirms that it is his good faith belief that he has met the standard of conduct necessary for indemnification under Section 6.3. Mr. Calce further agrees to repay any amount that is paid or reimbursed by Centurion Logistics, pursuant to Section 6.2, if it is determined by a court of competent jurisdiction that Mr. Calce did not meet the aforementioned standard or if indemnification is otherwise determined to be prohibited by law.

If you would like to discuss this matter further, please do not hesitate to contact me.

Sincerely,

Chase J. Potter

9253092.2/SP/38371/0105/082217

# EXHIBIT 1-B

MR.402



GREGORY SHAMOUN
g@snlegal.com

Member of the State Bar of
Texas | New York

September 5, 2017

**VIA ELECTRONIC MAIL (DAVID.KITNER@STRASBURGER.COM):**
David N. Kitner
STRASBURGER & PRICE, LLP
901 Main Street, Suite 6000
Dallas, Texas 75202
Tel. (214) 651-4618
Fax. (214) 659-4079

> Re:    John Calce's Request for Indemnification for claims related to Cause No. DC-16-07706; *Centuirion Logistics LLC, individually and derivatively on behalf of Centruion Pecos Terminal LLC v. James Ballengee, et al.* in the 44th Judicial District Court of Dallas County (the "Litigation") from Centurion Logistics pursuant to the Company Agreement of Centurion Logsitics (the "Company Agreement").

Dear Mr. Kitner:

Centurion Logistics, LLC ("Centurion Logistics") is in receipt of your August 22, 2017 correspondence (the "Indemnification Request"), sent on behalf of John Calce ("Calce") claiming that Mr. Calce is entitled to indemnification from Centurion Logistics based on his status as a manager of Centurion Logistics pursuant to Section 6.2 of the Company Agreement.

Although the Company Agreement grants Calce indemnification for "any act or omission . . . . within the scope of [his] authority in the course of the Company's business. . ."[1] the Company does not indemnify Calce from any act or omission that is not within the scope of his authority or in the course of the Company's business. Moreover, the Company Agreement specifically excludes "intentional misconduct, or a knowing violation of law" from the scope of Centurion Logistics' indemnification obligations.[2]

In the present case, as stated in *Plaintiff's Original Petition*, (the "Petition"), the active pleading on file in the Litigation, Centurion Logistics alleges that Calce signed a deed of trust in his capacity as manager of Centurion Pecos to secure a promissory note for Ballenge Interests, LLC and later signed an extension of that same note as a manager of Centurion Pecos.[3] Obviously, Calce was neither acting nor purporting to act "within the scope of [his] authority in course of the Company's business," and was engaging in "intentional misconduct" and "knowing

---

[1] Company Agreement Section 6.2
[2] Company Agreement Section 6.3(a)(1).
[3] Petition ¶¶25-26.

violation of law."[4] Accordingly, Centurion Logistics must deny Calce's indemnification request as to liability arising from this conduct.

The Petition also alleges that Calce, along with Stampede, "purported to obligate Centurion Pecos to assume Ballengee Interests' obligations under the notes from Ballengee Interessts to TCB . . ."[5] Calce was neither acting nor purporting to act "within the scope of [his] authority in course of the Company's business,"[6] and was engaging in "intentional misconduct" and "knowing violation of law."[7] Accordingly, Centurion Logistics must deny Calce's indemnification request as to liability arising from this conduct.

Further, the Petition alleges that "Calce created a note . . . purporting to obligate Centurion Pecos to make payments to Centrion Terminals."[8] As before, Calce was neither acting nor purporting to act "within the scope of [his] authority in course of the Company's business,"[9] and was engaged in "intentional misconduct" and a "knowing violation of law."[10] Accordingly, Centurion Logistics must deny Calce's indemnification request as to liability arising from this conduct.

Finally, the Petition alleges that Calce, along with Ballengee Interests, "created fraudulent notes by Centurrion Pecos to Ballengee Interests . . ."[11] As before, Calce was neither acting nor purporting to act "within the scope of [his] authority in course of the Company's business,"[12] and was engaging in "intentional misconduct" and "knowing violation of law."[13] Accordingly, Centurion Logistics must deny Calce's indemnification request as to liability arising from this conduct.

Your contentions that Mr. Calce is an "Indemnified Person"[14] and that the referenced Litigation is a "Proceeding"[15] under the Company Agreement are not contested by Centurion Logistics. However, the claims and factual allegations raised in the Litigation are unrelated to Calce's conduct as a manager of Centurion Logistics. Centurion Logistics' claims for breach of fiduciary duty and aiding and abetting fraudulent concealment are based upon intentional misconduct and knowing violations of law by Calce, where he was purporting to act with the authority of Centurion Pecos. Accordingly, Centurion Logistics must deny Calce's indemnification request as to liability arising from this conduct.

---

[4] Company Agreement Section 6.3(a)(1).
[5] Petition ¶ 27.
[6] Company Agreement Section 6.2.
[7] Company Agreement Section 6.3(a)(1).
[8] Petition ¶ 28.
[9] Company Agreement Section 6.2.
[10] Company Agreement Section 6.3(a)(1).
[11] Petition ¶ 29.
[12] Company Agreement Section 6.2.
[13] Company Agreement Section 6.3(a)(1).
[14] Company Agreement Section 1.1.
[15] Company Agreement Section 1.1.

SHAMOUN & NORMAN, LLP
1800 Valley View Lane, Suite 200 | Farmers Branch, TX 75234
Phone 214.987.1745 | Fax 214.521.9033 | www.snlegal.com

MR.404

For the reasons set forth above, we believe that your request for indemnification from Centurion Logistics on behalf of Calce is improper, and that no indemnification is owed to Calce pursuant to the terms of the Company Agreement.

If you have any questions regarding this letter, please telephone me at (214) 987-1745.

Sincerely,

*/s/ C. Gregory Shamoun*
C. GREGORY SHAMOUN

SHAMOUN & NORMAN, LLP
1800 Valley View Lane, Suite 200 | Farmers Branch, TX 75234
Phone 214.987.1745 | Fax 214.521.9033 | www.snlegal.com

MR.405

CAUSE NO. DC-16-07706

| | | |
|---|---|---|
| CENTURION LOGISTICS LLC,<br>individually and derivatively on behalf of<br>CENTURION PECOS TERMINAL LLC,<br>a Texas limited liability company, | §<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT OF |
| **Plaintiff,** | §<br>§ | |
| vs. | §<br>§ | DALLAS COUNTY, TEXAS |
| JAMES BALLENGEE, BALLENGEE<br>INTERESTS, LLC; JOHN CALCE;<br>CHRIS A. MOTT; TOM RAMSEY;<br>STAMPEDE TX ENERGY, LLC,<br>CENTURION MIDSTREAM GROUP LLC;<br>CENTURION TERMINALS, LLC;<br>CENTURION BROWNSVILLE<br>TERMINAL, LLC; JAMES HOCK;<br>JUPITERMLP, LLC | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |
| **Defendants,** | §<br>§ | B-44th JUDICIAL DISTRICT |
| and CENTURION PECOS TERMINAL<br>LLC, a Texas limited liability company | §<br>§<br>§ | |
| **Nominal Defendant.** | §<br>§ | |

### PLAINTIFF'S RESPONSE TO JOHN CALCE'S
### AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT
### REGARDING COUNTERCLAIM AGAINST CENTURION LOGISTICS LLC

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW plaintiff Centurion Logistics LLC ("Centurion Logistics" or "Plaintiff")

individually and derivatively on behalf of Centurion Pecos Terminal LLC ("Centurion Pecos"),

and pursuant to Rule 166(c) of the TEXAS RULES OF CIVIL PROCEDURE (the "TRCP"), files this

*Plaintiff's Response to John Calce's Amended Motion for Partial Summary Judgment Regarding*

*Counterclaim Against Centurion Logistics LLC* (the "Response"), in response to *John Calce's*

*Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion*

*Plaintiff's Response to John Calce's Amended Motion for Partial*
*Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*    Page 1 of 39

MR.406

*Logistics LLC* (the "Amended Motion") filed by defendant John Calce ("Calce" or "Defendant") on November 22, 2017. In support thereof, Plaintiff would respectfully show the Court as follows:

## I.
### CALCE'S REQUEST FOR INDEMNIFICATION & REIMBURSEMENT

1.      On June 27, 2016, Plaintiff Centurion Logistics filed *Plaintiff's Original Petition* (the "Petition") individually and derivatively on behalf of Centurion Pecos against James Ballengee ("Ballengee"), Ballengee Interests, LLC ("Ballengee Interests"), John Calce ("Calce"), Stampede TX Energy, LLC ("Stampede"), Centurion Midstream Group, LLC ("Centurion Midstream"), and Centurion Terminals, LLC ("Centurion Terminals") alleging causes of action for breach fiduciary duty as to Calce, breach of fiduciary duty as to Stampede, aiding and abetting breach of fiduciary duty as to Centurion Midstream and Centurion Terminals, for unjust enrichment as to Ballengee and Ballengee Interests, and for fraudulent concealment as to Calce and Stampede.

2.      On July 31, 2017, Calce filed *Defendant/Counter-Plaintiff John Calce's Original Counterclaim Against Centurion Logistics LLC and Centurion Pecos Terminal LLC* (the "Counterclaim") requesting declaratory relief regarding Calce's alleged right to indemnification from Centurion Logistics in this litigation as a result of the September 16, 2013 Company Agreement of Centurion Logistics LLC (the "Centurion Logistics Company Agreement"),[1] and requesting damages for alleged breaches of the Centurion Logistics Company Agreement by Centurion Logistics.

---

[1] A true and correct copy of the Centurion Logistics Company Agreement is attached hereto as <u>Exhibit "D"</u>.

*Plaintiff's Response to John Calce's Amended Motion for Partial*
*Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*      Page 2 of 39

MR.407

3.      On August 22, 2017, Centurion Logistics individually and derivatively on behalf of Centurion Pecos filed *Plaintiff's Original Answer and General Denial of Defendant/Counter-Plaintiff John Calce's Original Counterclaim Against Centurion Logistics LLC and Centurion Pecos Terminal* (the "Counterclaim Denial") which denied Calce's Counterclaim and raised the affirmative defenses of waiver, ratification, release, and estoppel.

4.      On the same day, Calce issued a written demand for indemnification and reimbursement to Centurion Logistics in defense of the claims raised against him in this litigation (the "Indemnification Demand").[2] Both the Indemnification Demand and the Counterclaim specifically identify Section 6.2 of the Centurion Logistics Company Agreement as the basis for Calce's indemnification claim. Section 6.2 of the Centurion Logistics Company Agreement provides:

> [Centurion Logistics] **indemnifies and holds harmless** each Indemnified Person from and against any Damages arising from any Proceeding **relating to the conduct of the Company's business or to any act** or omission by such Indemnified Person **within the scope of the Indemnified Person's authority in the course of the Company's business** or for any misconduct or negligence on the part of any other person that is an employee or agent of the Company . . ." (emphasis added).

5.      On September 5, 2017, Centurion Logistics responded to Calce's Indemnification Demand and denied that Centurion Logistics had a duty to indemnify Calce based on the factual allegations raised in this litigation (the "Indemnification Response").[3] In denying Calce's Indemnification Demand, the Indemnification Response highlights specific acts where Calce purported to act on behalf of Centurion Pecos and not within his capacity as Manager of Centurion Logistics,[4] and which constituted intentional misconduct and a knowing violation of

---

[2] A true and correct copy of the Indemnification Demand is attached hereto as <u>Exhibit "E"</u>.
[3] A true and correct copy of the Indemnification Response is attached hereto as <u>Exhibit "F"</u>.
[4] *See*, Petition ¶¶ 27-29.

*Plaintiff's Response to John Calce's Amended Motion for Partial*
*Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*      Page 3 of 39

MR.408

law, both of which are specifically excluded from indemnification by Section 6.3 of the Centurion Logistics Company Agreement.

6. On October 6, 2017, Calce filed *John Calce's Motion for Partial Summary Judgment Regarding Indemnification Claim Against Centurion Logistics LLC* (the "Motion") which requested declaratory relief from the Court that Calce was owed indemnification pursuant to the Centurion Logistics Company Agreement.

7. On November 8, 2017, Plaintiff filed *Plaintiff's First Amended Petition* (the "Amended Petition") (collectively with the Petition, the "Pleadings"), adding Chris Mott ("Mott"), Tom Ramsey ("Ramsey"), James Hock ("Hock"), Vispi Jilla ("Vispi"), and Jupiter MLP, LLC ("Jupiter") (collectively, with the parties identified as Defendants in the Petition, "Defendants") as additional parties, and adding additional causes of action for tortious interference, fraudulent inducement, promissory estoppel, fraudulent transfer, and a claim under the Texas Theft Liability Act.

8. On November 22, 2017, Calce filed *Defendant/Counter-Plaintiff John Calce's First Amended Counterclaim Against Centurion Logistics LLC and Centurion Pecos Terminal LLC* (the "Amended Counterclaim"), and the Amended Motion. The Amended Counterclaim is identical to the Counterclaim in most respects; however, the Amended Counterclaim now emphasizes Calce's request for reimbursement of expenses, in addition to his request for indemnification. In the Amended Motion, however, Calce has dropped his request for declaratory relief that Centurion Logistics owes him indemnification, and now states that "[t]his Motion only addresses Calce's right to advancement/reimbursement of defense costs—not his right to indemnification—as a matter of law—from Centurion Logistics at this point in the

*Plaintiff's Response to John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*     Page 4 of 39

MR.409

litigation."[5] Calce's Amended Motion now advances an argument for advancement or reimbursement based almost exclusively on the inapplicable findings of *In re Aguilar*, 344 S.W.3d 41 (Tex.App.—El Paso 2011); a case which relies upon a legal theory from a foreign jurisdiction. Neither the Amended Counterclaim nor the Amended Motion introduces any new evidence in support of the Amended Motion.[6]

9.    On December 8, 2017, Plaintiff filed *Plaintiff's First Amended Answer and General Denial of Defendant/Counter-Plaintiff John Calce's First Amended Counterclaim Against Centurion Logistics LLC and Centurion Pecos Terminal LLC* (the "Amended Counterclaim Response"), along with this Response.

## II.
### EXECUTIVE SUMMARY

10.    Calce's Amended Motion is no more than an attempt to shut down the present litigation, deprive the court of its authority to decide this case on the merits, and turn this dispute into a contest as to which party has the larger bank account. The Court should deny Calce's Amended Motion and rule in favor of Plaintiff for the following reasons:

- In order to be eligible for any reimbursement of expenses from Centurion Logistics, Calce must have been performing the work of Centurion Logistics, as alleged in the Pleadings. Plaintiff's First Amended Petition alleges conduct by Calce that was not even remotely related to the work of Centurion Logistics. *See*, Section V.A(ii)(a) of this Response.

- Calce participated in and succeeded in a plan to loot Centurion Pecos of its only corporate asset, thereby rendering Centurion Logistics' ownership interest in Centurion Pecos worthless. This type of conduct does not "relate to" the business conduct of Centurion Logistics as required by Section 6.2 of the Centurion Logistics Company Agreement. *See*, Section V.A(ii)(a) of this Response.

---

[5] *See* Amended Motion pg. 6.
[6] Specifically, the scope of the Amended Motion has been narrowed and Calce "only seeks a declaration that he is entitled to advancement/reimbursement from Centurion Logistics for his past and future defense costs and a Judgment that Centurion Logistics breached the [Centurion Logistics Company Agreement] by denying his claims in the Indemnification Response." *See*, Amended Motion pg. 2, fn.2.

*Plaintiff's Response to John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*      Page 5 of 39

MR.410

- In order to be eligible for any reimbursement of expenses from Centurion Logistics, Calce must have been acting within the scope of his authority. The only authority conferred upon Calce by the Centurion Logistics Company Agreement is to seek and obtain a majority vote of other Managers of Centurion Logistics in order to prompt Centurion Logistics to act. Any other conduct is outside the scope of Section 6.2 of the Centurion Logistics Company Agreement. *See*, Section V.A.(ii)(b) of this Response.

- Calce was not authorized by Centurion Logistics to misappropriate the assets, projects, and business opportunities of Centurion Logistics and Centurion Pecos. In so doing, Calce was acting in the interest of his affiliate companies Centurion Terminals and Centurion Midstream, as well as for Ballengee and Ballengee Interests. Such conduct is not eligible for reimbursement of expenses under Section 6.2 of the Company Agreement as it is not within the scope of Calce's authority as Manager of Centurion Logistics. *See*, Section V.A(ii)(b) of this Response.

- Calce's misconduct includes his executing numerous documents purporting to act as the "Manager" of Centurion Pecos after he had been removed as the Manager of Centurion Pecos, and purporting to act as "President" of Centurion Pecos despite never being appointed as such. Such unauthorized conduct is not eligible for reimbursement of expenses under Section 6.2 of the Centurion Logistics Company Agreement. *See*, Section V.A(ii)(b) of this Response.

- Calce acted without the authority of Centurion Logistics when he executed a deed of trust to secure a $750,000.00 line of credit so that Ballengee could make payments on personal items, such as his boat and private aircraft. Instead, Calce was acting in consort with Ballengee Interests when he executed that deed of trust. Calce is not eligible for reimbursement of expenses under Section 6.2 of the Centurion Logistics Company Agreement for conduct in furtherance of the business interests of another company. *See*, Section VI.A(ii)(b) of this Response.

- The language regarding reimbursement of "expenses" in Section 6.2 of the Centurion Logistics Company Agreement is vague and ambiguous, because it does not explicitly state that attorney fees are to be reimbursed as paid or incurred, and as such, testimony by parties to that agreement stating that it was not intended to include attorney fees, creates a genuine issue of material fact as to the meaning of the reimbursement language in Section 6.2 of the Company Agreement, and as such, the Amended Motion must be denied.

## III.
### STATEMENT OF RELEVANT FACTS

11.     On September 16, 2013, Marc Marrocco ("Marrocco"), Antonio Albanese ("Albanese"), and John Calce ("Calce") formed Centurion Logistics for the purpose of entering

*Plaintiff's Response to John Calce's Amended Motion for Partial*
*Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*     Page 6 of 39

MR.411

the business of transporting and shipping crude petroleum and petroleum related products, equipment, and materials by rail.[7] Centurion Logistics is manager-managed, its Managers are Marrocco, Albanese, and Calce, and under the Company Agreement, a majority of the Managers are required to take any action.[8] Accordingly, in order to act on behalf of Centurion Logistics, Calce would need the consent of either one of his co-Managers.

12. On February 12, 2014, Marrocco identified, and placed under contract, an approximately 177-acre parcel in Reeves County, Texas ("Tract-1") to use for the development and construction of a railroad terminal.[9] Centurion Logistics, however, still lacked adequate capital to bring the railroad terminal project to fruition, and needed to bring in an equity partner who would contribute capital. To this end, John Calce identified James Ballengee ("Ballengee") to contribute cash to fund the purchase of Tract-1.

13. On September 12, 2014, Centurion Logistics partnered with CAM Oil and Natural Gas, Inc. ("CAM"),[10] a company affiliated with Ballengee, and together created Centurion Pecos.[11] John Calce was initially appointed Manager of Centurion Pecos.[12] In order to capitalize Centurion Pecos, Centurion Logistics agreed to assign the contract to purchase Tract-1 to Centurion Pecos, and CAM would contribute the cash for the purchase of Tract-1 that Ballengee had promised. However, just as the seller of Tract-1 was threatening to sell Tract-1 to another buyer, Ballengee reversed course, and then demanded that Centurion Pecos grant a deed of trust

---

[7] On July 7, 2014, Centurion Logistics entered into a memorandum of understanding with Union Pacific Railroad Company to develop new rail service to Tract-1. A true and correct copy of the Union Pacific Memorandum of Understanding is attached hereto as Exhibit "G".

[8] Accordingly, Calce is incapable of acting within the scope of his authority as a Manager of Centurion Logistics unless Marrocco or Albanese concur. *See*, Company Agreement Section 5.1(d).

[9] A true and correct copy of the Tract-1 Purchase Agreement is attached hereto as Exhibit "H".

[10] CAM was later removed as a member of Centurion Pecos, and was replaced by Stampede Energy, LLC, a predecessor to Stampede TX Energy, LLC.

[11] A true and correct copy of the Original Pecos Company Agreement is attached hereto as Exhibit "I".

[12] *See*, definition of "Manager" in Section1.1 of the Original Pecos Company Agreement.

---

*Plaintiff's Response to John Calce's Amended Motion for Partial*
*Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*     Page 7 of 39

MR.412

(the "Tract-1 DOT") to Texas Capital Bank ("TCB") so that Ballengee Interests, another company affiliated with Ballengee, could secure a loan to fund his contribution. At risk of losing out on the entire opportunity, Centurion Pecos complied with Ballengee's demand.[13]

14.     On September 15, 2014, Centurion Logistics assigned the contract to purchase Tract-1 to Centurion Pecos,[14] and on September 24, 2014, Centurion Pecos became the record owner of Tract-1.[15] Little did Marrocco and Albanese know that a scheme to steal the ideas, capital, and business from Centurion Logistics, by means of fraudulent activity and the use of corrupt insiders, was already underway. Calce had already begun to collaborate with Ballengee to divest Centurion Pecos of Tract-1 when he executed a promissory note as the purported "President" of Centurion Pecos, despite never being appointed as such, obligating Centurion Pecos to Ballengee Interests for $1.5 million.[16] Accordingly, the promised cash contribution of $1.5 million had been surreptitiously transformed into a $1.5 million liability for Centurion Pecos.

15.     On October 21, 2014, Marrocco, through his affiliate company, Marrocco Ventures, LLC ("Marrocco Ventures"), identified and placed under contract, a roughly 300-acre tract adjacent to Tract-1 ("Tract-2") (collectively with Tract-1, the "Reeves County Property").[17]

16.     In November of 2014, Centurion Logistics and Stampede entered into the First Amended and Restated Company Agreement of Centurion Pecos Terminal LLC, which effectively removed Calce as Manager of Centurion Pecos, leaving Centurion Logistics and

---

[13] A true and correct copy of the Tract-1 DOT is attached hereto as Exhibit "J".
[14] A true and correct copy of the Tract-1 Assignment is attached hereto as Exhibit "K".
[15] A true and correct copy of the Recorded Tract-1 GWD is attached hereto as Exhibit "L".
[16] A true and correct copy of the Tract-1 Note is attached hereto as Exhibit "M".
[17] A true and correct copy of the Tract-2 Purchase Agreement is attached hereto as Exhibit "N".

*Plaintiff's Response to John Calce's Amended Motion for Partial*
*Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*     Page 8 of 39

MR.413

Stampede to act as co-equal Managers.[18] From this point forward, Calce no longer had the authority to act on behalf of Centurion Pecos.[19]

17.    Despite being removed as the Manager of Centurion Pecos, Calce continued to act as though he had the authority to act on behalf of Centurion Pecos. On January 6, 2015, Calce executed a deed of trust to Tract-1 in order to secure access to a $750,000.00 line of credit for Ballengee Interests, the proceeds of which were used to fund business opportunities of Centurion Pecos that were misappropriated by Calce's other affiliated companies.[20] Neither Centurion Logistics nor Centurion Pecos authorized the deed of trust or the line of credit.

18.    In July of 2015, after obtaining Ballengee's promise to contribute cash toward the purchase of Tract-2, Marrocco assigned the Tract-2 Purchase Agreement to Centurion Pecos, however, Ballenge once again reversed course, demanding that Centurion Pecos grant a deed of trust (the "Tract-2 DOT") to TCB so that his company, Ballengee Interests, could secure a loan to fund his promised contribution. Once again, rather than losing out on the entire opportunity, Centurion Pecos complied with Ballengee's demand.[21] Tract-2 was purchased with the proceeds from the second TCB loan secured by the Tract-2 DOT and Centurion Pecos became the record owner of Tract-2 on August 26, 2015.[22] As before, Calce executed a clandestine promissory note purporting to obligate Centurion Pecos to Ballengee Interests for the Tract-2 purchase price.[23] This time, however, Calce was without any authority to act on behalf of Centurion Pecos.[24]

---

[18] A true and correct copy of the Amended Pecos Company Agreement is attached hereto as <u>Exhibit "O"</u>.
[19] *See*, definition of "Manager" in §1.1 of the Amended Pecos Company Agreement, from which John Calce's name has been removed.
[20] A true and correct copy of the Jan. 2015 DOT is attached hereto as <u>Exhibit "P"</u>.
[21] A true and correct copy of the Tract-2 DOT is attached hereto as <u>Exhibit "Q"</u>.
[22] A true and correct copy of the Tract-2 GWD is attached hereto as <u>Exhibit "R"</u>.
[23] A true and correct copy of the Tract-2 Note is attached hereto as <u>Exhibit "S"</u>.
[24]  *See*, the definition of "Manager" in Section 1.1 of the Amended Pecos Company Agreement, from which John Calce's name has been removed since the Original Pecos Company Agreement.

*Plaintiff's Response to John Calce's Amended Motion for Partial*
*Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*     Page 9 of 39

MR.414

19. Calce signed both the Tract-1 DOT and the Tract-2 DOT as the purported "Manager" of Centurion Pecos,[25] although he was not a Manager of Centurion Pecos at the time he signed the Tract-2 DOT, and had no other authority to sign the second deed of trust for Centurion Pecos.[26]

20. Meanwhile, on September 11, 2015, Calce's affiliate companies Centurion Terminals and Centurion Midstream broke ground on a processing and storage facility at the Port of Brownsville with funds sourced from loans secured by the Reeves County Property,[27] effectively seizing a lucrative business opportunity from Centurion Pecos to transport crude oil from the Delaware Basin, through the Pecos Terminal, and then on to Brownsville, where it would be stored, processed, and blended, and subsequently sold or exported on the world market.

21. On October 12, 2015, Ballengee Interests extended the term of the Tract-1 Note to TCB, and filed an extension of the Tract-1 DOT to secure that note.[28] Again, that extension was falsely signed by Calce as Manager of Centurion Pecos despite being removed as a Manager of Centurion Pecos over a year prior.[29] Neither Marrocco nor Albanese were aware of the extension of the Tract-1 DOT, and only discovered it during a record search for the Reeves County Property in May 2016.

22. On November 15, 2015, Calce executed another promissory note purporting to obligate Centurion Pecos to make payments to Centurion Terminals, another entity controlled by Calce. Centurion Pecos first learned of this note in a demand letter dated May 27, 2016.[30]

---

[25] *See*, Tract-1 DOT; Tract-2 DOT.
[26] *See*, the definition of "Manager" in Section 1.1 of the Amended Pecos Company Agreement, from which John Calce's name has been removed since the Original Pecos Company Agreement.
[27] True and correct copies of News Articles announcing the groundbreaking are attached hereto as Exhibit "T".
[28] A true and correct copy of the Tract-1 Note Extension is attached hereto as Exhibit "U".
[29] *See*, Tract-1 Note Extension.
[30] A true and correct copy of the Centurion Terminals Demand is attached hereto as Exhibit "V".

*Plaintiff's Response to John Calce's Amended Motion for Partial*
*Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*     Page 10 of 39

MR.415

Neither Centurion Pecos nor Centurion Logistics ever authorized the note, and to date, neither Marrocco nor Albanese have ever seen this note.

23. On December 11, 2015, Union Pacific Railroad Company ("Union Pacific") sent a letter agreement to Centurion Logistics, outlining the infrastructure elements that would be required to provide rail service to the Reeves County Property,[31] however, Calce, Ballengee and Ramsey (CEO of Centurion Midstream),[32] attempted to negotiate directly with Union Pacific for the establishment of rail service to the Reeves County Property, by falsely representing that Centurion Midstream owned the property.[33]

24. After Centurion Logistics notified Union Pacific that Centurion Midstream had no affiliation with Centurion Pecos, Calce,[34] Ballengee and Ramsey falsely told Union Pacific that Marrocco and Centurion Logistics were no longer involved in the project, and that Centurion Midstream would own the Reeves County Property "within a few weeks." On its website, Centurion Midstream claimed to own the property purchased by Centurion Pecos and purported to be creating a terminal at Pecos, Texas.

25. After being unable to secure a contract with Union Pacific on the Reeves County Property, Calce acted through Centurion Midstream and Centurion Terminals to begin constructing a separate railway terminal adjacent to the site of the proposed Centurion Pecos terminal, presumably using funds sourced from the line of credit that was fraudulently obtained.

26. On April 6, 2016, without authority to act for Centurion Pecos, another unauthorized party, James Hock, purported to act as the President of Centurion Pecos, when he

---

[31] A true and correct copy of the Letter re: Interference is attached hereto as Exhibit "W".
[32] In addition to his affiliation with Centurion Logistics, Calce is President of Centurion Midstream, an entity unrelated to either Centurion Logistics or Centurion Pecos.
[33] A true and correct copy of content from the Centurion Terminals website is attached hereto as Exhibit "X", in which Centurion Terminals holds itself out as owning a 500-acre tract in Pecos, TX.
[34] *See*, Letter re: Interference.

---

*Plaintiff's Response to John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*      Page 11 of 39

MR.416

forged documents that purported to obligate Centurion Pecos to assume Ballengee Interests' obligations under the notes Ballengee Interests owed TCB. Hock granted Ballengee Interests deeds of trust to secure assumption,[35] which that obligated Centurion Pecos to assume the loans of Ballengee Interests.[36] Centurion Logistics and Centurion Pecos were unaware of these documents until they received "notice of default" letters dated May 25, 2016 from Ballengee Interests.[37]

27.     On May 26, 2016, Calce did his part to complete the looting of Centurion Pecos of the Reeves County Property by signing two (2) Special Warranty Deeds,[38] two (2) Release and Conveyance Agreements,[39] and two (2) Assignments of Personal Property, Warranties and Leases,[40] again purporting to act as the President of Centurion Pecos, to transfer both parcels of the Reeves County Property to Ballengee Interests.

28.     In an attempt to conceal their fraudulent scheme, Defendants created Jupiter, and transferred some or all of the assets, projects, and/or business opportunities of Centurion Pecos to that entity.[41] Jupiter continues to pursue the crude petroleum shipping project as originally envisioned by Marrocco, Albanese and Calce to this day. However, Centurion Logistics,

---

[35] True and correct copies of the Tract-1 DOT to Sec. Assumption and the Tract-2 DOT to Sec. Assumption are attached hereto as Exhibit "Y" and Exhibit "Z".

[36] True and correct copies of the Tract-1 Assumption and the Tract-2 Assumption are attached hereto as Exhibit "AA" and Exhibit "BB".

[37] True and correct copies of the Tract-1 Default Letter and the Tract-2 Default Letter are attached hereto as Exhibit "CC" and Exhibit "DD".

[38] True and correct copies of the Tract-1 SWD and the Tract-2 SWD are attached hereto as Exhibit "EE" and Exhibit "FF".

[39] True and correct copies of the Tract-1 Release and the Tract-2 Release are attached hereto as Exhibit "GG" and Exhibit "HH"

[40] True and correct copies of the Tract-1 PPWL Assignment and the Tract-2 PPWL Assignment are attached hereto as Exhibit "II" and Exhibit "JJ".

[41] A true and correct copy of content from the Jupiter Website is attached hereto as Exhibit "KK".

---

MR.417

Centurion Pecos, Marrocco, and Albanese have all been excluded from participation in or revenues from the Jupiter project.[42]

## IV.
### TRADITIONAL SUMMARY JUDGMENT STANDARD

29.    Defendant Calce is not entitled to a declaration that Centurion Logistics must advance or reimburse the him for the costs of his defense, since he cannot establish, as a matter of law, that Centurion Logistics has a duty to advance or reimburse his defense costs or otherwise defend him from his conduct, which occurred outside the scope of his authority and outside the scope of the business conduct of Centurion Logistics. Accordingly, the Court should rule, as a matter of law, that Calce is not entitled to any reimbursements under the Centurion Logistics Company Agreement.

30.    Rule 166a(c) provides that "the judgment sought shall be rendered forthwith if (i) the deposition transcripts, interrogatory answers, and other discovery responses referenced or set forth in the motion or response, and (ii) the pleadings, admissions, affidavits, stipulations of the parties, and authenticated or certified public record, if any, on file at the time of the hearing, or filed thereafter and before judgment with permission of the court, show that, except as to the amount of damages, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the issues expressly set out in the motion or in an answer or any other response." TEX. R. CIV. P. 166a(c).

31.    "The function of a summary judgment is not to deprive a litigant of its right to a full hearing on the merits of any real issue of fact but is to eliminate patently unmeritorious claims and untenable defenses." *Dallas Cent. Appraisal Dist. v. C.T.E. Directories Corp.*, 905 S.W.2d 318, 319 (Tex.App.—Dallas 1995). Accordingly, the party moving for a traditional

---

[42] A more thorough recitation of Plaintiff's factual allegations can be ascertained from the Pleadings.

*Plaintiff's Response to John Calce's Amended Motion for Partial*
*Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*     Page 13 of 39

MR.418

summary judgment has the burden to show that no material fact exists and that it is entitled to summary judgment as a matter of law. *M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 23 (Tex. 2000). In determining whether a disputed material fact precludes summary judgment, courts take as true evidence favorable to the non-movant, and courts must resolve any doubt in the non-movant's favor, as well as, make reasonable inferences in the non-movant's favor. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548-49 (Tex. 1985).

32.     In the present case, when the Court takes as true all evidence favorable to Centurion Logistics, resolves any doubt in favor of Centurion Logistics, and makes reasonable inferences in favor of Centurion Logistics, as it should, it will be evident that Calce has failed to meet his burden to demonstrate that he is entitled to a declaration, as a matter of law, that Centurion Logistics owes him any duty to reimburse or advance his expenses or attorney fees in the present litigation.

## V.
### RESPONSE

33.     Calce's Amended Motion seeks "advancement/reimbursement" from Centurion Logistics based on Section 6.2 of the Centurion Logistics Company Agreement.[43] Specifically, Calce's Motion seeks "[a] declaration that Centurion Logistics is required to reimburse Calce the expenses, including but not limited to attorneys' fees, that he has paid or incurred to date in defending himself against the claims brought against him in the Lawsuit," and "[a] declaration that Centurion Logistics is required to reimburse Calce the expenses, including but not limited to attorneys' fees, that he pays or incurs in the future in defending himself against the claims brought against him in the Lawsuit within ten (10) days of Calce submitting such expenses to

---

[43]  *See*, Amended Motion pg. 6.

*Plaintiff's Response to John Calce's Amended Motion for Partial*
*Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*     Page 14 of 39

MR.419

Centurion Logistics."[44] Such a declaration of the Court can only be made if Section 6.2 of the Centurion Logistics Company Agreement is misconstrued to require the Plaintiff to pay Calce for the opportunity sue Calce for his misconduct. Calce would have this Court believe that Section 6.2 of the Centurion Logistics Company Agreement authorized Calce to misappropriate the assets, projects, and business opportunities of Centurion Pecos, cut out his business partners from the proceeds of those assets, projects, and opportunities, and then require them to pay Calce for the privilege to file suit in response.[45] Calce's analysis in the Amended Motion, however, is incorrect and misguided, because it: (A) fails to point to facts in the pleadings which would bring his claim for reimbursement within the scope of Section 6.2 of the Centurion Logistics Company Agreement; and (B) ignores established Texas precedent in favor of inapplicable foreign law.

> A. **The Court Should Analyze the Request for Reimbursement Pursuant to Established Texas Precedent as a Contractual Duty to Defend**.

34. Instead of treating Section 6.2 of the Centurion Logistics Company Agreement as a contractual advancement provision, as Calce suggests, the Court should rightfully analyze the full context of Section 6.2 to determine whether or not it creates a duty to provide for the defense of a Manager who is sued for misconduct by the company itself; as is the case before us. Calce's

---

[44] *See*, Amended Motion pg. 13-14.
[45] This misdirected logic is emblematic of the inverted and circular defensive strategies that Calce and other Defendants have deployed in response to Plaintiff's claims in this lawsuit: (i) in this litigation, Calce and other Defendants continue to abuse the discovery process concealing the proof of their misconduct, so as to deprive Plaintiff of the necessary evidence to present its case before the Court; (ii) in Reeves County, Texas, Ballengee Interests has filed a Motion to Show Authority against Centurion Pecos seeking a ruling that Centurion Pecos is controlled by Stampede, so that Ballengee can essentially settle an entire lawsuit concerning the Reeves County Property with himself; (iii) Stampede has filed another baseless lawsuit against Marrocco, also in Dallas, County, which alleges that Marrocco concealed Albanese's existence as a Manager, and had Stampede known that Albanese was a Manager of Centurion Logistics, would never have invested in Centurion Pecos. (In essence, Stampede argues that they would not have invested in Centurion Pecos had they known that Calce would not be enabled to control Centurion Logistics to assist them in looting the Reeves County Property from Centurion Pecos uninterrupted); and (iv) TXC Energy, LLC ("TXC"), another entity that Calce controls, which is also a member of Centurion Logistics, filed a lawsuit which alleges that Marrocco concealed Albanese's existence as a Manager, and had they known that Albanese was a Manager, would never have invested in Centurion Logistics. (Absurdly enough, TXC alleges this despite having signed the Company Agreement which identifies Albanese as a Manager of Centurion Logistics).

---

*Plaintiff's Response to John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*      Page 15 of 39

MR.420

Amended Motion opts instead, to try its hand at persuading the Court that it should analyze his claim under a foreign legal concept, because he is unable to point to any factual allegations in the Pleadings that demonstrate that Calce's conduct falls within the scope of Section 6.2 of the Centurion Logistics Company Agreement. Contrary to Calce's contentions in the Amended Motion, Calce's request for reimbursement of expenses and attorney fees is emblematic of invoking a request for a defense under established Texas precedent regarding a contractual duty to defend, because payment of attorney fees is essential to finding a contractual duty to defend. *See*, *Fisk Elec. Co. v. Constructors & Associates, Inc.*, 888 S.W.2d 813, 815 (Tex.1994) ("Where an indemnitor has no duty to defend, the indemnitee may not recover attorney's fees or defense costs.").

36. In analyzing Calce's request a defense under Texas law, the Court must: (1) examine whether Section 6.2 of the Company Agreement expressly creates a duty on the part of Centurion Logistics to defend Calce in these circumstances; and (2) determine whether the facts alleged in the Pleadings fall within the scope of that duty. *See*, *Burlington Northern and Santa Fe Ry. Co. v. National Union Fire Ins. Co. of Pittsburgh, PA*, 334 S.W.3d 217, 219 (Tex. 2011) ("the determination as to duty to defend is according to the eight-corners rule wherein only the pleadings and the policy language are considered.").[46]

      i.     Section 6.2 of the Centurion Logistics Company Agreement Does Not Expressly Create a Duty to Defend Because it Only Mentions Reimbursement of "Expenses", Not Attorney Fees.

36. First, Section 6.2 of the Centurion Logistics Company Agreement does not expressly create a duty for Centurion Logistics to defend Calce. Although a contractual

---

[46] The duty to defend is distinct from the duty to indemnify. In analyzing a duty to indemnify, the Court must determine whether or not a duty to indemnify exists based on the "facts *actually established* in the underlying suit." *D.R. Horton-Texas, Ltd. v. Markel Intern. Ins. Co., Ltd.*, 300 S.W.3d 740, 744 (Tex.2009) (emphasis added).

*Plaintiff's Response to John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*     Page 16 of 39

MR.421

indemnity provision usually includes both a duty to defend and a duty to indemnify, the existence of a "duty to defend is determined solely by the precise language in the contract and the factual allegations in the pleadings." *English v. BGP Intern. Inc.*, 174 S.W.3d 366, 372 (Tex.App.—Houston [14th Dist.] 2005).[47] In the present case, Section 6.2 of the Centurion Logistics Company Agreement says "[a]n Indemnified Person's *expenses* paid or incurred in defending itself against any Proceeding shall be reimbursed as paid or incurred," (emphasis added) however, it does not specifically mention payment of the Indemnified Person's attorneys' fees. Payment of attorney fees is an essential obligation of a duty to provide defense. *See, Fisk Elec. Co.*, 888 S.W.2d at 815 ("Where an indemnitor has no duty to defend, the indemnitee may not recover attorney's fees or defense costs."). Accordingly, Section 6.2 of the Centurion Logistics Company Agreement does not create a duty to defend, because payment of attorney fees is essential to providing a defense, and payment of attorney fees is not included in Section 6.2 of the Centurion Logistics Company Agreement.

37. Calce's Amended Motion argues that that the holding in *In re Aguilar*, 344 S.W.3d 41 (Tex.App.—El Paso 2011) requires this Court to interpret the use of "expenses" to include attorney fees,[48] however, the ruling in *In re Aguilar* ignores the plain language interpretation of the bylaws of the company at issue in *In re Aguilar*. Further, the use of the word "expenses" in the Centurion Logistics Company Agreement is distinct from the use of the word "expenses" in the bylaws of the company at issue in *In re Aguilar*. The indemnity provision in *In re Aguilar*, which is completely independent from the "Payment of Expenses" provision under

---

[47] Although the court in *English* determines that a duty to defend existed, such finding was based on the express language of the contract which explicitly stated "BGP shall protect, indemnify, *defend*, and hold harmless . . ." (emphasis added). Section 6.2 of the Company Agreement does not explicitly state that Centurion Logistics will "defend" Calce.

[48] Amended Petition pg. 12.

*Plaintiff's Response to John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*     Page 17 of 39

MR.422

which the duty of reimbursement is found, required indemnification "against all judgments, penalties . . . fines, settlements and reasonable expenses actually incurred by the person, including attorney's fees actually and reasonably incurred by him in connection therewith." *In re Aguilar* at 51. Elsewhere in that section, as well as the "Payment of Expenses" provision, "attorney's fees" is omitted. *Id*. Oddly enough, the Court in *In re Aguilar* decides to give no effect to the plain language of the contract and the omitted references to attorneys' fees, and incorrectly reads the provision to define "reasonable expenses" to include attorney fees where it plainly does not. The reason for *In re Aguilar*'s odd conclusion that "reasonable expenses" included attorney fees is likely due to the fact that the Court in *In re Aguilar* was interpreting the bylaws of a corporation, which are not contractual obligations. *See*, *Johnson v. Spohn*, 334 Fed.Appx. 673 (5th Cir. 2009) (holding hospital's medical staff bylaws did not create a contractual relationship between the hospital and a physician). In the present case, the clause at issue is contained in the Centurion Logistics Company Agreement, which is contractual in nature, and as such, requires the Court to apply rules of contract interpretation. *See*, *Great American Ins. Co. v. Primo*, 512 S.W.3d 890, 892-93 (Tex. 2017) ("We have repeatedly affirmed that every contract should be interpreted as a whole and in accordance with the plain meaning of its terms . . . The goal of contract interpretation is to ascertain the parties' true intent as expressed by the plain language they used . . . 'Plain meaning' is a watchword for contract interpretation because word choice evinces intent."). *In re Aguilar*, might be more analogous to the present facts if it involved a shareholder agreement, and did not involve bylaws, which are not signed by the company's primary interest holders, and which have different characteristics than the provisions in company agreements; however, since it does not, *In re Aguilar* is inapplicable in this instance.

*Plaintiff's Response to John Calce's Amended Motion for Partial*
*Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*     Page 18 of 39

MR.423

38.     Regardless, following the misguided logic of *In re Aguilar* would mean that parties to a contract could not, and would not, contract for the payment of attorney fees upon a finding of indemnification, but only contract for the advancement of expenses prior to such a determination being made. Indeed, many businesses may rationally want to contract for the advancement of "expenses" to its officers in directors, without also being on the hook for advancing attorney fees, particularly in those cases involving breaches of fiduciary duties toward the business itself by those same officers and directors. Such is the case before the Court now. The Centurion Logistics Company Agreement clearly incorporates attorney fees into its use of the defined term "Damages", which is used exclusively in conjunction with that portion of Section 6.2 that addresses indemnity, but the reimbursement portion of Section 6.2 of the Centurion Logistics Company Agreement only requires that "*expenses . . . shall be reimbursed as paid or incurred.*" (emphasis added). Accordingly, the only duty created by Section 6.2 of the Centurion Logistics Company Agreement is a contractual duty to reimburse expenses incurred in defending a lawsuit within the scope of the larger indemnity provision, not an obligation to advance attorney fees irrespective of the Pleadings.

        ii.     <u>The Facts Alleged in the Pleading Do Not Fall within the Scope of Section 6.2 of the Centurion Logistics Company Agreement</u>.

39.     Second, even if the Court determines that the use of "expenses" in Section 6.2 of the Centurion Logistics Company Agreement includes payment of attorney fees, and consequently finds that Centurion Logistics potentially has a duty to defend Calce, Calce's conduct, as alleged in the Pleadings, must still fall within the scope of that duty in order to trigger any obligation to defend on the part of Centurion Logistics. In analyzing Section 6.2 of the Centurion Logistics Company Agreement for a duty to defend, the Court is limited to its

*Plaintiff's Response to John Calce's Amended Motion for Partial*
*Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*     Page 19 of 39

MR.424

examination of the Centurion Logistics Company Agreement and the Pleadings on file with the Court. "[I]f the underlying pleadings do not allege facts within the scope of the agreement, the indemnitor is not required to defend a suit against its indemnitee. In reviewing the Pleadings, the court must focus on the facts that show the origin of the damages rather than on the particular legal theories alleged." *English*, 174 S.W.3d at 372.[49]

40.     A close reading of Section 6.2 of the Centurion Logistics Company Agreement and the Pleadings demonstrates that Calce's conduct, as alleged, is: (a) is not remotely related to the business conduct of Centurion Logistics; and (b) well outside the scope of his authority as a Manager of Centurion Logistics. Moreover, Calce's Amended Motion fails to point to any allegations in the Pleadings which show the origin of any damages that he has suffered.

> (a)     *Calce's Conduct Does Not "Relate To" the Business Conduct of Centurion Logistics as Required by Section 6.2 of the Centurion Logistics Company Agreement.*

41.     Section 6.2 of the Centurion Logistics Company Agreement specifically excludes, conduct that does not relate to the conduct of Centurion Logistics' business.

42.     The conduct of Calce, as alleged in the Pleadings, does not relate to the business *conduct* of Centurion Logistics, because Calce's conduct was part of a broader scheme to encumber the Reeves County Property and remove it from Centurion Pecos through foreclosure, and to spend the proceeds from a line of credit derived from encumbrances on the Reeves County Property on other business opportunities that were ultimately misappropriated by Centurion Midstream, Centurion Terminals, and Jupiter.

---

[49]  The Texas Supreme Court has never recognized an exception from the rule that a court may only look at the four corners of the contract and the pleadings on file when analyzing whether or not a duty to defend exists. *See*, *Allstate County Mutual Insurance Company v. Wootton*, 494 S.W.3d 825, 833-34 (Tex.App.—Houston [14th Dist.] 2016, pet. denied).

*Plaintiff's Response to John Calce's Amended Motion for Partial*
*Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*     Page 20 of 39

MR.425

43. It is inconceivable that looting Centurion Pecos of its only corporate asset, thereby rendering Centurion Logistics' ownership interest in Centurion Pecos worthless, "relates to" the business conduct of Centurion Logistics. Such conduct cannot possibly "relate to" the business conduct of Centurion Logistics, because it is illogical for any business to participate in the looting or devaluing of its own assets. Accordingly, since Calce's conduct ran counter to the business interests of both Centurion Logistics and Centurion Pecos, neither of which were formed or operated for the purpose of fraudulently encumbering and dispossessing themselves of their sole corporate asset or otherwise diluting the value of their business holdings, Calce's indemnification claim must be denied.

44. Further, the conduct of Calce, as alleged in the Pleadings, and as demonstrated by the evidence incorporated by reference with this Response, does not relate to the *conduct* of the business of Centurion Logistics, since the business conduct of Centurion Logistics is to act as a member and co-Manager of Centurion Pecos along with Stampede. Although Centurion Logistics was initially created "to pursue a project to purchase real estate and to develop a railway terminal for the transportation and shipping of crude oil,"[50] petroleum related products, equipment, and materials by rail, the business conduct of Centurion Logistics changed when Centurion Pecos was formed. Afterwards, the business conduct of Centurion Logistics was only that of an investor and a Manager of Centurion Pecos.

45. In order for the conduct of Calce to relate to the business conduct of Centurion Logistics, the Court must look at the specific business that Centurion Logistics actually conducts. The actual business conduct of Centurion Logistics is to act as a member and co-Manager of

---

[50] Petition ¶12; *See also*, Amended Petition ¶19 ("Marrocco, Albanese and Calce decided to pursue a project to purchase real estate to develop a railway terminal for the shipping of crude oil and related materials.").

*Plaintiff's Response to John Calce's Amended Motion for Partial*
*Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*     Page 21 of 39

MR.426

Centurion Pecos along with Stampede. Accordingly, in order for Calce's conduct, as alleged in the Pleadings, and as demonstrated by the evidence incorporated by reference with this Response, to relate to the business conduct of Centurion Logistics, Calce would need to be acting in his capacity as Manager of Centurion Logistics, along with one of his other co-Managers, to influence the decision making ability or vote of Centurion Logistics in its interactions with Stampede. However, given the triumvirate management structure of Centurion Logistics, Calce could not possibly engage in conduct that relates to the business conduct of Centurion Logistics, without the cooperation of one of his co-Managers.[51] Since Calce purported to act unilaterally on behalf of Centurion Pecos, without the cooperation of his co-Managers, and directly against the business interests of both Centurion Logistics and Centurion Pecos, Calce's conduct cannot possibly relate to the business conduct of Centurion Logistics. Since Calce's actions do not relate to the business conduct of Centurion Logistics, Calce's request for a declaration that Centurion Logistics had a duty to provide reimbursement for his defense costs and attorney fees must be denied.

> (b)    *Calce's Conduct as Alleged in the Pleadings was Not within the Scope of his Authority as a Manager of Centurion Logistics.*

46.    Section 6.2 of the Centurion Logistics Company Agreement specifically excludes conduct that is not within an Indemnified Person's scope of authority in the course of Centurion Logistics' business from the scope of any potential indemnification or reimbursement. Calce's misconduct involves the execution of numerous documents purporting to act as the "Manager" of Centurion Pecos after he had been removed as the Manager of Centurion Pecos, and purporting

---

[51] *See*, Centurion Logistics Company Agreement Sec. 5.1.

*Plaintiff's Response to John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*      Page 22 of 39

MR.427

to act as "President" of Centurion Pecos despite never being appointed as such. This misconduct is not conceivably within the scope of his authority as a Manager of Centurion Logistics.

47.    Calce's conduct, as alleged in the Pleadings, and as demonstrated by the evidence incorporated by reference with this Response, relates to Calce's purported to actions on behalf of Centurion Pecos and not acts that were undertaken as a Manager of Centurion Logistics. In fact, Calce's conduct runs contrary to the business interests of both Centurion Logistics and Centurion Pecos. Accordingly, the subject of this lawsuit, based on the allegations contained in the Pleadings, and based on the evidence incorporated by reference into this Response, is not within the scope of Calce's authority as Manager of Centurion Logistics, and thus his request for a declaration that Centurion Logistics has a duty to reimburse him for his defense costs and attorney fees must be denied.

48.    The purpose of Section 6.2 of the Company Agreement is to indemnify the Managers of Centurion Logistics for their conduct in carrying out the authorized business of Centurion Logistics.[52] An act falls within the scope of an employee's authority in the course of a company's business when the act is incident to the management of the business to which the employee is entrusted. *Hedley Feedlot, Inc. v. Weatherly Trust*, 855 S.W.2d 826, 837 (Tex.App.—Amarillo 1993, writ denied); *see also*, *Minyard Food Stores v. Goodman*, 80 S.W.3d 573, 577 (Tex. 2002) ("[I]f an employee deviates from the performance of his duties for his own

---

[52]    The indemnification provision merely creates a contractual indemnity obligation for Centurion Logistics to indemnify its Managers for conduct that an employer is already liable for at common law. An employer is liable for the negligent conduct of an employee acting within the scope of their general authority or in the course of the company's business. *See*, *Leadon v. Kimbrough Bros. Lumber Co.*, 484 S.W.2d 567, 569 (Tex.1972) ("employer is liable when the negligent act falls within the scope of the general authority of the employee. It is not essential that the negligent act be authorized by the employer so long as it is in furtherance of the employer's business and for the accomplishment of the object for which the employee is employed."); *see also*, *In re Estate of Aguilar*, 2014 WL 631285 at *2 (Tex.App.—San Antonio Feb. 19, 2014, pet. denied) (applying general principal/agent law to establish a duty to indemnify); *CBIF Limited Partnership v. TGI Friday's Inc.*, 2017 WL 1455407 at *16 (Tex.App.—Dallas Apr. 21, 2017, pet. filed) (principle/agent relationship did not operate to shield agent from liability where agent knowingly participates in a breach of fiduciary duty).

---

*Plaintiff's Response to John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*    Page 23 of 39

MR.428

purposes, the employer is not responsible for what occurs during that deviation."). Accordingly, where Calce's actions fall outside of the authority to conduct the business to which Calce was entrusted pursuant to the Centurion Logistics Company Agreement, or where Calce's conduct deviates from the performance of his duties to Centurion Logistics, he is not entitled to any reimbursement under Section 6.2 of the Centurion Logistics Company Agreement.

49.     In the present case, Calce's conduct, as alleged by the Pleadings, and as established by the evidence incorporated by reference with this Response, was far outside the scope of his authority as a Manager of Centurion Logistics, because in purporting to act on behalf of Centurion Pecos, without an actual authority to do so, Calce was, in fact, acting against the business interests of both Centurion Logistics and Centurion Pecos. Importantly, Calce could not act on behalf of Centurion Logistics unless he had the consent of one of his co-Managers, Marrocco or Albanese, and as such, was incapable of influencing the business conduct of Centurion Pecos without first obtaining the consent of one of the Centurion Logistics co-Managers, as well as, the consent of Stampede. Further, Calce's Amended Motion does not incorporate any evidence which would indicate that the authority conferred on Calce pursuant to the Centurion Logistics Company Agreement is extended to his purported conduct as an officer of Centurion Pecos. Accordingly, Calce's conduct was not within the scope of his authority and it severely deviated from his duties as Manager of Centurion Logistics.

50.     The following conduct, as alleged in the Pleadings, and as demonstrated by the evidence incorporated into this Response by reference, unequivocally shows that Calce was not acting within the scope of his authority as a Manager of Centurion Logistics:

a.      Centurion Logistics alleges that Calce purported to sign an unsecured promissory note on September 16, 2014 as "President" of Centurion Pecos, but Calce was

*Plaintiff's Response to John Calce's Amended Motion for Partial*
*Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*     Page 24 of 39

MR.429

never, in fact, appointed as "President" of Centurion Pecos.[53] Calce did, in fact, sign the Tract-1 Note as "President" of Centurion Pecos on September 16, 2014.[54]

b. Centurion Logistics alleges that Calce purported to sign an unsecured promissory note on August 17, 2015, as the "President" of Centurion Pecos, but Calce was never, in fact, appointed as "President" of Centurion Pecos, and as of November 2014, no longer had any authority to act on behalf of Centurion Pecos.[55] Calce did, in fact, sign the Tract-2 Note as "President" of Centurion Pecos on August 17, 2015.[56]

c. Centurion Logistics alleges that "Calce signed both deeds of trust in his capacity as manager of Centurion Pecos, although he was not a manager of Centurion Pecos at the time he signed the deed of trust to the Second Parcel, and had no other authority to sign the second deed of trust for Centurion Pecos."[57] Calce did, in fact, sign the Tract-2 DOT as the purported "Manager" of Centurion Pecos on August 19, 2015, despite being removed as the Manager almost a year prior.[58]

d. Centurion Logistics alleges that, "Calce executed a deed of trust to [Tract-1], purportedly on behalf of Centurion Pecos as its manager," but that "Calce was not a manager of Centurion Pecos in January, 2015, and had no other authority to sign the January 6, 2015 deed of trust."[59] Calce did, in fact, execute the Jan. 2015 DOT as

---

[53] Petition ¶29; *See also*, Amended Petition ¶40. Although Calce's Amended Counterclaim insists that "Calce remained the duly appointed president of the company (*See*, Amended Counterclaim Pg. 6), no evidence of his appointment as such has ever been produced."
[54] *See*, Tract-1 Note; Tract-1 DOT.
[55] Petition ¶29; *See also*, Amended Petition ¶40.
[56] *See*, Tract-2 Note; Tract-2 DOT.
[57] Petition ¶21; *See also*, Amended Petition ¶28.
[58] *See*, Tract-2 DOT.
[59] Petition ¶25; *See also*, Amended Petition ¶36.

*Plaintiff's Response to John Calce's Amended Motion for Partial*
*Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*     Page 25 of 39

MR.430

Manager of Centurion Pecos, even though he had been removed as manager in November of 2014.[60]

  e. Centurion Logistics alleges that "Ballengee Interests extended the term of the note to TCB, and filed an extension of the deed of trust on [Tract-1] to secure the note. Again, that extension was signed by Calce, as manager of Centurion Pecos, although he was not a manager of Centurion Pecos at the time, and had no other authority to act on behalf of Centurion Pecos."[61] Calce did, in fact, sign the Tract-1 Note Extension purporting to be the Manager of Centurion Pecos even though he was removed as a Manager of Centurion Pecos in November of 2014.[62]

  f. Centurion Logistics alleges that, "Calce created a note, dated on or about November 15, 2015, purporting to obligate Centurion Pecos to make payments to Centurion Terminals, another entity controlled by Calce."[63] On May 27, 2016, Centurion Terminals sent Centurion Pecos a notice of default for a November 15, 2015 promissory note and a "demand for immediate payment of $237,975.10 representing outstanding principle and interest to Centurion Terminals, LLC from Centurion Pecos Terminal, LLC per the Promissory Note dated November 15, 2015."[64] Although, neither Marrocco nor Albanese have seen the alleged promissory note dated November 15, 2015, Plaintiff believes that Calce was, once again, purporting to act with the authority of Centurion Pecos after his removal as Manager of Centurion Pecos.[65]

---

[60] See, Jan. 2016 DOT.
[61] Petition ¶26; *See also*, Amended Petition ¶37.
[62] *See*, Tract-1 Note Extension.
[63] Petition ¶28; *See also*, Amended Petition ¶39.
[64] *See*, Centurion Terminals Demand.
[65] Importantly, the Defendants in this litigation have repeatedly resisted Plaintiff's efforts at securing discovery to support this claim. At the very least, the Court should not base a finding that Centurion Logistics owes a duty to

*Plaintiff's Response to John Calce's Amended Motion for Partial*
*Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*  Page 26 of 39

MR.431

g. Centurion Logistics also alleges that "[o]n May 26, 2016, Calce signed Special Warranty Deeds purporting to transfer both parcels of the Reeves County Property to Ballengee Interests" and that the purported "transfer of the Reeves County Property was an invalid and illegitimate transaction, fraudulently made as part of the grand scheme of cutting Marrocco and Albanese out of the Pecos terminal project . . ."[66] Calce did, in fact, execute the Tract-1 SWD and the Tract-2 SWD, as well as the Tract-1 Release, the Tract-2 Release, and the Assignment as "President" of Centurion Pecos, despite the fact that Calce was never duly appointed as President of Centurion Pecos.[67]

51. Finally, Centurion Logistics alleges that:

"Calce is President of Centurion Midstream, an entity unrelated to either Centurion Logistics or Centurion Pecos. Centurion Midstream, or an entity affiliated with Calce, has attempted to negotiate directly with Union Pacific Railroad ("Union Pacific") for the establishment of rail service to the Reeves County Property, initially holding itself out as owning or representing the owner of the property and, after Centurion Logistics notified Union Pacific that Centurion Midstream had no affiliation with Centurion Pecos by telling Union Pacific that Marrocco and Centurion Logistics were no longer involved in the project, and that Centurion Midstream would own the Reeves County Property 'within a few weeks.' On its website, Centurion Midstream claims to own the property purchased by Centurion Pecos and purports to be creating a terminal at Pecos, Texas. Calce, as President of Centurion Midstream, receives a salary and other benefits."[68]

The extent to which Calce, as President of Centurion Midstream, was involved in the conduct described above, it is obvious that such conduct occurred within the scope of his employment as President of Centurion Midstream, and not in his capacity or within his authority as a Manager of Centurion Logistics. Further, Calce's Amended Motion does not incorporate any evidence which

---

defend, reimburse, or advance expenses to Calce based on Calce's own contempt for the discovery process. In the meantime, the Court should take as true all evidence favorable to Centurion Logistics, resolve any doubt in favor of Centurion Logistics, and make reasonable inferences in favor of Centurion Logistics.
[66] Amended Petition ¶42.
[67] *See*, Tract-1 SWD; Tract-1 Release; Tract-2 SWD; Tract-2 Release; and the Pecos Assignment.
[68] Petition ¶23; Amended Petition ¶34.

---

*Plaintiff's Response to John Calce's Amended Motion for Partial*
*Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*      Page 27 of 39

MR.432

would indicate that the authority conferred on Calce pursuant to the Centurion Logistics Company Agreement is extended to his conduct as an officer of Centurion Midstream.

52.     Each specific allegation regarding Calce that appears in the Pleadings involves conduct that is not even purportedly within the scope of Calce's authority as Manager of Centurion Logistics, much less within the actual scope of Calce's authority as Manager of Centurion Logistics. Calce's conduct, as alleged in the Pleadings, and as demonstrated by the evidence incorporated by reference in this Response, is: (a) not even purportedly within the scope of his authority as a Manager of Centurion Logistics; (b) is only purportedly within the scope of his authority as "President" or "Manager" of Centurion Pecos, or potentially acting with the actual authority of Centurion Midstream or Centurion Terminals; and (c) was directly against the business interests of both Centurion Logistics and Centurion Pecos. Hence, this lawsuit does not relate to "any act or omission by [Calce] within the scope of [Calce's] authority in the course of [Centurion Logistics'] business."[69]

53.     Calce's Amended Motion fails to identify any specific facts from the Pleadings which demonstrate that his conduct is related to the business of Centurion Logistics so as to invoke any duty to provide him with a defense under Section 6.2 of the Company Agreement. Instead, Calce objects that "Centurion Logistics does not get to assume the role of accuser and fact finder,"[70] however, it is indisputable that, as Plaintiff, Centurion Logistics is afforded the right to "play the accuser", and it is the role of the Court to determine whether Calce's conduct, as alleged in the Pleadings, gives rise to a duty to defend pursuant to the Centurion Logistics Company Agreement. Since Calce does not point to specific allegations in the Pleadings which

---

[69] Company Agreement §6.2.
[70] Amended Motion pg. 8-9.

*Plaintiff's Response to John Calce's Amended Motion for Partial*
*Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*     Page 28 of 39

MR.433

bring him within the scope of any duty to defend under Section 6.2 of the Company Agreement, Calce's request for declaratory judgment that Centurion Logistics must fund the costs of his defense, including attorney fees, should rightfully be denied.

**B.      *The Court Should Ignore the Amended Motion's Insistence that it Follow the Misguided Opinion of In re Aguilar.***

54.      Calce's Amended Motion argues that his claim should be treated as an advancement claim, asking the Court to base its analysis almost exclusively on the findings of one Texas case, *In re Aguilar*, 344 S.W.3d 41 (Tex.App.—El Paso 2011, no pet.). The Court should not follow the logic of *In re Aguilar* because: (i) the facts are quite distinct from those before this Court; (ii) *In re Aguilar* is overly reliant on persuasive non-binding authority from a foreign jurisdiction; (iii) Calce's Indemnification Demand did not make a good faith request for reimbursement, which is a prerequisite for advancement under §8.104 of the Texas Business & Organizations Code; and (iv) the language of Section 6.2 of the Centurion Logistics Company Agreement is vague and ambiguous as to whether the use of the word "expenses" includes attorney fees.

i.      *In re Aguilar* is Distinguishable from the Facts before this Court.

55.      Parties are allowed to contract for advancement of indemnification fees, as allowed by §8.104 of the Texas Business Organizations Code.[71] However, just because the Texas Business Organizations Code permits the contracting for advancement of expenses to governing persons, doesn't mean that the parties to the Centurion Logistics Company Agreement agreed to reimburse its Managers for expenses or attorney fees incurred well outside of the scope of Centurion Logistics' duty to indemnify. If the Court compares the language of Section 6.2 of the

---

[71] Amended Motion pg. 7.

*Plaintiff's Response to John Calce's Amended Motion for Partial*
*Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*      Page 29 of 39

MR.434

Centurion Logistics Company Agreement titled "Indemnification by Company" with the provision from the bylaws cited in *In re Aguilar*, which is titled "Payment of Expenses" it will find two markedly distinct provisions.

56.     In *In re Aguilar*, the advancement provision was contained in the company's bylaws, separate from the indemnity provision, and separate from the standard of conduct provision that required the person to have acted in good faith and under a reasonable belief that their actions were not opposed to the company's best interests. *In re Aguilar*'s expense reimbursement provision provided:

> "SECTION 12.4 *Payment of Expenses*.  Reasonable expenses incurred by a person who was, is, or threatened to be made a named defendant or respondent in a Proceeding, **and without determination of indemnification**, after the Corporation receives a written affirmation by the director or officer of his good faith belief that he has met the standard of conduct necessary for indemnification . . ."

*In re Aguilar*, 344 S.W.3d 41, 44-45 (Tex.App.—El Paso 2011, no pet.). This language from the bylaws in *In re Aguilar*, is a near verbatim recitation of the language in §8.104 of the Texas Business Organizations Code.

57.     Section 6.2 of the Centurion Logistics Company Agreement, by contrast, states only that "An Indemnified Person's expenses paid or incurred in defending itself in any Proceeding shall be reimbursed as paid or incurred," within the context of a contractual provision titled "Indemnification by Company." Indeed, if the Centurion Logistics Company Agreement created a stand-alone payment of expenses provision, independent from the conditions of indemnification, specifically stating that expenses would be paid "without determination of indemnification, and after it received a written affirmation of Calce's good faith belief that he had met the standard of conduct necessary for indemnification," Calce's attempt to apply *In re Aguilar* to the present facts might be more persuasive.

*Plaintiff's Response to John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*     Page 30 of 39

MR.435

58. The language of the bylaws in *In re Aguilar* expressed a clear intention that that the expenses be paid without any determination as to indemnification. Section 6.2 of the Centurion Logistics Company Agreement has no such qualifying language, and as such, can only be interpreted in the context of its surrounding language defining the scope of indemnification.

59. Calce's Amended Motion is a veiled attempt to persuade the Court to divorce that that portion of Section 6.2, which states, "An Indemnified Person's expenses paid or incurred in defending itself against any Proceeding shall be reimbursed as paid or incurred," from the surrounding contextual language regarding the scope of indemnification, and consider it alone in isolation, while ignoring the fact that such an obligation for reimbursement is only valid if the claims and factual allegations in the lawsuit fall within the scope of Section 6.2 of the Centurion Logistics Company Agreement.

60. Calce's Amended Motion, claims that "Calce's *alleged* conduct is completely irrelevant to his right to immediate advancement/reimbursement of his defense costs,"[72] and that to rule otherwise "would turn every advancement case into a trial on the merits of the underlying claims of misconduct."[73] In drawing this conclusion, Calce again cites to *In re Aguilar*, however, in that case, the Court only found that "Aguilar's *conduct* in the underlying suit is irrelevant,"[74] (emphasis added), but not Aguilar's *alleged* conduct. Calce's Amended Motion stretches that finding a bit further to contend that Calce's *alleged* conduct is also irrelevant to an advancement analysis.[75] In fact, to the contrary, an examination of Calce's alleged conduct does not turn Calce's advancement claim into a trial on the merits, rather it is essential to determining whether the lawsuit relates to the scope of indemnity at all. Adopting Calce's more expansive reading of

---

[72] *See*, Amended Motion pg. 8.
[73] Amended Motion pg. 10 *citing*, *In re Aguilar*, 344 S.W.3d at 48.
[74] 344 S.W.3d 41, 49 (Tex.App.—El Paso 2011).
[75] Amended Motion pg. 10.

*Plaintiff's Response to John Calce's Amended Motion for Partial*
*Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*     Page 31 of 39

MR.436

*In re Aguilar*, which would, in his opinion, render Calce's alleged conduct irrelevant to the matter of advancement, would generate some absurd outcomes, namely, that Centurion Logistics would owe Calce reimbursement for a host of potential lawsuits that are entirely unrelated to Centurion Logistics.

61.     In order to follow Calce's inverted logic, the Court would have to put blinders on and completely ignore the language in Section 6.2 of the Centurion Logistics Company Agreement which states that "the Company indemnifies and holds harmless each Indemnified Person for any Damages arising from an Proceeding *relating to the conduct of the Company's business or to any act or omission by such Indemnified Person's authority in the course of the Company's business* . . ." Calce's Amended Motion would have the Court consider the statement regarding reimbursement in isolation, the consequence of which would be that Centurion Logistics would be on the hook to reimburse Calce any time he is sued, by any person, for any conduct, anywhere, without any obligation on the part of Calce to tie his claim for reimbursement back to his role as Manager or to the business conduct of the company from which he would be seeking reimbursement. This, of course, borders on the absurd, and is obviously devoid of any insight to the parties' intent in entering into the Centurion Logistics Company Agreement in the first place. Obviously, parties to a company agreement would only contract for indemnification, defense, or reimbursement for conduct that somehow related to the enterprise which formed the purpose of entering into the company agreement, and would not think of indemnifying its officers or directors for conduct outside the scope of their authority. Accordingly, Calce's suggestion that the Court should consider one line of Section 6.2 of the Centurion Logistics Company Agreement in isolation must be rejected, and the Court should consider that same statement in the context of the whole indemnification provision to which it

*Plaintiff's Response to John Calce's Amended Motion for Partial*
*Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*     Page 32 of 39

MR.437

belongs. This requires the Court to examine whether Calce's conduct, as alleged in the Pleadings, falls within the scope of the indemnification language of Section 6.2 of the Centurion Logistics Company Agreement.

    ii.  *In re Aguilar* is Over-Reliant on Persuasive Authority from a Foreign Jurisdiction.

  62.  Second, *In re Aguilar* seeks to apply law from the State of Delaware, a foreign jurisdiction, while ignoring the established Texas precedent on indemnification and the duty to defend, as cited by Plaintiff. As *In re Aguilar* correctly points out, "[t]here are no Texas cases concerning advancement under the Business Corporation Act or the Business Organizations Code."[76] This should be the first indication that Calce's Amended Motion rests on shaky legal authority. In contrast, the Texas case law applying a duty to defend analysis to indemnification clauses are plentiful. *See*, *Fisk Elec. Co.* 888 S.W.2d at 814; *see also*, *English* 174 S.W.3d 366; *Burlington Northern & Santa Fe Ry. Co. v. National Union Fire Insurance Company of Pittsburgh, PA*, 334 S.W.3d 217 (Tex. 2014); and *D.R. Horton-Texas, Ltd v. Markel Int'l. Ins. Co., Ltd*., 300 S.W.3d 740 (Tex. 2011).

  63.  Calce's Amended Motion has simply cherry-picked one misguided case to suit the purpose of obtaining advancement from Centurion Logistics, and absurdly argues that this should be accomplished without any reference to the alleged facts in the Pleadings or the surrounding language of the indemnification clause. Since *In re Aguilar* is an outlier, that itself is unable to point to any Texas authority to support its conclusions, and would instead apply the laws of a foreign jurisdiction, the Court should disregard it in favor of established Texas

---

[76] 344 S.W.3d 41, 46 (Tex.App.—El Paso 2011, no pet.).

*Plaintiff's Response to John Calce's Amended Motion for Partial*
*Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*  Page 33 of 39

MR.438

precedent. Accordingly, the Court should consult the established case law regarding a contractual duty to defend to guide its analysis.

> iii. Calce Did Not Make a Good Faith Request for Reimbursement, which is a Prerequisite for Advancement under §8.104 of the Texas Business & Organizations Code.

64.     Third, even if the Court is persuaded that Section 6.2 of the Centurion Logistics Company Agreement creates a duty to defend, reimburse, or advance, without reference to the factual allegations in the Pleadings, the fact remains, that Calce's Indemnification Demand failed to comply with §8.104 of the Texas Business & Organizations Code since it was not made by Calce upon a good faith belief that he has met the conduct necessary for indemnification under Section 6.2 of the Centurion Logistics Company Agreement. It is clear that Calce's Indemnification Demand was made in in bad faith, as the facts alleged in the Pleading, and the evidence incorporated into this Response by reference, clearly demonstrate that Calce's conduct was outside of the scope of any potential indemnification. Since, Calce's Indemnification Demand was made in bad faith, he should not be awarded with a declaration that he is entitled to reimbursement under the Centurion Logistics Company Agreement.

65.     Finally, even if the Court agrees with Calce that the analysis of *In re Aguilar* is applicable to the facts before it, even if the Court is persuaded to apply the law of a foreign jurisdiction, and even if the Court ignores Calce's bad faith affirmation regarding the standard for indemnification, the duty to defend and an advancement analysis may not be mutually exclusive. Both legal theories emphasize that they are independent from indemnification. *See D.R. Horton-Texas, Ltd.*, 300 S.W.3d at 744 (finding that the duty to defend is distinct from the duty to indemnify); *see also*, *In re Aguilar*, 344 S.W.3d at 46 ("Although the right to indemnification and advancement are correlative, they are separate and distinct legal actions.").

*Plaintiff's Response to John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*     Page 34 of 39

MR.439

In fact, if the Court examines Delaware case law, beyond what is cited in the *In re Aguilar* opinion, it will find that Delaware considers advancement and a duty to provide a defense as virtually the same legal concept. *See*, *Fillip v. Centerstone Linen Services, LLC*, 2013 WL 6671663 at *6 (Del. Ch. Dec. 3, 2013) (finding that the use of the word "defend" in an LLC Agreement "has a distinct meaning from the phrase 'indemnify and hold harmless,' and that the term 'defend' often confers a right to advancement."); *See also*, *Majkoski v. American Imaging Management Services, LLC*, 913 A.2d 572, 587-88 (Del. Ch. 2006) (use of the word "defend" created a stronger argument for the existence of a duty of advancement "because the obligation to 'defend' comes closer to suggesting the active employment of attorneys and continual payment as the attorneys' fees are incurred.").

66.     Given the absurd consequences that result from considering the reimbursement provision in isolation, separate and apart from the indemnity provision in which it resides, while ignoring established Texas precedent, it makes perfect sense to limit a duty to defend, reimburse, or advance to the context of the factual allegations raised in the Pleadings. Regardless of whether the Court interprets Section 6.2 of the Centurion Logistics Company Agreement as containing a duty to defend, reimburse, or advance, if it also reasonably interprets that duty as being restricted by the scope of the claims and factual allegations in the Pleadings and restricted by the other language in the indemnity provision which requires that Calce's conduct relate to the business conduct of Centurion Logistics, or otherwise be within the scope of his authority as Manager of Centurion Logistics, whichever avenue of analysis the Court decides to employ might only be a matter of semantics.

*Plaintiff's Response to John Calce's Amended Motion for Partial*
*Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*     Page 35 of 39

MR.440

iv. <u>There is a Genuine Issue of Material Fact as to the Interpretation of the Vague & Ambiguous Language Regarding Reimbursement in Section 6.2 of the Company Agreement</u>.

67. Finally, even if the Court is inclined to grant Calce's Amended Motion based on an assumption that the use of the word "expenses" in Section 6.2 of the Centurion Logistics Company Agreement was intended to include attorney fees, the language regarding reimbursement of "expenses" in Section 6.2 of the Company Agreement is vague and ambiguous, because it does not explicitly state that attorney fees are to be reimbursed as paid or incurred. Where "[a] contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, creating a fact issue on the parties' intent." *Tribble & Stephens Co. v. RGM Constructors, L.P.*, 154 S.W.3d 639, 652 (Tex.App.—Houston [14th Dist.] 2004). "If a contract is ambiguous, the court may admit extrinsic evidence, including evidence of the parties' interpretation, 'to determine the true meaning of the instrument." *Garcia v. Doctors Hosp. of Laredo*, 1996 WL 682211 at *2 (Tex.App.—San Antonio Nov. 27, 1996).

68. In the present case, two (2) out of the three (3) signatory members of the Centurion Logistics Company Agreement have provided sworn testimony that in negotiating and executing the Centurion Logistics Company Agreement, it was never their intent for Centurion Logistics: (i) to indemnify or pay the expenses, defense costs, or attorney fees of the Managers of Centurion Logistics LLC that breached fiduciary duties to the Centurion Logistics LLC; (ii) to reimburse or advance the expenses, defense costs, or attorney fees of a Manager for conduct that is not related to the business of Centurion Logistics LLC or conduct that is outside the scope of that Manager's authority; (iii) to have to pay the legal fees of a Manager to defend himself in a lawsuit brought by Centurion Logistics itself, or to defend against claims by Centurion Logistics

*Plaintiff's Response to John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*     Page 36 of 39

MR.441

itself, that a Manager depleted Centurion Logistics of all or substantially all of its assets; and (iv) it certainly never meant that Centurion Logistics would have to pay the party it was suing's attorneys' fees while the case was pending.[77] Accordingly, the testimony regarding the parties intent regarding Section 6.2 of the Centurion Logistics Company Agreement, at the very least, creates a genuine issue of material fact as to the meaning of the reimbursement language, and as such, the Amended Motion must be denied at this stage of the litigation.

## VII.
### PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that the Court deny Calce's Amended Motion in its entirety, and further issue declaratory relief in favor of the Plaintiff that Centurion Logistics owes no obligation to indemnify or defend Calce based on Calce's conduct as alleged in the Pleadings and as demonstrated by the evidence incorporated into this Response by reference, and award to Plaintiff any and all such other relief to which it is justly entitled at law or in equity.

---

[77] *See*, Marrocco Affidavit ¶7 and Albanese Affidavit ¶7 attached hereto as Exhibit "A" and Exhibit "B".

MR.442

Dated, December 8, 2017

Respectfully Submitted,

*/s/ C. Gregory Shamoun*

**C. GREGORY SHAMOUN**
State Bar No. 18089650
g@snlegal.com
**BRIAN K. NORMAN**
State Bar No. 00797161
bkn@snlegal.com
**J. BLAIR NORRIS**
State Bar No. 24014515
bn@snlegal.com
**TREVOR E. D. YOUNG**
State Bar No. 24084138
t@snlegal.com

**SHAMOUN & NORMAN, LLP**
1800 Valley View Lane, Suite 200
Farmers Branch, Texas 75234
Telephone: (214) 987-1745
Facsimile: (214) 521-9033

***Attorneys for Plaintiff***
***Centurion Logistics LLC***

*Plaintiff's Response to John Calce's Amended Motion for Partial*
*Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*     Page 38 of 39

MR.443

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing document has been served upon all counsel of record in accordance with the *Texas Rules of Civil Procedure* as follows:

David N. Kitner
david.kitner@strasburger.com
STRASBURGER & PRICE, LLP
901 Main Street, Suite 6000
Dallas, Texas 75202
Tel. (214) 651-4618
Fax. (214) 659-4079

Chase Potter
chase.potter@strasburger.com
STRASBURGER & PRICE, LLP
901 Main Street, Suite 6000
Dallas, Texas 75202
Tel. (214) 651-4618
Fax. (214) 659-4079

Robert A. McNiel
rmcniel@cbsattorneys.com
CALHOUN BHELLA & SECHREST LLP
325 N. Saint Paul St., Suite 2300
Dallas, Texas 75201
Tel. (214) 981-9200
Fax. (214) 981-9203

Paul E. Green
pgreen@cbsattorneys.com
CALHOUN BHELLA & SECHREST LLP
325 N. Saint Paul St., Suite 2300
Dallas, Texas 75201
Tel. (214) 981-9200
Fax. (214) 981-9203

*/s/ Trevor E. D. Young*
TREVOR E. D. YOUNG

*Plaintiff's Response to John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*     Page 39 of 39

MR.444

| | | |
|---|---|---|
| CENTURION LOGISTICS LLC, | § | IN THE DISTRICT COURT OF |
| individually and derivatively on behalf of | § | |
| CENTURION PECOS TERMINAL LLC, | § | |
| a Texas limited liability company, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | DALLAS COUNTY, TEXAS |
| | § | |
| JAMES BALLENGEE, BALLENGEE | § | |
| INTERESTS, LLC; JOHN CALCE; | § | |
| CHRIS A. MOTT; TOM RAMSEY; | § | |
| STAMPEDE TX ENERGY, LLC, | § | |
| CENTURION MIDSTREAM GROUP LLC; | § | |
| CENTURION TERMINALS, LLC; | § | |
| CENTURION BROWNSVILLE | § | |
| TERMINAL, LLC; JAMES HOCK; | § | |
| JUPITERMLP, LLC | § | |
| | § | |
| Defendants, | § | |
| | § | B-44th JUDICIAL DISTRICT |
| and CENTURION PECOS TERMINAL | § | |
| LLC, a Texas limited liability company | § | |
| | § | |
| Nominal Defendant. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFF'S RESPONSE TO
JOHN CALCE'S AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING COUNTERCLAIM AGAINST CENTURION LOGISTICS LLC**

Plaintiff files this *Appendix in Support of Plaintiff's Response to John Calce's Amended*

*Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics*

*LLC* (the "Appendix"). The following exhibits attached hereto are incorporated by reference into

Plaintiff's Response:

*Plaintiff's Response to John Calce's Amended Motion for Partial Summary
Judgment Regarding Counterclaim Against Centurion Logistics LLC*          Page 1 of 5

MR.445

| DESCRIPTION OF EVIDENCE | ABBREVIATION | DATE | EXHIBIT |
|---|---|---|---|
| Affidavit of Marc Marrocco | "Marrocco Affidavit" | 11.07.17 | "A" |
| Affidavit of Antonio Albanese | "Albanese Affidavit" | 11.08.17 | "B" |
| Attorney Affidavit of Trevor Young | "Attorney Affidavit" | 11.08.17 | "C" |
| Company Agreement of Centurion Logistics LLC a Texas Limited Liability Company | "Company Agreement" | 09.16.13 | "D" |
| The Indemnification Demand Letter | "Indemnification Demand" | 08.22.17 | "E" |
| The Indemnification Response Letter | "Indemnification Response" | 09.05.17 | "F" |
| Memorandum of Understanding between Union Pacific and Centurion Logistics | "MOU" | 07.07.14 | "G" |
| Commercial Real Estate Contract between Montane Industries, LLC and Centurion Logistics, LLC | "Tract-1 Purchase Agreement" | 02.12.14 | "H" |
| Company Agreement of Centurion Pecos Terminal, LLC | "Original Pecos Company Agreement" | 09.12.14 | "I" |
| Tract-1 Deed of Trust | "Tract-1 DOT" | 09.30.14 | "J" |
| Tract-1 Assignment of Contract | "Tract-1 Assignment" | 09.15.14 | "K" |
| Tract-1 General Warranty Deed | "Tract-1 GWD" | 09.24.14 | "L" |
| Tract-1 Unsecured Promissory Note | "Tract-1 Note" | 09.16.14 | "M" |
| First Amended and Restated Company Agreement of Centurion Pecos Terminal, LLC | "Amended Pecos Company Agreement" | 11.2014 | "N" |

*Plaintiff's Response to John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*

Page 2 of 5

MR.446

| | | | |
|---|---|---|---|
| Real Estate Purchase and Sale Contract between Zane Kiehne and Marrocco Ventures, LLC | "Tract-2 Purchase Agreement" | 10.21.14 | "O" |
| Deed of Trust to Secure Line of Credit | "Jan. 2015 DOT" | 01.14.15 | "P" |
| Tract-2 Deed of Trust | "Tract-2 DOT" | 08.26.15 | "Q" |
| Tract-2 General Warranty Deed | "Tract-2 GWD" | 08.26.15 | "R" |
| Tract-2 Unsecured Promissory Note | "Tract-2 Note" | 08.17.15 | "S" |
| News Articles: Centurion Terminals Breaks Ground at Port | "News Articles" | 09.12.15 | "T" |
| Extension of Real Estate Note and Lien | "Tract-1 Note Extension" | 10.30.15 | "U" |
| Demand Letter from Thomas Ramsey, CEO of Centurion Terminals to Centurion Pecos | "Centurion Terminals Demand" | 05.27.16 | "V" |
| Letter from Centurion Logistics to Union Pacific re: Interference by Centurion Terminals and Centurion Midstream | "Letter re: Interference" | 05.23.16 | "W" |
| Content from the Centurion Terminals Website | "Centurion Terminals Website" | 10.03.15 | "X" |
| Tract-1 Deed of Trust to Secure Assumption | "Tract-1 DOT to Sec. Assumption" | 04.11.16 | "Y" |
| Tract-2 Deed of Trust to Secure Assumption | "Tract-2 DOT to Sec. Assumption" | 04.11.16 | "Z" |
| Tract-1 Assumption Agreement | "Tract-1 Assumption" | 04.06.16 | "AA" |
| Tract-2 Assumption Agreement | "Tract-2 Assumption" | 04.06.16 | "BB" |
| Notice of Default Letter re: Sept. 2014 Note | "Tract-1 Default Letter" | 05.25.16 | "CC" |
| Notice of Default Letter re: Aug. 2015 Note | "Tract-2 Default Letter" | 05.25.16 | "DD" |

*Plaintiff's Response to John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*     Page 3 of 5

MR.447

| | | | |
|---|---|---|---|
| Special Warranty Deed No. 16-06584 | "Tract-1 SWD" | 05.31.16 | "EE" |
| Special Warranty Deed No. 16-06585 | "Tract-2 SWD" | 05.31.16 | "FF" |
| Release and Conveyance Agreement | "Tract-1 Release" | 05.26.16 | "GG" |
| Release and Conveyance Agreement | Tract-2 Release" | 05.26.16 | "HH" |
| Assignment of Personal Property Warranties and Leases | "Tract-1 PPWL Assignment" | 05.26.16 | "II" |
| Assignment of Personal Property Warranties and Leases | "Tract-2 PPWL Assignment" | 05.26.16 | "JJ" |
| Jupiter MLP Website Content | "Jupiter Website" | 10.19.17 | "KK" |

Dated, December 8, 2017

Respectfully Submitted,

*/s/ C. Gregory Shamoun*
**C. GREGORY SHAMOUN**
State Bar No. 18089650
g@snlegal.com
**BRIAN K. NORMAN**
State Bar No. 00797161
bkn@snlegal.com
**J. BLAIR NORRIS**
State Bar No. 24014515
bn@snlegal.com
**TREVOR E. D. YOUNG**
State Bar No. 24084138
t@snlegal.com


**SHAMOUN & NORMAN, LLP**
1800 Valley View Lane, Suite 200
Farmers Branch, Texas 75234
Telephone: (214) 987-1745
Facsimile:  (214) 521-9033

***Attorneys for Plaintiff***
***Centurion Logistics LLC***

*Plaintiff's Response to John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*

Page 4 of 5

MR.448

**CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of the above and foregoing document has been served upon all counsel of record in accordance with the *Texas Rules of Civil Procedure* as follows:

David N. Kitner
david.kitner@strasburger.com
STRASBURGER & PRICE, LLP
901 Main Street, Suite 6000
Dallas, Texas 75202
Tel. (214) 651-4618
Fax. (214) 659-4079

Chase Potter
chase.potter@strasburger.com
STRASBURGER & PRICE, LLP
901 Main Street, Suite 6000
Dallas, Texas 75202
Tel. (214) 651-4618
Fax. (214) 659-4079

Robert A. McNiel
rmcniel@cbsattorneys.com
CALHOUN BHELLA & SECHREST LLP
325 N. Saint Paul St., Suite 2300
Dallas, Texas 75201
Tel. (214) 981-9200
Fax. (214) 981-9203

Paul E. Green
pgreen@cbsattorneys.com
CALHOUN BHELLA & SECHREST LLP
325 N. Saint Paul St., Suite 2300
Dallas, Texas 75201
Tel. (214) 981-9200
Fax. (214) 981-9203

/s/ Trevor E. D. Young
TREVOR E. D. YOUNG

*Plaintiff's Response to John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC*      Page 5 of 5

MR.449

Exhibit "A"

| | | |
|---|---|---|
| CENTURION LOGISTICS LLC, individually and derivatively on behalf of CENTURION PECOS TERMINAL LLC, a Texas limited liability company, | § § § § § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § § | |
| vs. | § § | DALLAS COUNTY, TEXAS |
| JAMES BALLENGEE, BALLENGEE INTERESTS, LLC; JOHN CALCE; CHRIS A. MOTT; TOM RAMSEY; STAMPEDE TX ENERGY, LLC, CENTURION MIDSTREAM GROUP LLC; CENTURION TERMINALS, LLC; CENTURION BROWNSVILLE TERMINAL, LLC; JAMES HOCK; JUPITERMLP, LLC | § § § § § § § § § § § § | |
| Defendants, | § § | B-44th JUDICIAL DISTRICT |
| and CENTURION PECOS TERMINAL LLC, a Texas limited liability company | § § § | |
| Nominal Defendant. | § | |

## AMENDED AFFIDAVIT OF MARC MARROCCO

| | |
|---|---|
| STATE OF TEXAS | § § |
| COUNTY OF DALLAS | § |

BEFORE ME, the undersigned Notary Public, on this day personally appeared Marc Marrocco, who, being by me duly sworn upon his oath deposed and stated the following:

1. "My name is Marc Marrocco, I reside at 4206 Alta Vista Lane, Dallas, Texas 75229. I am over the age of twenty-one (21) years, have never been convicted of a felony or a crime involving moral turpitude, and am fully competent to testify in all respects.

---

*Amended Affidavit of Marc Marrocco*

1

MR.451

2.     I make this affidavit in support of *Plaintiff's Response to John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC* (the "Response"). The following statements are true and correct and based upon my personal knowledge.

3.     I am, and always have been, a member, Manager, and President of Centurion Logistics, LLC, which in turn, is both the sole member and the sole Manager of Centurion Pecos Terminal, LLC. I am also the managing member of Marrocco Ventures, LLC.

4.     On June 27, 2016, Centurion Logistics, LLC, individually and derivatively on behalf of Centurion Pecos Terminal, LLC, filed *Plaintiff's Original Petition* (the "Petition") in the 44th District Court of Dallas County, Texas, under Cause No. DC-16-07706.

5.     On November 8, 2017, Centurion Logistics, LLC, individually and derivatively on behalf of Centurion Pecos Terminal, LLC, filed *Plaintiff's Amended Petition* (the "Amended Petition") in the 44th District Court of Dallas County, Texas, under Cause No. DC-16-07706.

6.     On December 8, 2017, Centurion Logistics, LLC, individually and derivatively on behalf of Centurion Pecos Terminal, LLC, filed *Plaintiff's Response to John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC* (the "Response") in the 44th District Court of Dallas County, Texas, under Cause No. DC-16-07706.

7.     The Centurion Logistics LLC Company Agreement attached to the Response as Exhibit "D" is a true and correct copy of the Centurion Logistics LLC Company Agreement entered into on September 16, 2013, between TXC Energy LLC, Marc Marrocco, and Antonio Albanese. In entering into the Centurion Logistics LLC Company Agreement, it was never my intent in negotiating and executing the Centurion Logistics LLC Company Agreement to

*Amended Affidavit of Marc Marrocco*

2

MR.452

indemnify or pay the expenses, defense costs, or attorney fees of the Managers of Centurion Logistics LLC that breached fiduciary duties to the Centurion Logistics LLC, nor was it my intent in negotiating and executing the Centurion Logistics LLC Company Agreement to agree to reimburse or advance the expenses, defense costs, or attorney fees of a Manager for conduct that is not related to the business of Centurion Logistics LLC or conduct that is outside the scope of that Manager's authority. The indemnification language in the Centurion Logistics LLC Company Agreement does not mean, and has never meant, that Centurion Logistics would have to pay the legal fees of a Manager to defend himself in a lawsuit brought by Centurion Logistics itself, or to defend against claims by Centurion Logistics itself, that a Manager depleted Centurion Logistics of all or substantially all of its assets. It certainly never meant that Centurion Logistics would have to pay the party it was suing's attorneys' fees while the case was pending. That rule applies equally to all Managers who could get sued by Centurion Logistics.

8. The Union Pacific Rail Access Memorandum of Understanding between Union Pacific and Centurion Logistics attached to the Response as Exhibit "G" is a true and correct copy of the Memorandum of Understanding entered into between Centurion Logistics and Union Pacific Railroad Company that was executed on July 7, 2014.

9. The Commercial Real Estate Contract attached to the Response as Exhibit "H" is a true and correct copy of the Tract-1 Purchase Agreement, executed on February 12, 2014, by Montane Industries, LLC and on February 7, 2014 by Centurion Logistics LLC.

10. The Company Agreement of Centurion Pecos Terminal LLC attached to the Response as Exhibit "I" is a true and correct copy of the Original Company Agreement of Centurion Pecos Terminal LLC that was entered into on September 12, 2014, between Centurion Logistics LLC and CAM Oil and Natural Gas, LLC.

---

*Amended Affidavit of Marc Marrocco*

3

MR.453

11.     The Assignment of Contract attached to the Response as <u>Exhibit "K"</u> is a true and correct copy of the Tract-1 Assignment between Centurion Logistics and Centurion Pecos Terminal, LLC executed on September 16, 2017.

12.     The First Amended and Restated Company Agreement of Centurion Pecos Terminal attached to the Response as <u>Exhibit "N"</u> is a true and correct copy of the First Amended and Restated Company Agreement of Centurion Pecos Terminal LLC entered into between Stampede Energy, LLC and Centurion Logistics LLC in November of 2014.

13.     The Commercial Real Estate Sale Contract, attached to the Response as <u>Exhibit "O"</u> is a true and correct copy of the Tract-2 Purchase Agreement that was executed on October 17, 2014, between Zane Kiehne and Marrocco Ventures, LLC.

14.     The letter attached to the Response as <u>Exhibit "V"</u> is a true and correct copy of the May 27, 2016 Centurion Terminals Demand Letter received by Centurion Logistics LLC.

15.     The letter attached to the Response as <u>Exhibit "W"</u> is a true and correct copy of the letter that I sent to Union Pacific Railroad Company on behalf of Centurion Logistics on May 23, 2016.

16.     Centurion Logistics did not authorize Calce to create or execute any of the following documents:

a.     The Unsecured Promissory Note for $1.5 million, dated September 16, 2014, signed by John Calce, purportedly as "President" of Centurion Pecos, attached to the Response as <u>Exhibit "M"</u>.

b.     The Deed of Trust, dated January 6, 2015, signed by John Calce, purportedly as "Manager" of Centurion Pecos, in favor of Texas Capital Bank to secure

---

*Amended Affidavit of Marc Marrocco*

4

MR.454

promissory notes in the amount of $750,000 to Ballengee Interests, LLC, attached to the Response as Exhibit "P".

    c.    The Deed of Trust, dated August 19, 2015, signed by John Calce, purportedly as "Manager" of Centurion Pecos, in favor of Texas Capital Bank to secure promissory note for $1,500,000.00 to Ballengee Interests, LLC, attached to the Response as Exhibit "Q".

    d.    The Unsecured Promissory Note for $1.5 million, dated August 17, 2015, signed by John Calce, purportedly as "President" of Centurion Pecos, attached to the Response as Exhibit "S".

    e.    The Extension of Real Estate Note and Lien signed by John Calce, purportedly as "Manager" of Centurion Pecos Terminal LLC, attached to the Response as Exhibit "U".

    f.    Special Warranty Deed signed by John Calce on May 26, 2016, purportedly as president of Centurion Pecos Terminal, LLC conveying approximately 176.659 acres of land owned by Centurion Pecos to Ballengee Interests, LLC filed and recorded in Reeves County, Texas, on May 31, 2016, as Instrument No. 16-06584 in the Reeves County public records and attached to the Response as Exhibit "EE".

    g.    Special Warranty Deed signed by John Calce on May 26, 2016, purportedly as "President" of Centurion Pecos conveying approximately 299.325 acres of land owned by Centurion Pecos to Ballengee Interests, LLC recorded in Reeves County, Texas, on May 31, 2016, as Instrument No. 16-06585 in the Reeves County public records and attached to the Response as Exhibit "FF".

MR.455

h.     Release and Conveyance Agreement, dated May 26, 2016, relating to the 299.325 acre tract, relating to August 17, 2015 loan for $1.5 million, signed by James H. Ballengee on behalf of Ballengee Interests, James Ballengee, and John Calce, purportedly as "President" of Centurion Pecos, attached to the Response as Exhibit "HH".

i.     Release and Conveyance Agreement, dated May 26, 2016, relating to the 176.659 acre tract and that September 16, 2014 loan for $1.5 million, signed by James H. Ballengee on behalf of Ballengee Interests, James Ballengee, and John Calce, purportedly as "President" of Centurion Pecos and attached to the Response as Exhibit "GG".

j.     Assignments of Personal Property, Warranties and Leases that were executed on May 26, 2016, by John Calce, purportedly as "President" of Centurion Pecos and by James H. Ballengee on behalf of Ballengee Interests, attached to the Response as Exhibit "II" and Exhibit "JJ".

17.    Centurion Logistics did not authorize the Promissory Note from Centurion Pecos to Centurion Terminals, LLC, dated November 15, 2015, that is referenced in the correspondence from Thomas Ramsey of Centurion Terminals, LLC to Centurion Pecos Terminal, LLC, on May 27, 2016, declaring Centurion Pecos in default of a purported November 15, 2015 note and demanding immediate payment of $237,975.10, which is attached as Exhibit "V" to the Response.

18.    Currently, Centurion Logistics does not have any assets, cash on hand, or other means to pay indemnification, expenses, defense costs, or attorney fees that are requested by the Defendants in this matter. Accordingly, I believe that any request for indemnification,

MR.456

payment of expenses, defense costs, or attorney fees is an attempt to shut down the litigation and prevent the Court from deciding the merits of Plaintiff's causes of action.

MR.457

FURTHER AFFIANT SAYETH NOT

_____
MARC MARROCCO

SUBSCRIBED AND SWORN to before me on this 8th day of December, 2017, to certify which witness my hand and official seal.

_____
NOTARY PUBLIC
In and for the State of Texas

JAMES TAYLOR SHAW
Notary Public, State of Texas
Comm. Expires 07-08-2020
Notary ID 130731546

MR.458

Exhibit "B"

MR.459

| | | |
|---|---|---|
| CENTURION LOGISTICS LLC, individually and derivatively on behalf of CENTURION PECOS TERMINAL LLC, a Texas limited liability company, | § § § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § § § | |
| vs. | § § | DALLAS COUNTY, TEXAS |
| JAMES BALLENGEE, BALLENGEE INTERESTS, LLC; JOHN CALCE; CHRIS A. MOTT; TOM RAMSEY; STAMPEDE TX ENERGY, LLC, CENTURION MIDSTREAM GROUP LLC; CENTURION TERMINALS, LLC; CENTURION BROWNSVILLE TERMINAL, LLC; JAMES HOCK; JUPITERMLP, LLC | § § § § § § § § § § § | |
| Defendants, | § § | B-44th JUDICIAL DISTRICT |
| and CENTURION PECOS TERMINAL LLC, a Texas limited liability company | § § § | |
| Nominal Defendant. | § | |

## AMENDED AFFIDAVIT OF ANTONIO ALBANESE

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

BEFORE ME, the undersigned Notary Public, on this day personally appeared Antonio Albanese, who, being by me duly sworn upon his oath deposed and stated the following:

1. "My name is Antonio Albanese, I reside at 6605 Gentle Wind Lane, Dallas, Texas 75284. I am over the age of twenty-one (21) years, have never been convicted of a felony or a crime involving moral turpitude, and am fully competent to testify in all respects.

---

*Amended Affidavit of Antonio Albanese*

MR.460

2. I make this affidavit in support of *Plaintiff's Response to John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC* (the "Response"). The following statements are true and correct and based upon my personal knowledge.

3. I am, and always have been, a member and Manager of Centurion Logistics, LLC, which in turn, is both the sole member and the sole Manager of Centurion Pecos Terminal, LLC.

4. On June 27, 2016, Centurion Logistics, LLC, individually and derivatively on behalf of Centurion Pecos Terminal, LLC, filed *Plaintiff's Original Petition* (the "Petition") in the 44th District Court of Dallas County, Texas, under Cause No. DC-16-07706.

5. On November 8, 2017, Centurion Logistics, LLC, individually and derivatively on behalf of Centurion Pecos Terminal, LLC, filed *Plaintiff's Amended Petition* (the "Amended Petition") in the 44th District Court of Dallas County, Texas, under Cause No. DC-16-07706.

6. On December 8, 2017, Centurion Logistics, LLC, individually and derivatively on behalf of Centurion Pecos Terminal, LLC, filed *Plaintiff's Response to John Calce's Amended Motion for Partial Summary Judgment Regarding Countercaim Against Centurion Logistics LLC* (the "Response") in the 44th District Court of Dallas County, Texas, under Cause No. DC-16-07706.

7. The Centurion Logistics LLC Company Agreement attached to the Response as Exhibit "D" is a true and correct copy of the Centurion Logistics LLC Company Agreement entered into on September 16, 2013, between TXC Energy LLC, Marc Marrocco, and Antonio Albanese. In entering into the Centurion Logistics LLC Company Agreement, it was never my intent in negotiating and executing the Centurion Logistics LLC Company Agreement to indemnify or pay the expenses, defense costs, or attorney fees of the Managers of Centurion

---

*Amended Affidavit of Antonio Albanese*

MR.461

Logistics LLC that breached fiduciary duties to the Centurion Logistics LLC, nor was it my intent in negotiating and executing the Centurion Logistics LLC Company Agreement to agree to reimburse or advance the expenses, defense costs, or attorney fees of a Manager for conduct that is not related to the business of Centurion Logistics LLC or conduct that is outside the scope of that Manager's authority. The indemnification language in the Centurion Logistics LLC Company Agreement does not mean, and has never meant, that Centurion Logistics would have to pay the legal fees of a Manager to defend himself in a lawsuit brought by Centurion Logistics itself, or to defend against claims by Centurion Logistics itself, that a Manager depleted Centurion Logistics of all or substantially all of its assets. It certainly never meant that Centurion Logistics would have to pay the party it was suing's attorneys' fees while the case was pending. That rule applies equally to all Managers who could get sued by Centurion Logistics.

8.      The Union Pacific Rail Access Memorandum of Understanding between Union Pacific and Centurion Logistics attached to the Response as Exhibit "G" is a true and correct copy of the Memorandum of Understanding entered into between Centurion Logistics and Union Pacific Railroad Company that was executed on July 7, 2014.

9.      The Commercial Real Estate Contract attached to the Response as Exhibit "H" is a true and correct copy of the Tract-1 Purchase Agreement, executed on February 12, 2014, by Montane Industries, LLC and on February 7, 2014 by Centurion Logistics LLC.

10.     The Company Agreement of Centurion Pecos Terminal LLC attached to the Response as Exhibit "I" is a true and correct copy of the Original Company Agreement of Centurion Pecos Terminal LLC that was entered into on September 12, 2014, between Centurion Logistics LLC and CAM Oil and Natural Gas, LLC.

*Amended Affidavit of Antonio Albanese*

3

MR.462

11. The Assignment of Contract attached to the Response as Exhibit "K" is a true and correct copy of the Tract-1 Assignment between Centurion Logistics and Centurion Pecos Terminal, LLC executed on September 16, 2017.

12. The First Amended and Restated Company Agreement of Centurion Pecos Terminal attached to the Response as Exhibit "N" is a true and correct copy of the First Amended and Restated Company Agreement of Centurion Pecos Terminal LLC entered into between Stampede Energy, LLC and Centurion Logistics LLC in November of 2014.

13. The letter attached to the Response as Exhibit "V" is a true and correct copy of the May 27, 2016 Centurion Terminals Demand Letter received by Centurion Logistics LLC.

14. Centurion Logistics did not authorize Calce to create or execute any of the following documents:

a. The Unsecured Promissory Note for $1.5 million, dated September 16, 2014, signed by John Calce, purportedly as "President" of Centurion Pecos, attached to the Response as Exhibit "M".

b. The Deed of Trust, dated January 6, 2015, signed by John Calce, purportedly as "Manager" of Centurion Pecos, in favor of Texas Capital Bank to secure promissory notes in the amount of $750,000 to Ballengee Interests, LLC, attached to the Response as Exhibit "P".

c. The Deed of Trust, dated August 19, 2015, signed by John Calce, purportedly as "Manager" of Centurion Pecos, in favor of Texas Capital Bank to secure promissory note for $1,500,000.00 to Ballengee Interests, LLC, attached to the Response as Exhibit "Q".

d. The Unsecured Promissory Note for $1.5 million, dated August 17, 2015, signed by John Calce, purportedly as "President" of Centurion Pecos, attached to the Response as Exhibit "S".

e. The Extension of Real Estate Note and Lien signed by John Calce, purportedly as "Manager" of Centurion Pecos Terminal LLC, attached to the Response as Exhibit "U".

f. Special Warranty Deed signed by John Calce on May 26, 2016, purportedly as president of Centurion Pecos Terminal, LLC conveying approximately 176.659 acres of land owned by Centurion Pecos to Ballengee Interests, LLC filed and recorded in Reeves County, Texas, on May 31, 2016, as Instrument No. 16-06584 in the Reeves County public records and attached to the Response as Exhibit "EE".

g. Special Warranty Deed signed by John Calce on May 26, 2016, purportedly as "President" of Centurion Pecos conveying approximately 299.325 acres of land owned by Centurion Pecos to Ballengee Interests, LLC recorded in Reeves County, Texas, on May 31, 2016, as Instrument No. 16-06585 in the Reeves County public records and attached to the Response as Exhibit "FF".

h. Release and Conveyance Agreement, dated May 26, 2016, relating to the 299.325 acre tract, relating to August 17, 2015 loan for $1.5 million, signed by James H. Ballengee on behalf of Ballengee Interests, James Ballengee, and John Calce, purportedly as "President" of Centurion Pecos, attached to the Response as Exhibit "HH".

i. Release and Conveyance Agreement, dated May 26, 2016, relating to the 176.659 acre tract and that September 16, 2014 loan for $1.5 million, signed by James H. Ballengee on behalf of Ballengee Interests, James Ballengee, and John Calce,

purportedly as "President" of Centurion Pecos and attached to the Response as <u>Exhibit "GG"</u>.

j. Assignments of Personal Property, Warranties and Leases that were executed on May 26, 2016, by John Calce, purportedly as "President" of Centurion Pecos and by James H. Ballengee on behalf of Ballengee Interests, attached to the Response as <u>Exhibit "II"</u> and <u>Exhibit "JJ"</u>.

15. Centurion Logistics did not authorize the Promissory Note from Centurion Pecos to Centurion Terminals, LLC, dated November 15, 2015, that is referenced in the correspondence from Thomas Ramsey of Centurion Terminals, LLC to Centurion Pecos Terminal, LLC, on May 27, 2016, declaring Centurion Pecos in default of a purported November 15, 2015 note and demanding immediate payment of $237,975.10, which is attached as <u>Exhibit "V"</u> to the Response.

16. Currently, Centurion Logistics does not have any assets, cash on hand, or other means to pay indemnification, expenses, defense costs, or attorney fees that are requested by the Defendants in this matter. Accordingly, I believe that any request for indemnification, payment of expenses, defense costs, or attorney fees is an attempt to shut down the litigation and prevent the Court from deciding the merits of Plaintiff's causes of action.

MR.465

FURTHER AFFIANT SAYETH NOT



_____
ANTONIO ALBANESE

SUBSCRIBED AND SWORN to before me on this 8th day of December, 2017, to certify which witness my hand and official seal.

_____
NOTARY PUBLIC,
In and for the State of Texas

JAMES TAYLOR SHAW
Notary Public, State of Texas
Comm. Expires 07-08-2020
Notary ID 130731546

---

_Amended Affidavit of Antonio Albanese_

7

MR.466

Exhibit "C"

MR.467

| | | |
|---|---|---|
| CENTURION LOGISTICS LLC, | § | IN THE DISTRICT COURT OF |
| individually and derivatively on behalf of | § | |
| CENTURION PECOS TERMINAL LLC, | § | |
| a Texas limited liability company, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | DALLAS COUNTY, TEXAS |
| | § | |
| JAMES BALLENGEE, BALLENGEE | § | |
| INTERESTS, LLC; JOHN CALCE; | § | |
| CHRIS A. MOTT; TOM RAMSEY; | § | |
| STAMPEDE TX ENERGY, LLC, | § | |
| CENTURION MIDSTREAM GROUP LLC; | § | |
| CENTURION TERMINALS, LLC; | § | |
| CENTURION BROWNSVILLE | § | |
| TERMINAL, LLC; JAMES HOCK; | § | |
| JUPITERMLP, LLC | § | |
| | § | |
| Defendants, | § | |
| | § | B-44th JUDICIAL DISTRICT |
| and CENTURION PECOS TERMINAL | § | |
| LLC, a Texas limited liability company | § | |
| | § | |
| Nominal Defendant. | § | |

## AMENDED ATTORNEY AFFIDAVIT OF TREVOR YOUNG

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

BEFORE ME, the undersigned Notary Public, on this day personally appeared Trevor Young, who, being by me duly sworn upon his oath deposed and stated the following:

1. "My name is Trevor Edison Dailey Young, I reside at 6314 Covington Lane, Dallas, Texas 75214. I am over the age of twenty-one (21) years, have never been convicted of a felony or a crime involving moral turpitude, and am fully competent to testify in all respects.

*Amended Affidavit of Trevor Young*

1

2. I make this affidavit in support of *Plaintiff's Response to John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC* (the "Response"). The following statements are true and correct, and based upon my personal knowledge.

3. I am an associate attorney with the law firm Shamoun & Norman, LLP located at 1800 Valley View Lane, Suite 200, Farmers Branch, Texas 75234, and represent Centurion Logistics LLC individually and derivatively on behalf of Centurion Pecos Terminal in this 44th District Court of Dallas County, Texas, Cause No. DC-16-07706.

4. On November 8, 2017, acting on behalf of Centurion Logistics, LLC, individually and derivatively on behalf of Centurion Pecos Terminal, LLC, I filed *Plaintiff's Amended Petition* (the "Amended Petition"), in the 44th District Court of Dallas County, Texas, Cause No. DC-16-07706.

5. On December 8, 2017, acting on behalf of Centurion Logistics, LLC, individually and derivatively on behalf of Centurion Pecos Terminal, LLC, I filed the Response in the 44th District Court of Dallas County, Texas, under Cause No. DC-16-07706. The defined terms contained in the Response shall have the same meaning herein as they do in the Response, and those terms are incorporated herein by reference.

6. The letter attached as Exhibit "E" to the Response is a true and correct copy of the Indemnification Demand letter that Shamoun & Norman LLP received from counsel for John Calce on August 22, 2017.

7. The letter attached as Exhibit "F" to the Response is a true and correct copy of the Indemnification Response sent by C. Gregory Shamoun in response to the Indemnification demand letter on September 5, 2017.

---

*Amended Affidavit of Trevor Young*

MR.469

8. The deed of trust attached as <u>Exhibit "J"</u> to the Response is a true and correct copy of the Tract-1 Deed of Trust as identified in the Response and recorded as instrument number 14-09181 in the public records of Reeves County, Texas on September 30, 2014.

9. The general warranty deed attached as <u>Exhibit "L"</u> to the Response is a true and correct copy of the Tract-1 General Warranty Deed as identified in the Response and recorded as instrument number 14-08856 in the public records of Reeves County, Texas on September 24, 2014.

10. The unsecured promissory note attached as <u>Exhibit "M"</u> to the Response is a true and correct copy of that same Tract-1 Note that was attached as <u>Exhibit 5</u> to the *Affidavit of John Calce* (the "Calce Affidavit") that was filed in support of Calce's *Defendant John Calce's Motion to Transfer Venue and Brief in Support thereof and, Subject thereto, Original Answer* (the "Calce MTV") on September 20, 2016 in this 44th District Court of Dallas County, Texas, Cause No. DC-16-07706.

11. The deed of trust attached as <u>Exhibit "P"</u> to the Response is a true and correct copy of the January 2015 Deed of Trust identified in the Response and recorded as instrument number 15-00433 in the public records of Reeves County, Texas on January 14, 2015.

12. The deed of trust attached as <u>Exhibit "Q"</u> to the Response is a true and correct copy of the Tract-2 Deed of Trust identified in the Response and recorded as instrument number 15-07672 in the public records of Reeves County, Texas on August 26, 2015.

13. The general warranty deed attached as <u>Exhibit "R"</u> to the Response is a true and correct copy of the Tract-2 General Warranty Deed identified in the Response and recorded as instrument number 15-07673 in the public records of Reeves County, Texas on August 26, 2017.

14. The unsecured promissory note attached as Exhibit "S" to the Response is a true and correct copy of that same Tract-2 Note that was attached as Exhibit 4 to the Calce Affidavit filed in support of the Calce MTV on September 20, 2016 in this 44th District Court of Dallas County, Texas, Cause No. DC-16-07706.

15. The extension of real estate note and lien attached as Exhibit "U" to the Response is a true and correct copy of the Tract-1 Note Extension, recorded as instrument number 15-10258 in the public records of Reeves County, Texas on October 30, 2015.

16. The content attached as Exhibit "X" to the Response is a true and correct copy of the contents of www.centurionterminals.com as it appeared on February 23, 2016 by using the internet archive archive.org/web.

17. The deed of trust to secure assumption attached as Exhibit "Y" to the Response is a true and correct copy of that same Tract-1 Deed of Trust to Secure Assumption, recorded as instrument number 16-04401 in the public records of Reeves County, Texas on April 11, 2016, and attached as Exhibit 6 to the Calce Affidavit that was filed in support of the Calce MTV on September 20, 2016 in this 44th District Court of Dallas County, Texas, Cause No. DC-16-07706.

18. The deed of trust to secure assumption attached as Exhibit "Z" to the Response is a true and correct copy of that same Tract-2 Deed of Trust to Secure Assumption, recorded as instrument number 16-04402 in the public records of Reeves County, Texas on April 11, 2016, and attached as Exhibit 7 to the Calce Affidavit that was filed in support of the Calce MTV on September 20, 2016 in this 44th District Court of Dallas County, Texas, Cause No. DC-16-07706.

19. The assumption agreement attached as Exhibit "AA" to the Response is a true and correct copy of that same Tract-1 Assumption Agreement, dated April 6, 2016, that was attached

as Exhibit 2 to the Calce Affidavit that was filed in support of the Calce MTV on September 20, 2016 in this 44th District Court of Dallas County, Texas, Cause No. DC-16-07706.

20.     The assumption agreement attached as Exhibit "BB" to the Response is a true and correct copy of that same Tract-2 Assumption Agreement, dated April 6, 2016, that was attached as Exhibit 3 to the Calce Affidavit that was filed in support of the Calce MTV on September 20, 2016 in this 44th District Court of Dallas County, Texas, under Cause No. DC-16-07706.

21.     The letters attached as Exhibit "CC" and Exhibit "DD" to the Response are true and correct copies of those same May 25, 2016 letters that were attached as Exhibit 13 to the Calce Affidavit that was filed in support of the Calce MTV on September 20, 2016 in this 44th District Court of Dallas County, Texas, Cause No. DC-16-07706.

22.     The special warranty deed attached as Exhibit "EE" to the Response is a true and correct copy of that same Tract-1 Special Warranty Deed, recorded as instrument number 16-065484 in the public records of Reeves County, Texas on May 31, 2016, and that same Tract-1 Special Warranty Deed attached as Exhibit 8 to the Calce Affidavit that was filed in support of the Calce MTV on September 20, 2016 in this 44th District Court of Dallas County, Texas, Cause No. DC-16-07706.

23.     The special warranty deed attached as Exhibit "FF" to the Response is a true and correct copy of that same Tract-2 Special Warranty Deed, recorded as instrument number 16-065485 in the public records of Reeves County, Texas on May 31, 2016, and attached as Exhibit 1 to the Calce Affidavit filed in support of the Calce MTV on September 20, 2016 in this 44th District Court of Dallas County, Texas, Cause No. DC-16-07706.

24.     The release and conveyance agreement attached as Exhibit "GG" to the Response is a true and correct copy of that same Tract-1 Release, dated May 26, 2016, attached as Exhibit

11 to the Calce Affidavit filed in support of the Calce MTV on September 20, 2016 in this 44th District Court of Dallas County, Texas, Cause No. DC-16-07706.

25. The release and conveyance agreement attached as Exhibit "HH" to the Response is a true and correct copy of that same Tract-2 Release, dated May 26, 2016, attached as Exhibit 9 to the Calce Affidavit filed in support of the Calce MTV on September 20, 2016 in this 44th District Court of Dallas County, Texas, Cause No. DC-16-07706.

26. The assignment of personal property, warranties and leases attached as Exhibit "II" to the Response is a true and correct copy of that same Assignment that was attached as Exhibit 12 to the Calce Affidavit filed in support of the Calce MTV on September 20, 2016 in this 44th District Court of Dallas County, Texas, Cause No. DC-16-07706.

27. The assignment of personal property, warranties and leases attached as Exhibit "JJ" to the Response is a true and correct copy of that same Assignment that was attached as Exhibit 10 to the Calce Affidavit filed in support of the Calce MTV on September 20, 2016 in this 44th District Court of Dallas County, Texas, Cause No. DC-16-07706.

28. The content attached as Exhibit "KK" to the Response is a true and correct copy of the contents the www.jupitermlp.com website as it appeared on October 19, 2010.

*Amended Affidavit of Trevor Young*

MR.473

FURTHER AFFIANT SAYETH NOT

_____
TREVOR YOUNG

SUBSCRIBED AND SWORN to before me on this 8th day of December, 2017, to certify which witness my hand and official seal.

GRACE YBARRA BURRIS
Notary Public, State of Texas
Comm. Expires 05-15-2021
Notary ID 10004648

NOTARY PUBLIC,
In and for the State of Texas

*Amended Affidavit of Trevor Young*

MR.474

Exhibit "D"

MR.475

COMPANY AGREEMENT

OF

Centurion Logistics LLC

a Texas Limited Liability Company

Effective September 16, 2013

THE MEMBERSHIP INTERESTS REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER ANY SECURITIES LAWS AND MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED ABSENT SUCH REGISTRATION OR AN EXEMPTION THEREFROM. THE TRANSFER OF MEMBERSHIP INTERESTS IS FURTHER RESTRICTED BY ARTICLE X OF THIS AGREEMENT.

1150848v2 2/12/2014

MR.476

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS........................................................................................1
    1.1.    Defined Terms..........................................................................1
    1.2.    Usage.......................................................................................4

ARTICLE II ORGANIZATIONAL MATTERS.........................................................5
    2.1.    Formation.................................................................................5
    2.2.    Name.......................................................................................5
    2.3.    Registered Office and Agent; Principal Office..........................5
    2.4.    Term........................................................................................5
    2.5.    Purposes..................................................................................5
    2.6.    Powers.....................................................................................5
    2.7.    Company Property....................................................................5
    2.8.    Initial Members.......................................................................6
    2.9    Options to Acquire Additional Units........................................6
    2.10    Consent of Managers...............................................................6
    2.11.    Status of Managers and Members.............................................6
    2.12.    Unit Certificates......................................................................6
    2.13.    No State Law Partnership........................................................6

ARTICLE III CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS......................6
    3.1.    Initial Capital Contributions...................................................6
    3.2.    Additional Capital Contributions............................................6
    3.3.    Capital Accounts.....................................................................7
    3.4.    No Right to Return of or Interest on Capital Account..............7
    3.5.    Member Loans.........................................................................7
    3.6.    Member Notes..........................................................................7

ARTICLE IV ALLOCATIONS AND DISTRIBUTIONS............................................8
    4.1.    Allocation of Profit or Loss......................................................8
    4.2.    Distributions of Distributable Cash.........................................8
    4.3.    Withholding.............................................................................8
    4.4.    Limitation on Distributions.....................................................8
    4.5.    No Right to Partition or Distributions in Kind.........................9

ARTICLE V MANAGEMENT....................................................................................9
    5.1.    Management and Control of Company Business.......................9
    5.2.    Delegation of Authority.........................................................10
    5.3.    Limitations on Manager Authority.........................................10
    5.4.    Reliance.................................................................................10
    5.5.    Compensation and Expenses of Members and Managers.......10
    5.6.    Standards of Manager and Member Conduct..........................10

MR.477

| | | |
|---|---|---|
| 5.7. | Resignation, Removal, and Replacement of Manager | 11 |

**ARTICLE VI  LIABILITY AND INDEMNIFICATION** .................................... **13**
| 6.1. | Limitation of Liability | 13 |
| 6.2. | Indemnification by Company | 13 |
| 6.3. | Conduct Not Protected | 13 |
| 6.4. | Insurance | 14 |
| 6.5. | Survival | 14 |

**ARTICLE VII  BOOKS AND RECORDS; REPORTS** ...................................... **14**
| 7.1. | Maintenance of and Access to Books and Records | 14 |
| 7.2. | Fiscal Year | 14 |
| 7.3. | Financial and Operating Reports | 14 |
| 7.4. | Tax Reports | 15 |
| 7.5. | Transmission of Communications | 15 |

**ARTICLE VIII  TAX MATTERS** ........................................................ **15**
| 8.1. | Tax Classification | 15 |
| 8.2. | Company Returns | 15 |
| 8.3. | Tax Elections | 15 |
| 8.4. | Consistent Reporting | 16 |
| 8.5. | Tax Proceedings | 16 |
| 8.6. | Information and Documents to Company | 16 |

**ARTICLE IX  MEETINGS AND VOTING OF MEMBERS** ............................ **17**
| 9.1. | Meetings | 17 |
| 9.2. | Voting | 17 |

**ARTICLE X  TRANSFER OF MEMBERSHIP INTERESTS** ........................... **17**
| 10.1. | Limitation on Transfers | 17 |
| 10.2. | Permitted Transfer of Membership Interest | 18 |
| 10.3. | Conditions to Permitted Transfers of Membership Interests | 19 |
| 10.4. | Effective Date; Distributions | 19 |
| 10.5. | Transferor's Obligations | 20 |
| 10.6. | Assignee's Rights and Obligations | 20 |
| 10.7. | Effect and Consequences of Prohibited Transfer | 20 |
| 10.8. | Agreements of Spouse; Sole Management Community Property | 21 |

**ARTICLE XI  ADMISSION OF NEW MEMBERS** ..................................... **21**
| 11.1. | Substituted Members | 21 |
| 11.2. | Additional Members | 22 |

**ARTICLE XII  WITHDRAWAL OR REMOVAL OF MEMBERS** ..................... **22**
| 12.1. | Withdrawal of Members | 22 |
| 12.2. | Removal of Members | 23 |

MR.478

| 12.3. | Optional Redemption of Membership Interest | 24 |
| 12.4. | Status of Former Member | 24 |

**ARTICLE XIII  WINDING UP AND TERMINATION** .......................................................... **24**

| 13.1. | Events Requiring Winding Up | 24 |
| 13.2. | Winding Up Procedures | 24 |
| 13.3. | Continuation Without Winding Up | 25 |
| 13.4. | Liquidation of Assets and Application and Distribution of Proceeds | 25 |
| 13.5. | Certificate of Termination | 26 |
| 13.6. | Reinstatement | 26 |

**ARTICLE XIV  VALUATION** ............................................................................................ **26**

| 14.1. | Fair Value of Company Property | 26 |
| 14.2. | Fair Value of Membership Interest | 27 |

**ARTICLE XV  GENERAL PROVISIONS** ......................................................................... **28**

| 15.1. | Amendments | 28 |
| 15.2. | Notice | 28 |
| 15.3. | Governing Law; Consent to Jurisdiction | 29 |
| 15.4. | Waiver | 29 |
| 15.5. | Entire Agreement | 29 |
| 15.6. | Successors and Assigns | 29 |
| 15.7. | Third-Parties | 29 |
| 15.8. | Severability | 29 |
| 15.9. | Construction | 29 |
| 15.10. | Execution of Agreement | 30 |
| 15.11. | Further Assurances | 30 |
| 15.12. | Power of Attorney | 30 |

**EXHIBIT A  MEMBERS' CONTRIBUTIONS AND PERCENTAGE INTERESTS** ......... **32**

**EXHIBIT B  SPOUSAL JOINDER AND CONSENT** .......................................................... **I**

**APPENDIX A  PRINCIPLES OF ALLOCATION** ............................................................ **A-1**

| A.1 | Introduction | A-1 |
| A.2 | Definitions | A-1 |
| A.3 | Capital Accounts | A-4 |
| A.4 | Allocations of Net Profit and Net Loss | A-5 |
| A.5 | Tax Allocations | A-8 |

1150848v2 2 12 2014

MR.479

# COMPANY AGREEMENT
# OF
# CENTURION LOGISTICS LLC

This agreement ("Agreement") is entered into effective as of September 18, 2013 (the "Effective Date"), by the persons identified on the signature page(s) hereof.

## RECITALS

A.     The Company was formed pursuant to a Certificate of Formation filed with the Secretary of State of the State of Texas effective as of September 16, 2013.

B.     The parties desire to provide for the regulation and management of the affairs of the Company according to this Agreement and the Code.

NOW, THEREFORE, the parties agree as follows:

## ARTICLE I
## DEFINITIONS

1.1.     Defined Terms.

The following definitions and the definitions set forth in Appendix A to this Agreement, apply to the terms used in this Agreement for all purposes.

"Additional Capital Contribution" means the sum of cash and the Fair Value of any property contributed to the Company with respect to a Membership Interest as permitted under this Agreement, but does not include an Initial Capital Contribution.

"Additional Member" means a person who acquires a Membership Interest from the Company in exchange for a Capital Contribution and is admitted to the Company as a Member pursuant to Section 11.2 after the Effective Date.

"Affiliate" means a person who directly or indirectly controls, is controlled by, or is under common control with the person in question.

"Agreement" means this Agreement, as it may be amended, supplemented or restated from time to time.

"Assignee" means a person to whom a Membership Interest has been transferred by a Member or Assignee in a Permitted Transfer, or in a Prohibited Transfer that the Company is required by law to recognize, but who has not become a Member.

"Capital Contribution" means the sum of the Initial Capital Contribution and Additional Capital Contributions, if any, with respect to a Membership Interest.

MR.480

"Certificate of Formation" means the certificate of formation filed with respect to the Company as provided in Section 2.1, as such certificate may be corrected, amended, or restated.

"Certificate of Membership Interest" means a certificate representing each Member's Membership Interest in a form approved by the Managers.

"Code" means the Texas Business Organizations Code, as amended from time to time, and any successor law.

"Company" means the limited liability company formed pursuant to the Certificate of Formation.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise.

"Damages" means any expense or loss (including any court costs, judgment, or settlement payment, penalty, fine, tax, and reasonable attorney's fees or other dispute resolution costs) paid or incurred in connection with or as a consequence of any Proceeding, net of any insurance or other recoveries received by the Indemnified Party with respect to the foregoing.

"Distributable Cash" means the cash and cash equivalents held by the Company (determined in accordance with its accounting policies for reporting cash flows), less any amount of such cash that the Managers determine should be retained for the reasonable current and future needs of the Company business.

"Effective Date" means the effective date of this Agreement as set forth in the introduction to this Agreement.

"Fair Value" means, with respect to an asset, its Fair Value determined according to Article XIV.

"Formation Date" means the effective date of the original Certificate of Formation of the Company.

"Indemnified Person" means (a) a Member or Assignee; (b) a Manager, (c) a Liquidator (if any); (d) any Affiliate of the Company, a Member or Assignee, a Manager, or a Liquidator; and (e) any governing person, officer, employee, agent, or owner of the Company, a Member or Assignee, a Manager, a Liquidator, or any Affiliate of any of the foregoing. A person is an Indemnified Person whether or not such person has the status required to be an Indemnified Person at the time any Proceeding is made or maintained as described in Article VI or at the time any amendment to this Agreement is proposed under Section 15.1.

"Index Rate" means the rate specified in section 302.002 of the Texas Finance Code.

MR.481

"Initial Capital Contribution" means the sum of any cash and the Fair Value of any property contributed to the Company by a Member with respect to a Membership Interest in connection with the original issuance of the Membership Interest by the Company as set forth on Exhibit A or determined pursuant to Section 11.2.

"Initial Members" is defined in Section 2.8.

"I.R.C." means the Internal Revenue Code of 1986, as amended, or any successor thereto.

"Liquidator" is defined in Section 13.2(b).

"Manager" means the person designated as manager of the Company in the Certificate of Formation, any person who becomes a Manager hereunder, including a replacement Manager, and the Members when they are acting pursuant to Section 5.7(e), in each case in such person's capacity as Manager and for the period that such person has such capacity. "Managers" means all persons that are designated as a Manager, collectively.

"Mandatory Distribution" means any distribution that a Member is entitled to receive and as to which the Member has attained the status of a creditor under Section 101.207 of the Code.

"Member" means any person identified as a member on Exhibit A, and any other person who becomes a member of the Company pursuant to this Agreement, who has not ceased to be a Member. "Members" means all persons that are Members, collectively.

"Member Notes" is defined in Section 3.6.

"Membership Interest" means a Member's or Assignee's economic interest in the Company. The term includes the Member's or Assignee's right to receive allocations of profits and losses and distributions as described in Article IV, and other rights and obligations under this Agreement or the Code of an Assignee who has not been admitted as a Member, but does not include any right to participate in management or any other right reserved under this Agreement or the Code exclusively to a Member.

"Percentage Interest" means, as to any Member or Assignee, the Membership Interest of the Member or Assignee expressed as a percentage, which percentage shall be determined from time to time by dividing the number of Units held by such Member or Assignee by the Units held by all Members and Assignees.

"Permitted Transfer" means any transfer of a Membership Interest that is described in Section 10.2.

"Proceeding" means (a) any threatened, pending, or completed action or other proceeding, whether civil, criminal, administrative, arbitrative, or investigative; (b) an appeal of any such proceeding; and (c) an inquiry or investigation that could lead to any such proceeding.

MR.482

"Prohibited Transfer" means any transfer of a Membership Interest that is not a Permitted Transfer.

"Requisite Percentage" means one or more Members owning more than seventy five percent (75.0%) of the Percentage Interests owned by all Members entitled to vote on the particular issue.

"Substituted Member" means a person who is admitted as a Member to the Company pursuant to Section 11.1 with respect to the transfer of an existing Membership Interest.

"Units" means units of Membership Interest in the Company.

1.2.    Usage.

In this Agreement, unless a clear contrary intention appears:

(a)    the singular number includes the plural number and vice versa;

(b)    reference to any person includes such person's successors and assigns but, if applicable, only if such successors and assigns are not prohibited by this Agreement, and reference to a person in a particular capacity excludes such person in any other capacity or individually;

(c)    reference to any gender includes the other gender and the neuter;

(d)    reference to any agreement or other document means such agreement or other document as amended or modified and in effect from time to time;

(e)    reference to any statute, regulation, or other legal requirement means such legal requirement as amended, modified, codified, replaced, or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder, and reference to any section or other provision of any legal requirement means that provision of such legal requirement from time to time in effect and constituting the substantive amendment, modification, codification, replacement, or reenactment of such section or other provision;

(f)    "hereunder," "hereof," "hereto," and words of similar import refer to this Agreement as a whole and not to any particular Article, Section, or other provision hereof;

(g)    "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding such term;

(h)    "or" is used in the inclusive sense of "and/or";

(i)    with respect to the determination of any period of time, "from" means "from and including" and "to" means "to but excluding"; and

MR.483

(j) references to agreements or other documents refer as well to all addenda, exhibits, schedules, or amendments thereto.

## ARTICLE II
## ORGANIZATIONAL MATTERS

2.1. Formation. The Company was formed pursuant to the Certificate of Formation of the Company filed with the Texas Secretary of State effective as of the Formation Date.

2.2. Name. The Company's name is as set forth in the Certification of Formation. The Managers may change the Company name at any time without the approval of any Member by filing a Certificate of Amendment. The Managers shall provide notice of the change to all Members. The Company's business may be conducted under its name and/or any other name or names deemed advisable by the Managers. The Managers shall cause to be executed and filed of record all assumed or fictitious name certificates required by law.

2.3. Registered Office and Agent; Principal Office.

(a) The street address of the initial registered office of the Company in Texas and the name of the initial registered agent of the Company are as set forth in the Certificate of Formation. The Managers may change the Company's registered office or registered agent at any time by filing a Change of Registered Agent and/or Registered Office as provided in the Code. The Managers shall provide notice of the change to all Members.

(b) The address of the principal office of the Company in the United States where records are to be kept or made available under Section 101.501 of the Code shall be as determined by the Managers. The Managers may change the Company's principal office in the United States at any time upon notice to the Members. The Company shall keep at its registered office and make available to a Member on reasonable request the street address of the Company's principal office in the United States.

2.4. Term. The Company will exist perpetually and will continue until terminated in accordance with Article XIII.

2.5. Purposes. The purposes of the Company are to engage in any activities that are permitted under applicable laws.

2.6. Powers. Subject to any limitations in this Agreement, the Company may exercise the power to do any and all acts reasonably related to its purposes.

2.7. Company Property.

(a) All Company property shall be owned in the name of the Company and not in the name of any Member. No Member or Assignee will have any interest in such Company property solely by reason of the Member's status as a Member.

MR.484

(b)     The Managers shall deposit or invest all funds of the Company in an account or accounts in the name of the Company. No funds other than the funds of the Company may be deposited therein. The funds in such accounts shall be used exclusively for the business of the Company (including distributions to the Members) and may be withdrawn only by persons approved by the Managers.

2.8.     Initial Members. In connection with the formation of the Company, the persons executing this Agreement as of the Effective Date ("Initial Members") are admitted to the Company as Members. The number of Units held by each of the Initial Members as of the Effective Date are set forth next to the Initial Members' names on Exhibit "A."

2.9.     Consent of Members. Each person executing this Agreement consents to the admission as members in the Company all of the Initial Members and all other persons who are Members as of the date such person executes this Agreement and further consents to the issuance of additional Units as provided in Section 2.9.

2.10.     Status of Managers and Members. Except as otherwise provided by this Agreement, the Managers have the status, rights, and obligations of a manager in a limited liability company as set forth in the Code, and each Member has the status, rights, and obligations of a member in a limited liability company as set forth in the Code.

2.11.     Unit Certificates. Each Member's Units may be represented by a Unit Certificate. If Unit Certificates are issued, each Unit Certificate shall be numbered and registered in the records of the Company as they are issued, and signed by any of the Managers. The holder of any Unit Certificate shall promptly notify the Company of any loss or destruction of the certificate, and the Managers shall cause a replacement certificate to be issued to the holder upon receipt of satisfactory evidence of the loss, destruction, or mutilation or the certificate and satisfaction of other reasonable conditions.

2.12.     No State Law Partnership. The Members intend that the Company is not a partnership or joint venture, and that no Manager or Member is a partner or a joint venturer of any other Manager or Member for any purposes other than income tax purposes. No provision of this Agreement may be construed to suggest otherwise.

## ARTICLE III
## CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

3.1.     Initial Capital Contributions. Each Member's Initial Capital Contribution is set forth on Exhibit A.

3.2.     Additional Capital Contributions. A Member is not required to make Additional Capital Contributions to the Company. No Member has the right or is permitted to make Additional Capital Contributions unless (a) all of the Managers and a Requisite Percentage approves such Additional Capital Contribution after notice to all Members of (i) the amount of the Additional Capital Contribution to be made and (ii) other material information relevant to the

MR.485

proposed Additional Capital Contribution, and (b) all Members are afforded an opportunity to participate in the Additional Capital Contribution in accordance with their relative Percentage Interests.

3.3. Capital Accounts. The Company shall establish a separate Capital Account for each Member and Assignee. The Capital Accounts shall be maintained according to the provisions of Appendix A.

3.4. No Right to Return of or Interest on Capital Account. No Member may demand or receive the return of its Capital Contribution or any portion of its Capital Account, except as provided in this Agreement and the Code. The Managers do not have any personal liability for the repayment of any Capital Contributions of any Member. No interest will accrue or be paid with respect to the Capital Contributions or Capital Account of any Member.

3.5. Member Loans. Subject to the approval of all of the Managers, the Company may borrow money from one or more Members to the extent the Managers deem appropriate to the conduct of the Company business on terms that comply with the requirements of Section 5.6(e) (relating to related party transactions). The amount of any loan made to the Company by a Member will not constitute a Capital Contribution or otherwise affect such Member's Capital Account or Membership Interest.

3.6. Member Notes. In connection with the execution of this Agreement, the Company expects to issue promissory notes to certain Members in connection with assets that the Members have transferred to the Company or expenses that the Members have incurred on behalf of the Company ("Member Notes"). For federal income tax purposes, the Members intend that each Member Note be characterized as a preferred membership interest (equity) in the Company, that a holder's right to any interest or original issue discount on the Member Note be characterized as a right to a distributive share of Company income and not as a guaranteed payment under I.R.C. Section 707(c), and that all payments with respect to the Member Note be characterized as a distribution with respect to a membership interest. Allocations of profit or loss and tax items as provided in Section 4.1 and Section A.5 of Appendix A shall be adjusted as necessary, as determined by the Managers, to reflect the preferred membership interest deemed to be held by the holders of the Member Notes. For this purpose, the Members intend that only net profit or net loss, and only net taxable income or loss (rather than items thereof), for any allocation period will be allocated with respect to the Member Notes. For example, if there is net taxable income for the period from the issue date of the Member Notes through the end of 2009, it is intended that such net taxable income will be allocated to the Member Notes holders to the extent of any accrued interest or original issue discount on the Member Notes, and if there is a net taxable loss for such period, it is intended that such net taxable loss will be allocated first to the Members to the extent of their Capital Contributions and then to the holders of the Member Notes.

MR.486

# ARTICLE IV
## ALLOCATIONS AND DISTRIBUTIONS

4.1.    Allocation of Profit or Loss. Subject to Section 3.6, Company profits and losses shall be allocated among the Members and Assignees in accordance with the provisions of Appendix A or as is determined by the Managers. The Members are aware of the income tax consequences of the allocations.

4.2.    Distributions of Distributable Cash.

(a)    Except as otherwise provided in Section 4.3 (relating to withholding), Section 4.4 (relating to limitations on distributions), or Section 13.4 (relating to liquidating distributions), any Distributable Cash shall be distributed not later than the 30th day after the end of each fiscal quarter to the Members and Assignees according to their Percentage Interests unless otherwise determined by the Managers. The Managers may provide for a record date with respect to distributions.

(b)    To the extent it may lawfully do so, the Company shall make distributions to Members and Assignees in accordance with Section 4.2(a) and Section 13.4(a)(iii) at such times and in such amounts as the Managers determine is sufficient to enable Members and Assignees to make payments of tax due (including any applicable interest and penalties) with respect to their allocable shares of the Company's taxable income. Unless the Managers determine otherwise, the taxes due for each Member and Assignee shall be calculated by assuming that the Member or Assignee is an individual taxed at the highest tax rate applicable to the type of income involved.

4.3.    Withholding. The Company shall withhold from distributions, or pay on behalf of a Member or Assignee, all amounts that the Managers determine the Company is required to withhold or pay on behalf of such person (including federal and state income tax withholding). All amounts so withheld from distributions are deemed to have been distributed to the person otherwise entitled to receive the amount so withheld. To the extent an amount is paid by the Company on behalf of a Member or Assignee but not withheld from a distribution, the amount paid constitutes a loan to such Member or Assignee. Such loan bears interest at the Index Rate and is repayable on demand or, at the election of the Managers, is repayable out of distributions to which such Member or Assignee would otherwise be entitled.

4.4.    Limitation on Distributions.

(a)    The Company may not make a distribution to a Member or Assignee if it would render the Company insolvent, determined in accordance with Section 101.206 of the Code. A Member or Assignee who receives a distribution in violation of Section 101.206 of the Code is not required to return the distribution except as required in Section 101.206 of the Code.

(b)    The Members shall look solely to the assets of the Company for any distributions, including liquidating distributions. If the assets of the Company remaining after the payment or

MR.487

discharge, or the provision for payment or discharge, of the Company liabilities are insufficient to make any distributions, no Member has any recourse against the separate assets of any other Member.

4.5. No Right to Partition or Distributions in Kind. No Member has any right, and waives any right that it might otherwise have, to cause any Company property to be partitioned and/or distributed in kind. Except as provided in Section 13.4(d) (relating to liquidating distributions), the Company may not make any distributions in kind.

## ARTICLE V
## MANAGEMENT

5.1. Management and Control of Company Business.

(a) Subject to the limitations set forth in this Agreement, the Managers have exclusive authority to manage and conduct the Company's business. The Managers shall do all things appropriate to carry out the Company's purpose. Except as otherwise provided in this Agreement, all actions that the Managers may take and all determinations that the Managers may make pursuant to this Agreement may be taken and made in the absolute discretion of the Managers.

(b) The initial Managers of the Company are: John Calce, Antonio Albanese, and Marc Marrocco. Each Manager will serve as a Manager until his successor is appointed pursuant to Section 5.7(f).

(c) The Members may not take part in the management or control of the Company business or bind the Company in their capacity as Members. A Member may have the status of a Manager or governing person of a Manager or the Company and may possess and exercise the powers and authority associated with such status.

(d) Meetings of the Managers shall be held from time to time as determined by the Manages. Managers may participate in any meeting by means of video or audio conferencing or similar communications equipment whereby all Managers can hear each other. No notice of any meeting of the Managers is required to be given. At all meetings of Managers, the presence of a majority of the Managers shall be necessary and sufficient to constitute a quorum for the transaction of business unless a greater number is required by this Agreement, law or the Certificate of Formation. Each Manager will have one vote. Except as otherwise provided in this Agreement, the act of a majority of the Managers present at a meeting at which a quorum is present shall be the act of the Managers. If a quorum shall not be present at any meeting of Managers, the Managers present may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

(e) Any action required by the Code to be taken at any annual or special meeting of Managers, or any action which may be taken at any annual or special meeting of Managers, may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in

MR.488

writing, setting forth the action so taken, shall be signed by Managers having not fewer than the minimum number of votes required to approve such action under the Code, the Certificate or this Agreement. A facsimile or similar reproduction of a writing signed by a Manager, shall be regarded as signed by the Managers for purposes of this Section 5.1(e).

5.2.    Delegation of Authority.

(a)    The Managers may cause the Company to hire employees and agents, and may delegate to such persons any of its authority hereunder, as the Managers deems appropriate for the conduct of the Company's business.

(b)    The Managers may appoint officers of the Company as the Managers deem appropriate. The officers may be appointed for such terms and may exercise such powers and authority and perform such duties as determined by the Managers. An officer need not be a Member of the Company. Any two or more offices may be held by the same person. Any officer elected or appointed by the Managers may be removed, with or without cause, at any time by the Managers. Each officer will hold office until his successor is chosen and is qualified in his stead, or until his death, resignation, or removal from office. Any vacancy in an office because of death, resignation, removal, or otherwise may be filled by a person appointed by the Managers. An officer has the same fiduciary duties as a Manager as described in Section 5.6.

5.3.    Reliance.    Persons dealing with the Company may rely conclusively on the authority of the Managers as set forth in this Agreement. Every document executed by a Manager with respect to any business or property of the Company is conclusive evidence in favor of any person relying on the document that (a) at the time of the execution and delivery of the document this Agreement was effective, (b) the document was executed in accordance with this Agreement and is binding upon the Company, and (c) the Manager was authorized to execute and deliver the document on behalf of the Company.

5.4.    Compensation and Expenses of Members and Managers.    Members and Managers are not entitled to any salary, fee, or other remuneration (other than distributions with respect to the Member's Membership Interest) for providing property or services or other consideration to or for the benefit of the Company in their capacity as a Member or Manager, except that the Managers are entitled to reimbursement from the Company for reasonable out-of-pocket expenses paid or incurred on behalf of the Company. The Company shall pay all out-of-pocket costs incurred in organizing the Company. This Section 5.5 does not limit or enlarge the Manager's or a Member's rights to liability protection or indemnification under Article VI, and does not limit the Company's ability to enter into transactions with Members in their capacities other than as Members in accordance with Section 5.6(e).

5.5.    Standards of Manager and Member Conduct.

(a)    In General.    Each Manager shall manage and conduct the Company's business in good faith and in a manner the Manager reasonably believes to be in the Company's best

MR.489

interest. A Manager does not violate its obligations under this Section 5.6(a) or the Code unless the Manager engages in conduct described in Section 6.3(a) (relating to improper conduct).

(b)     Outside Activities of Managers and Members. Each Manager shall devote to the Company's affairs only such time and resources as the Managers deem necessary for the conduct and winding up of the Company business. The Managers and Members or their Assignees may engage in or have an interest in other business ventures of every nature and description, independently or with others, including the ownership and operation of businesses similar to or in competition with, directly or indirectly, the Company. Neither the Company nor any Member or Assignee has, solely as a result of such person's interest in the Company, any right to acquire any rights in or to any such other business venture or to the income or profits derived from any such other business venture.

(c)     Related Party Transactions. Except as otherwise provided in this Agreement, the Managers, when acting on behalf of the Company, may purchase property from, sell property to, or otherwise deal with any Manager, Member, or Assignee, acting on its own behalf, or any Affiliate of any Manager, Member, or Assignee, but any such transaction shall be on terms that are no less favorable to the Company than if the transaction had been entered into with an independent third party. No provision of this Agreement requires disclosure of any transaction to, and approval of the transaction by, any disinterested governing persons of the Company or the Members as provided in Section 101.255 of the Code.

5.6.    Resignation, Removal, and Replacement of Manager.

(a)     Resignation. A Manager may resign as manager of the Company only upon notice to all Members. If there is no resignation date specified in the notice, or if the specified date is earlier than 90 days following the date the notice is given to Members ("notice date"), the Manager's resignation is effective on the 90th day following the notice date. If the specified resignation date is later than 180 days after the notice date, the Manager's resignation is effective on the 180th day following the notice date. A Manager is deemed to have resigned as manager of the Company upon the following events:

(i)     any event specified in Section 153.155(a)(4) or Section 153.155(a)(5) of the Code (relating to bankruptcy or insolvency proceedings with respect to a general partner), applied as if the Manager were a general partner;

(ii)    if the Manager is an individual, the Manager's death, the appointment of a guardian or general conservator for the Manager, or a judicial determination that the Manager is incapable of performing the Manager's duties under the Agreement; or

(iii)   if the Manager is an entity, the termination of the Manager's existence or suspension of the Manager's right to do business.

MR.490

(b)     Removal for Cause. A Manager may be removed as manager of the Company only upon the affirmative vote of a Requisite Percentage if there is cause for removal as specified in Section 5.7(c) and the Company has received a written opinion of counsel that:

(i)     cause for removal as specified in Section 5.7(c) exists; and

(ii)     the removal of the Manager is not prohibited under any loan agreements, contracts, or other applicable legal requirements.

(c)     Definition of Cause. Cause for removal exists only if one or more of the following conditions has occurred:

(i)     there has been a change in Control of the Manager;

(ii)     a final judgment of a court of competent jurisdiction has been entered that the Manager's removal is necessary to comply with any requirements, conditions, or guidelines contained in any opinion, directive, order, ruling, or regulation of any federal or state agency or judicial authority or contained in any federal or state statute.

(d)     Status of Former Manager. A Manager who has resigned in violation of this Agreement or who has been removed has the status of an Assignee with respect to any Membership Interest held by the former Manager.

(e)     Interim Management. During the period that the Members may elect a replacement Manager as provided in Section 5.7(f) and prior to such election (or an election to wind up the Company), the Members may by vote of a Requisite Percentage appoint an interim manager having authority to manage and conduct the Company's business as the Manager as provided herein. If an interim Manager is not appointed, the authority to manage and conduct the Company's business is vested in the Members who may act by vote of a Requisite Percentage, and who may by vote of a Requisite Percentage appoint a committee of one or more persons to exercise the authority of the Manager until such time as a replacement Manager is elected or the Company commences winding up. The Members shall file any required amendments to this Agreement or the Certificate of Formation to reflect the resignation or removal of the former Manager and the appointment of the interim Manager or the conversion of the Company to a member-managed limited liability company, and all Members approve any such amendments.

(f)     Election of Replacement Manager. If a Manager dies, is disabled, resigns, or is removed as the manager of the Company, within 90 days following such death, disablement, resignation or removal a Requisite Percentage may elect a replacement Manager of the Company effective as of the date of the former Manager's death, disablement, resignation, or removal. The Managers shall file any required amendments to this Agreement to reflect the death, disablement, resignation, or removal of the former Manager and the election of the replacement Manager.

MR.491

# ARTICLE VI
## LIABILITY AND INDEMNIFICATION

6.1.　Limitation of Liability.　No Member or Manager is liable for any debts, obligations, or liabilities of the Company.　Subject to Section 6.3, an Indemnified Person is not liable to the Company or any other Indemnified Person for any Damages arising from any Proceeding relating to the conduct of the Company's business or relating to any act or omission by the Indemnified Person within the scope of the Indemnified Person's authority in the course of the Company's business, including any breach of any fiduciary duties, or for any misconduct or negligence on the part of any other person who is an employee or agent of the Company.

6.2.　Indemnification by Company.　To the fullest extent permitted by applicable law, and subject to Section 6.3, the Company indemnifies and holds harmless each Indemnified Person from and against any Damages arising from any Proceeding relating to the conduct of the Company's business or to any act or omission by such Indemnified Person within the scope of the Indemnified Person's authority in the course of the Company's business or for any misconduct or negligence on the part of any other person that is an employee or agent of the Company.　An Indemnified Person's expenses paid or incurred in defending itself against any Proceeding shall be reimbursed as paid or incurred.　The right to indemnification conferred in this Article VI is not exclusive of any other right that any person may have or hereafter acquire under any statute, agreement, vote of Members, or otherwise.

6.3.　Conduct Not Protected.

(a)　This Article VI does not operate to limit liability or to indemnify a person to the extent the person is found liable pursuant to a final judgment of a court of competent jurisdiction for:

(i)　an act or omission that involves gross negligence, intentional misconduct, or a knowing violation of law;

(ii)　a transfer or attempted transfer of all or a portion of a Membership Interest in a Prohibited Transfer, a Manager's resignation in violation of Section 5.7(a), or a Member ceasing to be a Member in violation of Section 12.1(a);

(iii)　a willful or reckless material breach of this Agreement or any other agreement relating to the Company's business; or

(iv)　an act or omission for which indemnification is prohibited by law.

(b)　No provision of this Agreement requires the Company to pay or incur any amount for which indemnification is not permitted under this Article VI.

(c)　Any payments made to or on behalf of a person who is later determined not to be entitled to such payments shall be repaid by the person to the Company.　The Company may

MR.492

require, as a condition to the payment of any amounts pursuant to Section 6.2, that the Indemnified Person provide to the Company (i) a written affirmation by the Indemnified Person of the person's good faith belief that the person has met the standard of conduct necessary for indemnification under this Section 6.3; and (ii) a written undertaking by or on behalf of the Indemnified Person to repay the amount paid or reimbursed if the person has not met that standard or if indemnification is otherwise prohibited by law.

6.4. Insurance. The Company may maintain insurance to protect any person against any expense, liability, or loss, whether or not the Company would have the power to indemnify such person against such expense, liability, or loss under the Code.

6.5. Survival. The indemnities provided for in this Agreement survive the transfer of an Indemnified Person's Membership Interest, the termination of the person's status as a Member or other status giving rise to classification as an Indemnified Person, and the termination of this Agreement and the Company.

## ARTICLE VII
## BOOKS AND RECORDS; REPORTS

7.1. Maintenance of and Access to Books and Records. The Company shall maintain such books and records regarding the Company's business and properties as is reasonable, including all books and records required under the Code. Each Member shall have access thereto during ordinary business hours to the extent and under the conditions provided in the Code.

7.2. Fiscal Year. The Company shall adopt the calendar year as its fiscal year for financial and tax accounting purposes.

7.3. Financial and Operating Reports. As soon as practicable after the end of each fiscal year, but in any event not later than 90 days after the end of the fiscal year, the Managers shall deliver to each Member an annual report containing the following:

(a) a Company balance sheet as of the end of such fiscal year, and Company statements of income, cash flows, and changes in Members' equity for such fiscal year, each in reasonable detail and prepared according to United States generally accepted accounting principles;

(b) a general description of the Company's activities during such fiscal year and business plans for the succeeding year; and

(c) a statement of changes in the Member's Capital Account (showing the balance in the Member's Capital Account as of the beginning of the fiscal year, contributions or distributions during the year, allocations of profits and losses during the year, any other adjustments to the Capital Account balances during the year, and the balance in the Capital Account as of the end of the year).

MR.493

7.4.    Tax Reports.

(a)    Not later than the date (including extensions) for filing the Company's tax return with the Internal Revenue Service (Form 1065), the Managers shall deliver to each person who was a Member or Assignee at any time during the period covered by the return all information necessary for the preparation of such person's United States federal income tax returns, including a Form 1065 Schedule K-1 (if applicable).

(b)    Upon the written request of any Member or Assignee, the Managers shall deliver to such person information necessary for the preparation of any tax returns that must be filed by such person, including information necessary for estimating and paying estimated taxes.

7.5.    Transmission of Communications. Each person who holds a Membership Interest on behalf of, or for the benefit of, another person or persons shall be responsible for conveying any report, notice, or other communication received concerning the Company's affairs to such other person or persons.

# ARTICLE VIII
## TAX MATTERS

8.1.    Tax Classification. The Members intend that the Company be classified as a partnership for federal income tax purposes. The Managers shall take all actions as are or may be reasonably necessary or appropriate to ensure the Company is so classified (including the filing of elections or tax returns). No Manager, officer, or Member shall take any action inconsistent with the classification of the Company as a partnership for federal income tax purposes.

8.2.    Company Returns. The Managers shall cause the Company to file such tax returns as may be required by law.

8.3.    Tax Elections.

(a)    General. Except as otherwise provided in this Agreement, the Managers shall cause the Company to timely make or revoke all elections, and take all tax reporting positions, necessary or desirable for the Company and to maximize the tax benefits to the Members. No election shall be made to have the Company excluded from the application of any provision of Subchapter K of the I.R.C. or any equivalent tax provision in any other tax jurisdiction.

(b)    Section 754 Election. The Company shall make the election referred to in I.R.C. Section 754 upon the request of any Member in connection with a transfer of the Member's Membership Interest.

(c)    Safe Harbor Election for Compensatory Membership Interests. If Proposed Treasury Regulation 1.83-3(l) is adopted as a temporary or final regulation, the Company shall make the safe harbor election described in such regulations, and the Company and each Member

MR.494

(including any person to whom an interest in the Company is transferred in connection with the performance of services) shall comply with all requirements of the safe harbor with respect to all Membership Interests transferred in connection with the performance of services while the election remains effective. The Managers shall prepare, execute, and file any required documentation to cause the election to be effective. The Managers may terminate the safe harbor election at any time if it determines in good faith that it is in the best interests of the Company and the Members to do so.

8.4. Consistent Reporting. Each Member shall, on the Member's tax returns, treat each partnership item (as defined in I.R.C. Section 6231(a)(3)) in a manner consistent with the treatment of the item on the Company's return in all respects, including the amount, timing, and character of the item. No Member shall file a request for an administrative adjustment of partnership items under I.R.C. Section 6227(a) if such request would cause the Member's treatment of the item to be inconsistent with the treatment of the item on the Company's return.

8.5. Tax Proceedings.

(a) The Managers shall be the Company's tax matters partner as defined in I.R.C. Section 6231, and shall take such actions as are required to be designated the tax matters partner under applicable Treasury Regulations. The tax matters partner shall represent the Company in connection with all examinations of the Company's tax returns by tax authorities, including administrative and judicial proceedings to contest any proposed adjustments. Subject to Section 8.5(c), the tax matters partner has the exclusive right to conduct Proceedings relating to Company taxes and to determine whether the Company (either on its own behalf or on behalf of the Members) will contest or continue to contest any tax deficiencies assessed or proposed to be assessed by any taxing authority. The tax matters partner shall keep the Members informed on a timely basis of all material developments with respect to any such Proceeding. Each Member shall cooperate with the tax matters partner and do or refrain from doing all things reasonably requested by the tax matters partner with respect to the conduct of any Company tax Proceeding.

(b) The tax matters partner may not bind any other Member to a settlement agreement relating to taxes without obtaining the written concurrence of such Member.

(c) Any deficiency for taxes imposed on a Member (including penalties, additions to tax or interest imposed with respect to such taxes) shall be paid by such Member and, if paid or required to be paid by the Company, is recoverable from such Member pursuant to Section 4.3 or by other legal means.

(d) This Section 8.5 and Section 8.6 survive the termination of the Company and the termination of any Member's interest in the Company and remain binding for a period of time necessary to resolve all tax matters with applicable taxing authorities.

8.6. Information and Documents to Company. Each Member shall timely provide to the Company all information and documents that such Member is required to provide by applicable tax requirements, and shall also provide to the Company upon request such additional

MR.495

information and documents as the Managers may reasonably request in connection with the Company's compliance with applicable tax requirements or filing of any permitted tax elections.

## ARTICLE IX
## MEETINGS AND VOTING OF MEMBERS

9.1.    Meetings.

(a)     Meetings of the Members may be called at any time by the Managers or by one or more Members holding at least 75.0% of the Percentage Interest held by Members. Meetings shall be held at the Company's principal place of business or at such other reasonable place set forth in the notice of the meeting.

(b)     Any action that may be taken at a Members' meeting may be taken without holding a meeting if Members having at least the Requisite Percentage interest that would be necessary to take the action at a meeting, in which each Member entitled to vote on the action is present and votes, sign a written consent or consents stating the action taken.

(c)     Except as otherwise provided in this Agreement, meeting notices and procedures, including procedures for obtaining written consents in lieu of a meeting, shall be in conformity with Chapters 6 and 101(H) of the Code. Sections 101.353 through 101.356 of the Code (relating to quorum and minimum voting requirements) shall not apply to the extent such provisions are inconsistent with this Agreement. The Managers are solely responsible for convening and conducting meetings of the Members, conducting the solicitation of consents, determining the validity and effect of responses to any solicitation of consents, and determining other matters regarding meetings, voting, and consents.

(d)     Notice of the results of any vote taken at a meeting, or the results of any solicitation of consents in lieu of a meeting, shall be given to the Members not later than with the delivery of the next following report of financial information given pursuant to Section 7.3.

9.2.    Voting. A Member may vote at a meeting in person, or by a proxy executed in writing by the Member and received by the Managers prior to the time when the votes of Members are to be counted. The provisions of the Code pertaining to the validity and use of proxies by shareholders of a corporation govern the validity and use of proxies given by Members. Only Members of record on the date of the meeting (or if the vote is conducted without a meeting then on the date of the notice soliciting the Member consents) may vote.

## ARTICLE X
## TRANSFER OF MEMBERSHIP INTERESTS

10.1.    Limitation on Transfers.

(a)     The term "transfer," when used in reference to a transfer of a Membership Interest, means an assignment (whether voluntarily, involuntarily, or by operation of law and

MR.496

whether or not effective under this Agreement) of all or any portion of a Member's or Assignee's Membership Interest, or any interest therein, to another person, and includes a sale, assignment, conveyance, gift, exchange, or other disposition, a transfer by merger or other business combination, a transfer pursuant to bankruptcy, insolvency, incapacity, or death, and any pledge, hypothecation, or other encumbrance. A redemption of a Member's or Assignee's Membership Interest pursuant to Section 12.3 is not a transfer of the Membership Interest. A transfer does not include a transfer of a community property or other interest in a Membership Interest from a former spouse of a Member to the Member pursuant to the death of the former spouse or in connection with the termination of the marital relationship.

(b)     No Member may transfer all or any portion of its Membership Interest unless the transfer is a Permitted Transfer. A transfer of a Membership Interest that is not a Permitted Transfer is a Prohibited Transfer.

(c)     A change of Control of any Member constitutes a transfer of the Membership Interest held by such Member.

10.2.   Permitted Transfer of Membership Interest.

(a)     A transfer of a Membership Interest is a Permitted Transfer only if the transfer satisfies the conditions set forth in Section 10.3 and is described in one of more of the following paragraphs of this Section:

(i)     the transfer is approved by all of the Managers;

(ii)     if the Member is a corporation, the transfer is to a member of the Member's affiliated group (as defined in I.R.C. Section 1504(a));

(iii)     if the Member is a trustee of one or more employee benefit plans, the transfer is to a co-trustee or a successor trustee to such plans; or

(iv)     if the Member is an individual, the transfer is to the Member's estate, testamentary trust, or legal representative as a result of the Member's death or adjudication of incapacity in managing its person or affairs, or the transfer is to a member of the Member's family, directly or in trust.

(b)     Upon a Permitted Transfer by a Member of all of its Membership Interest, the Member ceases to be a Member as of the effective date of the transfer determined according to Section 10.4.

(c)     For purposes of Section 10.2(a)(iv), a Member's family means the Member's spouse (excluding a former spouse), children, grandchildren, parents, and grandparents. A person's legally adopted child is treated as his child.

MR.497

10.3. Conditions to Permitted Transfers of Membership Interests. Without limiting the Managers' authority to withhold approval for the transfer of a Membership Interest, a transfer shall not be a Permitted Transfer unless the Managers determine that all of the following conditions are satisfied:

(a) The transfer complies with all applicable laws, including any applicable securities laws.

(b) The transfer will not cause the Company to be treated as other than a partnership for United States federal income tax purposes.

(c) The transfer will not cause the Company to be subject to regulation under the Investment Company Act of 1940, as amended.

(d) The transfer will not cause any assets of the Company to be deemed "plan assets" under the Employee Retirement Income Security Act of 1974.

(e) The transfer will not result in a termination of the Company under I.R.C. Section 708, unless the Managers determine that such termination will not have an adverse impact on the Members.

(f) The transfer will not cause the application of the tax-exempt use property rules of I.R.C. Sections 168(g)(1)(B) and 168(h) to the Company or its Members, unless the Managers determine that such rules will not have an adverse impact on the Members.

(g) The transferor and transferee have delivered to the Company any documents that the Managers request to confirm that the transfer satisfies the requirements of this Agreement, to give effect to the transfer, and to confirm the transferee's agreement to be bound by this Agreement as an Assignee.

(h) If requested by the Managers, the Company has received a transfer fee in an amount determined by the Managers to be sufficient to reimburse the Company for the estimated expenses likely to be incurred by the Company in connection with such transfer.

10.4. Effective Date; Distributions.

(a) A Permitted Transfer of a Membership Interest is effective as of the first day of the calendar month following the calendar month during which the Managers receive notice of such transfer (in such form and manner as the Managers may require) unless the Managers determine that the transfer should be effective as of an earlier or later date (for example, on any date the transfer is effective as a matter of state law, or where the notice of transfer specifies that the transfer is to be effective on a future date).

MR.498

(b)    Distributions with respect to a transferred Membership Interest that are made before the effective date of the transfer shall be paid to the transferor, and distributions made after such date shall be paid to the Assignee.

(c)    Effective as of the effective date of a transfer of a Membership Interest, the Managers shall amend Exhibit A to reflect the reduction in the transferor's Percentage Interest and to reflect the Assignee's Percentage Interest.

(d)    Neither the Company nor the Managers have any liability for making allocations and distributions to the Members determined in accordance with this Section 10.4, whether or not the Company or the Managers have knowledge of any transfer of any Membership Interest.

10.5.    Transferor's Obligations. The transferor of a Membership Interest who ceases to be a Member continues to be obligated with respect to its Membership Interest or its status as a former Member as provided in the Code and applicable law.

10.6.    Assignee's Rights and Obligations.

Unless an Assignee becomes a Member pursuant to Article XI, such Assignee shall not be entitled to any of the rights granted to a Member, other than the rights to receive allocations of profits and losses and distributions as if such Assignee were a Member, to transfer the Assignee's Membership Interest (subject to the conditions of this Article X), and to receive reports and information as specified in Article VII. An Assignee of a Membership Interest shall succeed to the Capital Contribution of the transferor to the extent of the Membership Interest transferred. An Assignee is bound by this Agreement irrespective of whether the Assignee has signed or otherwise adopted this Agreement. An Assignee's Membership Interest may be redeemed at the option of the Managers as provided in Section 12.3.

10.7.    Effect and Consequences of Prohibited Transfer.

(a)    Except as otherwise required by law, the Company and the Managers shall treat a Prohibited Transfer as void and shall recognize the transferor as continuing to be the owner of the Membership Interest purported to be transferred. If the Company is required by law to recognize a Prohibited Transfer, the transferee shall be treated as an Assignee with respect to the Membership Interest transferred and may not be treated as a Member with respect to the Membership Interest transferred unless admitted as a Member in accordance with Article XI.

(b)    The Company may remove the transferor and Assignee with respect to a Prohibited Transfer as provided in Article XII.

(c)    The transferor and transferee with respect to a Prohibited Transfer shall be jointly and severally liable to the Company for, and shall indemnify and hold the Company harmless against, any expense, liability, or loss incurred by the Company (including reasonable legal fees and expenses) as a result of such transfer, their removal and liquidation of their Membership Interests (if applicable), and the efforts to enforce the indemnity granted in this Section 10.7(c).

MR.499

10.8. Agreements of Spouse: Sole Management Community Property.

(a)    Execution of Spousal Joinder and Consent. The spouse of each Member shall execute and deliver to the Company a Spousal Joinder and Consent in the form of Exhibit B.

(b)    Agreements of Spouse. The spouse of each Member agrees that:

(i)    this Agreement is entirely fair, just and equitable and in his or her best interest;

(ii)    the covenants made in this Agreement are binding on such spouse individually and that such spouse is bound by this Agreement, including insofar as any interest such spouse may have now or hereafter in any Membership Interest by reason of the community property laws of the State of Texas or any other state, or otherwise;

(iii)    whenever, pursuant to the terms of this Agreement, such Member does, or is required to, in any manner transfer, pledge, or encumber his or her Membership Interest, or any interest in such Membership Interest, to the Company or any other person, such transfer, pledge, or encumbrance shall include the community property interest, if any, of such spouse in such Membership Interest so transferred, pledged, or encumbered; and

(iv)    in the event of the death of such spouse, any interest such spouse may have now or hereafter in any Membership Interest which constitutes community property should pass to such Member and, accordingly, such spouse shall will and bequeath such spouse's entire community property interest, if any, in such Membership Interest to such Member.

(c)    Sole Management Community Property. Each Member who is a natural person and his or her spouse agree that such Member's Membership Interest, whether presently owned or hereafter acquired, is, if such Membership Interest is community property, community property subject to the sole management, control, and disposition of such Member.

## ARTICLE XI
## ADMISSION OF NEW MEMBERS

11.1.    Substituted Members. An Assignee of a Membership Interest shall be admitted as a Substituted Member with respect to such Membership Interest on the date on which all of the following conditions are satisfied:

(a)    The Managers have approved in writing the admission of the Substituted Member.

(b)    The Assignee has delivered to the Company any agreements and other documents that the Managers request to confirm such Assignee as a Member in the Company and such Assignee's agreement to be bound by this Agreement as a Member.

MR.500

(c) If requested by the Managers, the Company has received an admission fee in an amount determined by the Managers to be sufficient to reimburse the Company for the estimated expenses likely to be incurred by the Company in connection with the admission of the Assignee as a Substituted Member.

11.2. Additional Members.

(a) In General. The Managers may cause the Company to admit a person as an Additional Member and issue Additional Units to such Additional Member upon satisfaction of all of the following conditions.

(i) A Requisite Percentage has approved the admission of the Additional Member after notice to all Members of (i) the Initial Capital Contribution to be made by the proposed Additional Member, (ii) the effect of the admission on each Partner's Percentage Interest, and (iii) other material information relevant to the proposed admission.

(ii) The admission of the proposed Additional Member satisfies the applicable conditions of Section 10.3.

(iii) The proposed Additional Member has delivered to the Company any agreements and other documents that the Managers request to confirm the person as a Member in the Company and the person's agreement to be bound by this Agreement as a Member.

## ARTICLE XII
## WITHDRAWAL OR REMOVAL OF MEMBERS

12.1. Withdrawal of Members.

(a) No Member may withdraw from the Company or otherwise cease to be a Member except upon the following events:

(i) receipt by the Company of a notice of such Member's withdrawal from the Company;

(ii) a transfer of all of the Member's Membership Interest in a Permitted Transfer; or

(iii) removal of the Member as a Member as provided in this Agreement.

(b) A Member shall be deemed to withdraw from the Company upon the following events:

(i) an event specified in Section 12.1(a);

MR.501

(ii)  an event specified in Section 153.155(a)(4) or Section 153.155(a)(5) of the Code (relating to bankruptcy or insolvency proceedings with respect to a general partner), applied as if the Member were a general partner;

(iii)  if a Member is an individual, the Member's death, the appointment of a guardian or general conservator for the Member, or a judicial determination that the Member is incapable of performing the Member's duties under this Agreement; or

(iv)  if the Member is an entity, an event requiring the Member's winding up or causing the termination of the Member's existence or suspension of the Member's right to do business.

(c)  If a Member ceases to be a Member in violation of Section 12.1(a), the Company may recover damages from the former Member for breach of this Agreement.

12.2.  Removal of Members.

(a)  A Member may be removed as a Member by the unanimous written consent of the Managers under the following circumstances:

(i)  the Member has transferred or attempted to transfer all or any portion of its Membership Interest in a Prohibited Transfer;

(ii)  in the case of any Member who is also a Manager or an Affiliate of a Manager, the Member or its Affiliate has ceased to be a Manager in violation of Section 5.7(a) or has been removed as a Manager in accordance with Section 5.7(b);

(iii)  the Managers determine, in their sole discretion, that it is in the best interest of the Company to remove a Member;

(iv)  the Member has materially breached the terms of this Agreement or any other material agreement with the Company; or

(v)  the Managers determine that removal is necessary to comply with any requirements, conditions, or guidelines contained in any opinion, directive, order, ruling, or regulation of any United States federal or state agency or judicial authority or contained in any United States federal or state statute.

(b)  If the Managers propose to remove a Member pursuant to this Section 12.2, the Managers shall notify the Member in writing of the proposed removal, and if applicable shall provide such Member a reasonable opportunity to cure the event giving rise to removal. The removal of the Member is effective at such time as determined by the Managers in accordance with applicable law and taking into account the Member's opportunity to cure the event giving rise to removal.

MR.502

12.3. Optional Redemption of Membership Interest. Subject to Section 4.4 (relating to limitations on distributions), the Managers, or, if there is no Manager, a Requisite Percentage, may cause the Company to redeem the Membership Interest of an Assignee by paying the Assignee the Fair Value of its Membership Interest as of the redemption date or the actual value of the Members Capital Account. Interest will accrue at the Index Rate on the amount owed under this Section 12.3 from the 30th day after the redemption date to the date the payment is made. The redemption date shall be fixed by the Managers in accordance with the principles of Section 10.4. Except as otherwise required by the I.R.C., amounts paid in redemption of an Assignee's Membership Interest shall be treated as made in exchange for the interest of the Assignee in Company property pursuant to I.R.C. Section 736(b)(1), including the interest of such Assignee in Company goodwill.

12.4. Status of Former Member. A Member who withdraws or has been removed from the Company or otherwise ceases to be a Member has the status of an Assignee with respect to any Membership Interest held by such former Member. Except as provided in Section 12.3 (relating to optional redemption of a Member's Membership Interest) or Article XIII (relating to winding up and termination), such former Member is not entitled to receive any payments under Section 101.205 of the Code.

## ARTICLE XIII
## WINDING UP AND TERMINATION

13.1. Events Requiring Winding Up. The Company shall commence winding up procedures in accordance with this Agreement and the Code upon the first to occur of any of the following events:

(a) a Requisite Percentage vote to wind up and terminate the Company;

(b) a decree by a court requiring the winding up of the Company;

(c) the termination of membership of the last remaining Member; or

(d) the resignation or removal of all Managers if the Members fail to elect a replacement Manager as provided in Section 5.7(f).

13.2. Winding Up Procedures.

(a) On the occurrence of an event requiring winding up of the Company, unless there is an action to continue the Company without winding up in accordance with Section 13.3, the Managers (or other Liquidator as provided below) shall, as soon as reasonably practicable, wind up the Company's business and affairs (including disposing of the Company's assets and applying the proceeds as provided in Section 13.4) and terminate the Company in accordance with this Agreement and the Code. The Company shall cease to carry on its business (except to the extent necessary to wind up its business), collect and sell its property to the extent the

MR.503

property is not to be transferred or distributed in kind, and perform any other act required to wind up its business and affairs.

(b)     If the Managers have wrongfully caused the winding up of the Company or if there is no Manager, (i) a Requisite Percentage may vote to elect a person or persons to accomplish the winding up of the Company, or (ii) if the Members fail to elect a person to accomplish winding up the Company, then any Member or Assignee may petition a court to wind up the Company as provided in Section 11.054 of the Code. The person or persons winding up the Company, whether the Managers or an elected or court appointed person or persons, is referred to in this Agreement as the "Liquidator."

(c)     The Liquidator may determine the time, manner, and terms of any sale or sales of Company property pursuant to such winding up. The Liquidator (if not the Managers) is entitled to receive reasonable compensation for its services; may exercise all of the powers conferred upon the Managers under this Agreement to the extent necessary or desirable in the good faith judgment of the Liquidator to perform its duties; and with respect to acts taken or omitted while acting in such capacity on behalf of the Company, is entitled to the limitation of liability and indemnification rights set forth in Article VI.

(d)     The Liquidator shall provide quarterly reports to the Members and Assignees during the winding up procedure showing the assets and liabilities of the Company, providing information and documents required by the Members and Assignees to comply with their tax reporting obligations, and such other information as the Liquidator deems appropriate. Within a reasonable time after completing the winding up, the Liquidator shall give each Member and Assignee a final statement setting forth the assets, liabilities, and reserves of the Company as of the date of completion of winding up.

13.3.     Continuation Without Winding Up.

(a)     If there is a decision to wind up and terminate the Company as described in Section 13.1(a), the Company may be continued as provided in Section 101.552 of the Code.

(b)     If there is a termination of the continued membership of the last remaining Member as described in Section 13.1(c), then prior to completion of the winding up process but not later than 90 days after the event of termination, the Managers may continue the Company by admitting one or more Members effective as of the occurrence of the event of termination. Any Assignee whose Percentage Interest would be diminished by reason of the admission of an Additional Member under the circumstances described in this Section 13.3(b) must approve the admission of the Additional Member.

13.4.     Liquidation of Assets and Application and Distribution of Proceeds.

(a)     In General. On winding up the Company, the Liquidator shall dispose of the Company's properties and apply and distribute the proceeds, or transfer the Company properties, in the following order of priority:

(i)     to creditors (including Members who are creditors) in accordance with their relative rights and priorities to satisfy the liabilities of the Company, including expenses associated with the winding up and termination of the Company, but excluding any Company liability for any unpaid Mandatory Distributions;

(ii)    to Members, Assignees, and former Members to satisfy the Company's liability for any unpaid Mandatory Distributions; and

(iii)   to Members and Assignees as provided in Section 4.2.

(b)     No Member Deficit Restoration Obligation.   No Member is liable to the Company, to another Member, or to a third party, for the repayment of any deficit in the Member's Capital Account, except as provided in Section 101.206 of the Code.

(c)     Reserves.   In the discretion of the Liquidator, a pro rata portion of the distributions that would otherwise be made pursuant to Section 13.4(a)(ii) and (iii) may be withheld to provide a reasonable reserve for Company liabilities (contingent or otherwise) and future expenses, including a reasonable reserve for any claims for indemnification under Article VI and for any future expenses associated with any tax audit or other Proceeding that is pending or may arise.

(d)     Payments and Distributions to Members in Kind.   The Liquidator may not make any payments or distributions to Members or Assignees pursuant to Section 13.4(a)(ii) or (iii) other than in cash unless all Members and Assignees receiving the property approve the transfer in kind.   The Liquidator shall determine the Fair Market Value of any property transferred to Members or Assignees in kind according to the valuation procedures set forth in Article XIV.

(e)     Character of Liquidating Distributions.   Except as otherwise required by the I.R.C., amounts paid to Members pursuant to this Section 13.4 shall be treated as made in exchange for the interest of the Member in Company property pursuant to I.R.C. Section 736(b)(1), including the interest of such Member in Company goodwill.

13.5.   Certificate of Termination.   The Liquidator shall file a Certificate of Termination of a Domestic Entity on the completion of the winding up of the Company.

13.6.   Reinstatement.   If the Company is terminated, it may be reinstated in the manner provided in the Code.

## ARTICLE XIV
## VALUATION

14.1.   Fair Value of Company Property.   The Fair Value of property contributed to the Company by a Member as part of such Member's Initial Capital Contribution is the amount of such Member's Initial Capital Contribution, as set forth on Exhibit A, minus the amount of any cash contributed to the Company as part of such Member's Initial Capital Contribution.   In all

MR.505

other cases, the Fair Value of an asset as of any date is its fair market value as determined by the Managers in good faith using any reasonable valuation method. If any affected Member does not agree with the valuation set by the Managers, the Fair Value shall be determined using procedures similar to those set forth in Section 14.2, and the cost of any such determination shall be borne entirely by the affected Member unless the Managers or a majority in interest of all Members other than the affected Member approves an alternative allocation of such costs.

14.2.    Fair Value of Membership Interest.

(a)    For purposes of any redemption of a Membership Interest pursuant to Section 12.3, the Fair Value of the Membership Interest is its fair market value as determined by the Managers (or, if there are no Managers, by the Liquidator) in good faith based on the net proceeds that would be received with respect to the Membership Interest in a winding up of the Company, taking into account all expenses associated with such winding up and any damages or other amounts recoverable by the Company from the Assignee or with respect to the Assignee's Membership Interest. In connection with the payment in redemption of the Membership Interest, the Managers or Liquidator shall provide a notice to the Assignee setting forth the Fair Value of the Membership Interest, including information relevant to the determination of such Fair Value.

(b)    If the Assignee does not agree with the Fair Value of the Membership Interest as determined by the Managers or Liquidator, the Member may submit to the Company a notice of objection within 30 days of the Member's receipt of the valuation notice. Within 15 days following receipt of the Assignee's notice of objection, the Company shall appoint a qualified appraiser, and inform the Assignee of the name and business address of the appraiser. The appraiser shall determine the Fair Value of the Membership Interest in accordance with the principles of Section 14.2(a). The appraiser shall give the Assignee and the Managers an opportunity to meet with him prior to completing his appraisal. Except as provided in Section 14.2(c), the appraiser's determination of the Fair Value of the asset(s) in dispute shall be made within 30 days of his appointment (or such longer period as is reasonably required to complete the appraisal), and is final and binding on all concerned, absent manifest error.

(c)    If the Assignee does not approve the appraiser selected by the Company, within 15 days following notification of such selection pursuant to Section 14.2(b) the Assignee may appoint a qualified appraiser of the Assignee's choice, and inform the Company in writing of the name and business address of the appraiser. In such event, the appraisers appointed by the Company and the Assignee shall appoint a third qualified appraiser. Each of the three appraisers shall determine the Fair Value of the Membership Interest in accordance with the principles of Section 14.2(a). The average of the two valuations that are closest to each other shall be determined to be the Fair Value of the Membership Interest and such determination shall be final and binding on all concerned, absent manifest error.

(d)    The cost of each appraisal shall be shared equally by the Company and the Assignee.

MR.506

(e)     The Company shall pay the Assignee any excess of (i) the recomputed Fair Value of the Membership Interest over (ii) the sum of any amount previously paid to the Assignee in redemption of his Membership Interest plus any costs charged to the Assignee as provided in paragraph (d).  The Assignee shall pay the Company any excess of (i) the sum of any amount previously paid to the Assignee in redemption of his Membership Interest plus any costs charged to the Assignee as provided in paragraph (d), over (ii) the recomputed Fair Value of the Membership Interest.

(f)     Interest shall be paid at the Index Rate on any amount determined under Section 14.2(e) for the period from the 30th day after the redemption date to the date the amount is paid.

## ARTICLE XV
## GENERAL PROVISIONS

15.1.   Amendments.

(a)     In General.  Subject to the following exceptions and limitations set forth in Section 15.1(b), this Agreement may be amended only with the approval of a Requisited Percentage.

(b)     Exceptions and Limitations.  The Managers may amend Exhibit A from time to time to reflect the admission and withdrawal of Members, and changes to any Member's Percentage Interest, in accordance with this Agreement.  The Managers may use the power of attorney granted in Section 15.12 to make non-substantive amendments that do not adversely impact the rights or obligations of any Manager or Member.  No amendment of the Agreement may adversely affect any Member's rights or obligations under this Agreement (determined without taking into account the right of other Members to amend the Agreement) without the adversely affected Member's approval.  No amendment of Article VI (relating to liability and indemnification) may adversely affect the rights or obligations of any Indemnified Person without the Indemnified Person's approval.  No amendment of this Agreement may change the requirements under this Agreement for approving any action without the approval of the Members holding an aggregate Percentage Interest required to approve the action.

15.2.   Notice.  Any notice, report, or other communication required or permitted to be made to any person by this Agreement shall be in writing and is deemed given when (a) delivered to the person by hand, (b) the third business day after delivery to the United States Postal Service (or other designated delivery service as defined in I.R.C. Section 7502(f)), postage prepaid, in an envelope properly addressed to the person at the person's address set forth in the Company's records as of the date of delivery, or (c) successfully transmitted by facsimile or electronic message to the facsimile phone number or e-mail address (as applicable) set forth in the Company's records as of the date of transmission.  Any communication to the Managers or the Company may be delivered to the Company's registered office designated pursuant to Section 2.3.

MR.507

15.3. Governing Law; Consent to Jurisdiction. This Agreement is governed by and shall be construed under the laws of the State of Texas without regard to legal requirements that would require the application of the law of any other jurisdiction. Any Proceeding arising out of or relating to this Agreement or the Company's activities or properties may be brought in the state courts of the County where the Company's principal office is located, or, if it has or can acquire jurisdiction, in the United States District Court for the District in which the Company's principal office is located. Each Member and Assignee irrevocably submits to the exclusive jurisdiction of each such court in any such Proceeding, waives any objection it may now or hereafter have to venue or to convenience of forum, agrees that all claims in respect of the Proceeding shall be heard and determined only in any such court and agrees not to bring any such Proceeding in any other court. The Company or any Member or Assignee may file a copy of this Agreement with any court as written evidence of the agreement between the parties irrevocably to waive any objections to venue or to convenience of forum. Process in any Proceeding referred to in the second sentence of this section may be served on any party anywhere in the world.

15.4. Waiver. Any failure by a party to insist upon the strict performance of any covenant or condition of this Agreement, or to exercise any right or remedy upon a breach of any such covenant or condition, does not constitute waiver of any such covenant or condition or any breach thereof.

15.5. Entire Agreement. This Agreement supersedes all prior agreements, whether written or oral, between the parties with respect to its subject matter and constitutes a complete and exclusive statement of the agreement between the parties with respect to its subject matter.

15.6. Successors and Assigns. No Member or Assignee may assign any of its rights or delegate any of its obligations under this Agreement except as expressly permitted in this Agreement.

15.7. Third-Parties. Other than as provided in Section 5.4 (relating to reliance on authority of the Managers), Section 3.6 (relating to Member Notes), Section 11.2(b) (relating to the Cotham/Merritt Note Equity Kicker), and Article VI (relating to rights of Indemnified Persons), none of the provisions of this Agreement are for the benefit of or enforceable by any creditors of the Company or other persons not a party to this Agreement, except such benefits as inure to a successor or permitted assign in accordance with Section 15.6.

15.8. Severability. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

15.9. Construction. The language in this Agreement is to be construed according to its fair meaning and is not to be strictly construed for or against any party. Nothing in this Agreement is to be construed as authorizing or requiring any action that is prohibited by the

MR.508

Code or other applicable law, or as prohibiting any action that is required by the Code or other applicable law.

15.10. Execution of Agreement. This Agreement may be executed in counterparts, each of which will be deemed to be an original copy of this Agreement, and all of which together constitute one agreement. Any signature to this Agreement evidenced by a facsimile transmission of such signature shall be binding on the parties to the same extent as if such signature were an original.

15.11. Further Assurances. The parties shall execute and deliver all documents, provide all information, and take or refrain from taking action as may be necessary or appropriate to achieve the purposes of this Agreement.

15.12. Power of Attorney.

(a) Each Member appoints the Managers and the Liquidator severally with full power of substitution, as the true and lawful attorney-in-fact for such Member, and in the name, place, and stead of such Member, to execute, certify, acknowledge, swear to, file, publish, and record:

(i) any certificate or other document that may be required to be filed by the Company or the Members in order to qualify the Company to do business in any jurisdiction, except that no such filing shall include a consent by any Member to service of process in any jurisdiction without the Member's approval;

(ii) any amendment to the Certificate of Formation, to this Agreement, or to any other agreement or document as required or permitted by this Agreement;

(iii) any certificate of termination and other documents that may be required to effectuate the termination of the Company pursuant to the provisions of this Agreement; and

(iv) any document required of the Company to carry out the actions that the Managers are authorized to take under this Agreement.

(b) The foregoing appointment of the Managers and Liquidator as a Member's attorney-in-fact does not grant such attorney-in-fact any power or authority to approve, consent, or agree to the substantive terms of any agreement or other document on behalf of such Member.

(c) The power of attorney granted pursuant to this Section 15.12 (i) is a special power of attorney coupled with an interest and is irrevocable, and (ii) survives the withdrawal or removal of a Member or the assignment of its Membership Interest.

[This Page Intentionally Left Blank. Signature Page Follows.]

MR.509

Executed as of the Effective Date set forth above, by and among the persons signing below.

MEMBERS:

TXC ENERGY LLC

BY: _____
John V. Calce, Its President

Marc Marrocco, an individual

Antonio Albanese, an individual

MR.510

## EXHIBIT A

### Effective as of September 18, 2013

| MEMBER NAME AND ADDRESS | Number of Units | Initial Capital Contribution |
|---|---|---|
| **TXC Energy LLC**<br>5601 Preakness Ln<br>Plano, Texas 75093 | 300 | $300.00 |
| **Marc Marrocco**<br>3602 Binkley Ave<br>Dallas, Texas 75205 | 300 | $300.00 |
| **Antonio Albanese**<br>6605 Gentle Wind Ln<br>Dallas, Texas 75248 | 300 | $300.00 |

MR.511

# COMPANY AGREEMENT
## OF
## CENTURION LOGISTICS LLC

## EXHIBIT B

### SPOUSAL JOINDER AND CONSENT

I ACKNOWLEDGE (i) THAT I HAVE READ THE FOREGOING COMPANY AGREEMENT OF CENTURION LOGISTICS LLC (THE "AGREEMENT"), (ii) FULLY UNDERSTAND ITS CONTENTS, AND (iii) I HAVE BEEN GIVEN THE OPPORTUNITY TO ASK QUESTIONS AND TO SEEK AND OBTAIN THE ADVICE OF LEGAL COUNSEL CONCERNING MY RIGHTS, AND THE LIMITATIONS ON THOSE RIGHTS, THAT ARE CONTAINED IN THE AGREEMENT. I agree to be bound by all of the terms of the Agreement, including, without limitation, the provisions of Section 10.8. I am aware that, by the provisions of the Agreement, my spouse agrees to hold his or her Membership Interest (as such term is defined in the Agreement) including any portion of such Membership Interest comprising my community property, subject to the specific restrictions on the transfer of such Membership Interests set forth in the Agreement. I agree that I will not make any transfer of, or otherwise deal with, such Membership Interest or my community property interest therein, if any, during my lifetime except as expressly permitted by the Agreement. As provided in Section 10.8 of the Agreement, I agree that, in the event of my death, any Membership Interest that constitutes my community property should pass to my spouse, and I agree to will and bequeath my entire community property interest, if any, in such Membership Interest to my spouse.

Signature: _____

Printed Name: _____

Date: _____

MR.512

# COMPANY AGREEMENT
## OF
## CENTURION LOGISTICS LLC

## APPENDIX A

## PRINCIPLES OF ALLOCATION

A.1    Introduction.  This Appendix sets forth principles under which items of income, gain, loss, deduction and credit shall be allocated among the Members.  This Appendix also provides for the determination and maintenance of Capital Accounts, generally in accordance with Treasury Regulations promulgated under I.R.C. Section 704(b), for purposes of determining such allocations.  For purposes of this Appendix, an Assignee shall be treated in the same manner as a Member.

A.2    Definitions.  Capitalized terms used in this Appendix have the meanings set forth below or in the Agreement.

"Adjusted Capital Account Deficit" means any deficit balance in a Member's Capital Account as of the end of a taxable year, after giving effect to the following adjustments:

(i)    Credit to the Capital Account any amounts the Member is obligated to restore pursuant to the Agreement or is deemed to be obligated to restore pursuant to (a) Treasury Regulations Section 1.704-1(b)(2)(ii)(c) (relating to obligations to pay partner promissory notes and other obligations to make contributions to the Company), or (b) the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) (relating to partnership minimum gain) and 1.704-2(i)(5) (relating to partner nonrecourse debt minimum gain); and

(ii)    Debit to such Capital Account the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition is intended to comply with Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Capital Account" has the meaning set forth in Section A.3.

"Depreciation" means, for each taxable year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such taxable year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such taxable year, Depreciation is an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such taxable year bears to such beginning adjusted tax basis.  If the adjusted basis for federal income tax purposes of an asset at the

11508480 2 2 12 2014

MR.513

beginning of such taxable year is zero. Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Managers.

"Gross Asset Value" means an asset's adjusted basis for federal income tax purposes, except as follows:

(i) The initial Gross Asset Value of an asset contributed by a Member to the Company is the gross Fair Value of such asset, as determined by the contributing Member and the Managers and as set forth on Exhibit A.

(ii) The Gross Asset Values of Company assets shall be adjusted to equal their respective gross Fair Values (taking I.R.C. § 7701(g) into account), as determined by the Managers, as of the following times: (A) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution; (B) the distribution by the Company to a Member of more than a *de minimis* amount of property as consideration for an interest in the Company; (C) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); and (D) in connection with the grant of an interest in the Company (other than a *de minimis* interest) as consideration for the provision of services to or for the benefit of the Company by a Member acting in a member capacity or in anticipation of being a Member. Adjustments pursuant to clauses (A), (B) and (C) above are required only if the Managers determine that such adjustments are necessary to accurately reflect the relative economic interests of the Members in the Company.

(iii) The Gross Asset Value of a Company asset distributed to a Member shall be adjusted to equal the gross Fair Value (taking I.R.C. § 7701(g) into account) of such asset on the date of distribution as determined by the distributee and the Managers.

(iv) The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to I.R.C. Section 734(b) or I.R.C. Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m). Gross Asset Values shall not be adjusted pursuant to this paragraph (iv) to the extent that an adjustment is required pursuant to paragraph (ii).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraphs (i), (ii) or (iv) of this definition, the asset's Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Net Profit and Net Loss.

"Net Profit" and "Net Loss" mean, for each taxable year or other relevant period, an amount equal to the Company's taxable income or loss for such taxable year or other relevant period, determined in accordance with I.R.C. Section 703(a) (for this purpose, all items of

1150848v2 2 12-2014

MR.514

income, gain, loss, or deduction required to be stated separately pursuant to I.R.C. Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(i)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profit or Net Loss shall be added to such taxable income or loss.

(ii)    Any expenditures of the Company described in I.R.C. Section 705(a)(2)(B) or treated as I.R.C. Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profit or Net Loss, shall be subtracted from such taxable income or loss.

(iii)   If the Gross Asset Value of any Company asset is adjusted pursuant to subparagraph (ii) or (iii) of the Section A.2 definition of Gross Asset Value, the amount of such adjustment shall be taken into account as gain or loss from disposition of the asset for purposes of computing Net Profit and Net Loss.

(iv)    Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of (unreduced by any liabilities attributable thereto), notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value.

(v)     In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation computed in accordance with the definition of Depreciation in Section A.2.

(vi)    To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to I.R.C. Section 734(b) is required pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Membership Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Net Profit or Net Loss.

"Nonrecourse Deductions" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(1) and shall be determined according to the provisions of Treasury Regulations Section 1.704-2(c).

"Nonrecourse Liability" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

1150848v2 2 12 2014

MR.515

"Partner Nonrecourse Debt" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(4).

"Partner Nonrecourse Debt Minimum Gain" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(2) and shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

"Partner Nonrecourse Deductions" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(1) and shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(2).

"Partnership Minimum Gain" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(2) and shall be determined in accordance with Treasury Regulations Section 1.704-2(d).

A.3     Capital Accounts. The Company shall determine and maintain Capital Accounts. "Capital Account" means an account of each Member determined and maintained throughout the full term of the Company in accordance with the capital accounting rules of Treasury Regulations Section 1.704-1(b)(2)(iv). Without limiting the generality of the foregoing, the following rules apply:

(a)     The Capital Account of each Member shall be credited with (i) an amount equal to such Member's Capital Contributions and the Fair Value of property contributed (if permitted hereunder) to the Company by such Member, (ii) such Member's share of the Company's Net Profit, and (iii) the amount of any Company liabilities assumed by such Member or that are secured by property distributed to such Member.

(b)     The Capital Account of each Member shall be debited by (i) the amount of cash and the Fair Value of property distributed to such Member, (ii) such Member's share of the Company's Net Loss, and (iii) the amount of any liabilities of such Member assumed by the Company or that are secured by any property contributed by such Member to the Company.

(c)     Upon the transfer by a Member of all or part of an interest in the Company after the Effective Date, the Capital Account of the transferor that is attributable to the transferred interest carries over to the transferee and the Capital Accounts of the Members shall be adjusted to the extent provided in Treasury Regulations Section 1.704-1(b)(2)(iv)(m).

(d)     In determining the amount of any liability for purposes of Sections A.3.1(a) and A.3.1(b), I.R.C. Section 752(c) and any other applicable provisions of the I.R.C. and the Treasury Regulations shall be taken into account.

(e)     Except as otherwise required by Treasury Regulations Section 1.704-1(b)(2)(iv), adjustment to Capital Accounts in respect of Company income, gain, loss, deduction, and I.R.C. Section 705(a)(2)(B) expenditures (or items thereof) shall be made with reference to the federal tax treatment of such items (and, in the case of book items, with reference to the federal tax

MR.516

treatment of the corresponding tax items) at the Company level, without regard to any mandatory or elective tax treatment of such items at the Member level.

(f) The provisions of this Appendix and of the Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b)(2)(iv), and shall be interpreted and applied in a manner consistent with such Treasury Regulations. If the Managers determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including debits or credits relating to liabilities that are secured by contributions or distributed property or that are assumed by the Company or any Member), are computed in order to comply with such Treasury Regulations, the Managers may make such modification if it is not likely to have a material effect on the amounts distributed or to be distributed to any Member pursuant to the Agreement. The Managers shall make any adjustments that are necessary or appropriate (i) to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g), and (ii) if unanticipated events (for example, the acquisition by the Company of oil or gas properties) might otherwise cause this Agreement not to comply with Treasury Regulations Section 1.704-1(b).

(g) The provisions of the proposed Treasury Regulations published on January 22, 2003 (68 Fed. Reg. 2930), as they may subsequently be modified or adopted as temporary or final Treasury Regulations, shall apply with respect to any noncompensatory options issued by the Company.

A.4    Allocations of Net Profit and Net Loss

A.4.1    In General. Subject to Section 3.6, Company Net Profit and Net Loss shall be allocated to the Members as follows:

(a)    Net Profit. Net Profit for any period (excluding tax items allocated pursuant to Sections A.4.2 and A.4.3) shall be allocated as follows:

(i)    First, Net Profit shall be allocated to the Members to the extent of and in proportion to the excess, if any, of (i) the cumulative Net Loss allocated pursuant to Section A.4.1(b) for all prior periods, over (ii) the cumulative Net Profit allocated pursuant to this Section A4.1(a) for all prior periods.

(ii)    Second, any remaining Net Profit shall be allocated to the Members pro rata in accordance with their respective Percentage Interests.

(b)    Net Loss. Net Loss for any period (excluding tax items allocated pursuant to Sections A.4.2 and A.4.3) shall be allocated as follows:

(i)    Net Loss shall be allocated to the Members pro rata in accordance with their respective Percentage Interests, subject to the limitation in Section A.4.1(b)(ii).

MR.517

(ii)    No Member may receive an allocation of Net Loss that would cause the Member to have an Adjusted Capital Account Deficit at the end of the taxable year. Net Loss not allocated to a Member pursuant to this subparagraph (ii) shall be allocated to other Members according to their relative positive Capital Account balances (calculated taking into account the adjustments described in the definition of Adjusted Capital Account Deficit).

A.4.2   Regulatory Allocations. The following special allocations shall be applied in the order in which they are listed. Such ordering is intended to comply with the ordering rules in Treasury Regulations Section 1.704-2(j) and shall be applied consistently therewith.

(a)    Minimum Gain Chargeback.    Except as otherwise provided in Treasury Regulations Section 1.704-2(f), notwithstanding anything to the contrary in this Section A.4, if there is a net decrease in Partnership Minimum Gain during any taxable year, each Member shall be allocated items of income and gain for that taxable year (and, if necessary, subsequent taxable years) equal to that Member's share of the net decrease in Partnership Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g)(2). This Section A.4.2(a) is intended to comply with the minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith, including that no chargeback shall be required to the extent the requirements for requesting a waiver described in Treasury Regulations Section 1.704-2(f)(4) are met or the requirements for any other exception prescribed by or pursuant to Treasury Regulations Section 1.704-2(f) are met.

(b)    Partner Nonrecourse Debt Minimum Gain Chargeback.    Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), notwithstanding anything to the contrary in this Section, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain during a taxable year, then, in addition to the amounts, if any, allocated pursuant to paragraph 4.2(a), any Member with a share of that Partner Nonrecourse Debt Minimum Gain (determined in accordance with Treasury Regulations Section 1.704-2(i)(5)) as of the beginning of the taxable year shall be allocated items of Company income and gain for that taxable year (and, if necessary, for subsequent taxable years) equal to that Member's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(i)(4). This Section A.4.2(b) is intended to comply with the chargeback of partner nonrecourse debt minimum gain required by Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith, including that no chargeback shall be required to the extent the requirements for any exceptions provided in Treasury Regulation Section 1.704-2(i)(4) are met.

(c)    Qualified Income Offset. If any Member unexpectedly receives any adjustment, allocation, or distribution described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5), or (6), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible. An allocation pursuant to the foregoing sentence shall be made only to the extent that such Member would

1150848v2.2 12 2011

MR.518

have an Adjusted Capital Account Deficit after all other allocations provided for in Section A.4 have been tentatively made as if this Section A.4.2(e) were not in this Appendix. This allocation is intended to constitute a "qualified income offset" within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(3) and shall be construed in accordance with the requirements thereof.

(d)     Gross Income Allocation.    In the event a Member has an Adjusted Capital Account Deficit at the end of any taxable year, each such Member shall be specially allocated items of Company income and gain in the amount of such Adjusted Capital Account Deficit as quickly as possible; provided that an allocation pursuant to this clause shall be made only if and to the extent that the Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section A.4 have been made as if this Section A.4.2(d) were not in this Appendix.

(e)     Nonrecourse Deductions.    Nonrecourse Deductions for any taxable year shall be allocated among the Members in accordance with their Percentage Interests.

(f)     Partner Nonrecourse Deductions.    Partner Nonrecourse Deductions for any taxable year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i)(1).

(g)     Basis Adjustments.    To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to I.R.C. Section 734(b) or I.R.C. Section 743(b) is required under Treasury Regulations Section 1.704-1(b)(2)(iv)(m) to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Treasury Regulations.

A.4.3 Curative Allocations.    The allocations set forth in Section A.4.2 hereof (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations. The Members intend that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section A.4.3. Therefore, notwithstanding any other provisions of this Section A.4 (other than the Regulatory Allocations), the Managers shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner the Managers determine appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section A.4.1. In exercising their discretion under this Section A.4.3, the Managers shall take into account future Regulatory Allocations under Sections A.4.2(a) and A.4.2(b) that, although not yet made, are

115084802 2 12 2014

MR.519

likely to offset other Regulatory Allocations previously made under Sections A.4.2(e) and A.4.2(f).

### A.4.4 Other Allocation Rules

(a) Net Profit, Net Loss, and other items shall be allocated to the Members pursuant to this Appendix A as of the last day of each taxable year, and at such times as the Gross Asset Values of Company Property are adjusted pursuant to subparagraph (ii) of the definition of Gross Asset Value.

(b) If during any taxable year any Member's Percentage Interest changes, each Member's share of Net Profit, Net Loss, and other items for such taxable year shall be determined according to their varying interests and I.R.C. Section 706(d), using any conventions permitted by law and selected by the Managers.

(c) All allocations pursuant to this Appendix shall, except as otherwise provided in this Agreement, be divided among the Members in proportion to the Percentage Interests held by each.

(d) For purposes of determining a Member's share of Company "excess nonrecourse liabilities" within the meaning of Treasury Regulations Section 1.752-3(a)(3), the Members' shares of Company profits shall be deemed to be in proportion to their respective Percentage Interests.

(e) To the extent permitted by Treasury Regulations Section 1.704-2(h)(3), the Managers may treat any distribution of the proceeds of a Nonrecourse Liability or a Partner Nonrecourse Debt (that would otherwise be allocable to an increase in Partnership Minimum Gain) as a distribution that is not allocable to an increase in Partnership Minimum Gain to the extent the distribution does not cause or increase an Adjusted Capital Account Deficit for any Member.

### A.5 Tax Allocations

(a) _In General._ Except as otherwise provided in this Section A.5, each item of income, gain, loss, and deduction of the Company for federal income tax purposes shall be allocated among the Members in the same manner as such items are allocated for book purposes under the Agreement and this Appendix.

(b) _Contributed or Revalued Property._ In accordance with I.R.C. Section 704(c) and the related Treasury Regulations, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Gross Asset Value. If the Gross Asset Value of any Company asset is adjusted pursuant to subparagraph (ii) of the definition of Gross Asset Value in Section A.2 hereof, subsequent allocations of income, gain, loss, and deductions

MR.520

with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under I.R.C. Section 704(c) and the related Treasury Regulations. Any elections or other decisions relating to allocations pursuant to this Section A.5 shall be made by the Managers in any manner that reasonably reflects the purpose and intention of this Appendix and the Agreement.

(c)     Credits. Except as otherwise required by Treasury Regulations Section 1.704-1(b)(4)(ii), items of tax credit and tax credit recapture shall be allocated among the Members in accordance with their Percentage Interests.

(d)     Effect of Tax Allocations. Allocations pursuant to this Section are solely for purposes of U.S. federal, state, and local taxes and shall not affect any Member's Capital Account or share of Net Profit, Net Loss, or other items or distributions pursuant to any provision of this Appendix and the Agreement.

1150848\2 2 12-2014

MR.521



## Office of the Secretary of State

### CERTIFICATE OF FILING
### OF

Centurion Logistics LLC
File Number: 801850695

The undersigned, as Secretary of State of Texas, hereby certifies that a Certificate of Formation for the above named Domestic Limited Liability Company (LLC) has been received in this office and has been found to conform to the applicable provisions of law.

ACCORDINGLY, the undersigned, as Secretary of State, and by virtue of the authority vested in the secretary by law, hereby issues this certificate evidencing filing effective on the date shown below.

The issuance of this certificate does not authorize the use of a name in this state in violation of the rights of another under the federal Trademark Act of 1946, the Texas trademark law, the Assumed Business or Professional Name Act, or the common law.

Dated: 09/16/2013

Effective: 09/16/2013



John Steen
Secretary of State

Come visit us on the internet at http://www.sos.state.tx.us/

Phone: (512) 463-5555      Fax: (512) 463-5709      Dial: 7-1-1 for Relay Services
Prepared by: Lisa Sasin      TID: 10306      Document: 504225160002

MR.522

Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $300



## Certificate of Formation
## Limited Liability Company

**Filed in the Office of the
Secretary of State of Texas
Filing #: 801850695 09/16/2013
Document #: 504225160002
Image Generated Electronically
for Web Filing**

### Article 1 - Entity Name and Type

The filing entity being formed is a limited liability company. The name of the entity is:

## Centurion Logistics LLC

### Article 2 – Registered Agent and Registered Office

☑A. The initial registered agent is an organization (cannot be company named above) by the name of:

## Three Bar C Inc

### OR

☐B. The initial registered agent is an individual resident of the state whose name is set forth below:

C. The business address of the registered agent and the registered office address is:

**Street Address:**
**1750 Preston Road**
**Suite 1080  Dallas  TX  75252**

### Consent of Registered Agent

☐A. A copy of the consent of registered agent is attached.

### OR

☑B. The consent of the registered agent is maintained by the entity.

### Article 3 - Governing Authority

☑A. The limited liability company is to be managed by managers.

### OR

☐B. The limited liability company will not have managers. Management of the company is reserved to the members.

The names and addresses of the governing persons are set forth below:

Manager 1: (Business Name) **TXC Energy LLC**

Address: **17950 Preston Rd   Suite 1080  Dallas  TX, USA  75252**

### Article 4 - Purpose

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

### Supplemental Provisions / Information

MR.523

[The attached addendum, if any, is incorporated herein by reference.]

## Organizer

The name and address of the organizer are set forth below.

**John Calce       5601 Preakness Ln Plano TX 75093**

## Effectiveness of Filing

☑ A. This document becomes effective when the document is filed by the secretary of state.

### OR

☐ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

## Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**John Calce**

Signature of Organizer

FILING OFFICE COPY

Exhibit "E"

MR.525



August 22, 2017

CHASE J. POTTER
Direct Phone: 214.651.2026
Direct Fax: 214.659.4145
chase.potter@strasburger.com

**Via Email Only: bkn@snlegal.com**

Brian K. Norman
Shamoun & Norman, LLP
1800 Valley View Lane, Suite 200
Farmers Branch, Texas 75234

RE:     Cause No. DC-16-07706; *Centurion Logistics LLC, individually and derivatively on behalf of Centurion Pecos Terminal LLC v. James Ballengee, et al.* in the 44th Judicial District Court of Dallas County (the "Lawsuit").

Dear Mr. Norman:

As you know, we represent John Calce in the Lawsuit.  Mr. Calce has been named as a defendant in the Lawsuit by Centurion Logistics LLC ("Centurion Logistics").  Mr. Calce is a manager of Centurion Logistics and, therefore, is entitled to indemnification from Centurion Logistics pursuant to Section 6.2 of the Company Agreement of Centurion Logistics (the "Agreement").  A true and correct copy of the Agreement is attached hereto as Exhibit A.

The Agreement specifically provides that Centurion Logistics "indemnifies and holds harmless each Indemnified Person from and against any Damages arising from any Proceeding relating to the conduct of [Centurion Logistics'] business or to any act or omission by such Indemnified Person within the scope of the Indemnified Person's authority in the course of [Centurion Logistics'] business . . . ."  *See* Ex. A § 6.2.  The Agreement further provides that "[a]n Indemnified Person's expenses paid or incurred in defending itself against any Proceeding shall be reimbursed as paid or incurred."  *See id.*

Mr. Calce is an Indemnified Person under the Agreement.  *See* Ex. A § 1.1.  Moreover, the Lawsuit constitutes a Proceeding under the Agreement.  *See id.*  Centurion Logistics is therefore required to reimburse Mr. Calce the expenses he pays or incurs in defending himself in the Lawsuit, including attorneys' fees, as such expenses are paid or incurred.

As of July 31, 2017, Mr. Calce had been billed a total of $114,440.99 in expenses related to his defense of the Lawsuit.  Mr. Calce hereby demands that, on or before August 28, 2017, Centurion Logistics (1) reimburse him the full amount of expenses that he has been invoiced ($114,440.99) plus an additional $50,000 that will be applied to future expenses as they are incurred; and (2) agree to reimburse Mr. Calce the additional expenses, in excess of the

9253092.2/SP/38371/0105/082217

**Strasburger & Price, LLP**

901 Main Street, Suite 4400  |  Dallas, Texas 75202.3794  |  214.651.4300 tel  |  214.651.4330 fax  |  www.strasburger.com

Austin  |  Collin County  |  Dallas  |  Houston  |  San Antonio  |  New York, N.Y.  |  Washington, D.C.  |  Mexico City - Strasburger & Price, SC

MR.526



additional $50,000 referenced above, that he pays or incurs in his defense of the Lawsuit as such expenses are paid or incurred.

Pursuant to Section 6.3 of the Agreement, Mr. Calce hereby affirms that it is his good faith belief that he has met the standard of conduct necessary for indemnification under Section 6.3. Mr. Calce further agrees to repay any amount that is paid or reimbursed by Centurion Logistics, pursuant to Section 6.2, if it is determined by a court of competent jurisdiction that Mr. Calce did not meet the aforementioned standard or if indemnification is otherwise determined to be prohibited by law.

If you would like to discuss this matter further, please do not hesitate to contact me.

Sincerely,

Chase J. Potter

9253092.2/SP/38371/0105/082217

Exhibit "F"

MR.528



GREGORY SHAMOUN
g@snlegal.com

Member of the State Bar of
Texas | New York

September 5, 2017

**VIA ELECTRONIC MAIL (DAVID.KITNER@STRASBURGER.COM):**
David N. Kitner
STRASBURGER & PRICE, LLP
901 Main Street, Suite 6000
Dallas, Texas 75202
Tel. (214) 651-4618
Fax. (214) 659-4079

> Re:    John Calce's Request for Indemnification for claims related to Cause No. DC-16-07706; *Centuirion Logistics LLC, individually and derivatively on behalf of Centruion Pecos Terminal LLC v. James Ballengee, et al.* in the 44th Judicial District Court of Dallas County (the "Litigation") from Centurion Logistics pursuant to the Company Agreement of Centurion Logsitics (the "Company Agreement").

Dear Mr. Kitner:

Centurion Logistics, LLC ("Centurion Logistics") is in receipt of your August 22, 2017 correspondence (the "Indemnification Request"), sent on behalf of John Calce ("Calce") claiming that Mr. Calce is entitled to indemnification from Centurion Logistics based on his status as a manager of Centurion Logistics pursuant to Section 6.2 of the Company Agreement.

Although the Company Agreement grants Calce indemnification for "any act or omission . . . within the scope of [his] authority in the course of the Company's business. . ."[1] the Company does not indemnify Calce from any act or omission that is not within the scope of his authority or in the course of the Company's business. Moreover, the Company Agreement specifically excludes "intentional misconduct, or a knowing violation of law" from the scope of Centurion Logistics' indemnification obligations.[2]

In the present case, as stated in *Plaintiff's Original Petition*, (the "Petition"), the active pleading on file in the Litigation, Centurion Logistics alleges that Calce signed a deed of trust in his capacity as manager of Centurion Pecos to secure a promissory note for Ballenge Interests, LLC and later signed an extension of that same note as a manager of Centurion Pecos.[3] Obviously, Calce was neither acting nor purporting to act "within the scope of [his] authority in course of the Company's business," and was engaging in "intentional misconduct" and "knowing

---

[1] Company Agreement Section 6.2
[2] Company Agreement Section 6.3(a)(1).
[3] Petition ¶¶25-26.

MR.529

violation of law."[4] Accordingly, Centurion Logistics must deny Calce's indemnification request as to liability arising from this conduct.

The Petition also alleges that Calce, along with Stampede, "purported to obligate Centurion Pecos to assume Ballengee Interests' obligations under the notes from Ballengee Interessts to TCB . . ."[5] Calce was neither acting nor purporting to act "within the scope of [his] authority in course of the Company's business,"[6] and was engaging in "intentional misconduct" and "knowing violation of law."[7] Accordingly, Centurion Logistics must deny Calce's indemnification request as to liability arising from this conduct.

Further, the Petition alleges that "Calce created a note . . . purporting to obligate Centurion Pecos to make payments to Centrion Terminals."[8] As before, Calce was neither acting nor purporting to act "within the scope of [his] authority in course of the Company's business,"[9] and was engaged in "intentional misconduct" and a "knowing violation of law."[10] Accordingly, Centurion Logistics must deny Calce's indemnification request as to liability arising from this conduct.

Finally, the Petition alleges that Calce, along with Ballengee Interests, "created fraudulent notes by Centurrion Pecos to Ballengee Interests . . ."[11] As before, Calce was neither acting nor purporting to act "within the scope of [his] authority in course of the Company's business,"[12] and was engaging in "intentional misconduct" and "knowing violation of law."[13] Accordingly, Centurion Logistics must deny Calce's indemnification request as to liability arising from this conduct.

Your contentions that Mr. Calce is an "Indemnified Person"[14] and that the referenced Litigation is a "Proceeding"[15] under the Company Agreement are not contested by Centurion Logistics. However, the claims and factual allegations raised in the Litigation are unrelated to Calce's conduct as a manager of Centurion Logistics. Centurion Logistics' claims for breach of fiduciary duty and aiding and abetting fraudulent concealment are based upon intentional misconduct and knowing violations of law by Calce, where he was purporting to act with the authority of Centurion Pecos. Accordingly, Centurion Logistics must deny Calce's indemnification request as to liability arising from this conduct.

---

[4] Company Agreement Section 6.3(a)(1).
[5] Petition ¶ 27.
[6] Company Agreement Section 6.2.
[7] Company Agreement Section 6.3(a)(1).
[8] Petition ¶ 28.
[9] Company Agreement Section 6.2.
[10] Company Agreement Section 6.3(a)(1).
[11] Petition ¶ 29.
[12] Company Agreement Section 6.2.
[13] Company Agreement Section 6.3(a)(1).
[14] Company Agreement Section 1.1.
[15] Company Agreement Section 1.1.

MR.530

For the reasons set forth above, we believe that your request for indemnification from Centurion Logistics on behalf of Calce is improper, and that no indemnification is owed to Calce pursuant to the terms of the Company Agreement.

If you have any questions regarding this letter, please telephone me at (214) 987-1745.

Sincerely,

*/s/ C. Gregory Shamoun*
C. GREGORY SHAMOUN

MR.531

Exhibit "G"

MR.532

## UNION PACIFIC RAIL ACCESS
## MEMORANDUM OF UNDERSTANDING

Union Pacific Railroad Company ("UP") has reviewed Centurion Logistics ("Company") request for rail service in Pecos, TX as depicted on the conceptual plan dated 4/17/2014. UP is pleased to notify you that we are looking forward to working with you on developing new rail service to Centurion Logistics Pecos, TX location. Based on the conceptual plan and representations made to UP, UP agrees to move forward with its track authorization process subject to Company satisfying the conditions detailed below. This memorandum ("MOU") is being provided to Company to outline the infrastructure elements that UP requires to efficiently and safely provide rail service to Company's new facility (the "Facility") and to establish an understanding of UP's track authorization process. The criteria outlined below are consistent with Union Pacific's Guidelines for Rail Service and Union Pacific's Industry Track Standards, a link to which can be found at http://www.uprr.com/customers/attachments/industry_guidelines.pdf.

In addition to the requirements of Union Pacific's Guidelines for Rail Service and Union Pacific's Industry Track Standards, the following terms and conditions must be met prior to Company proceeding with its new construction:

- This MOU is based upon the commodities, traffic volumes, and methods of operation Company represented in its conceptual plan dated April 17th, 2014. To the extent any of those change, Union Pacific reserves the right to impose additional requirements on providing rail service to the Facility, which could include construction of additional track infrastructure.

- All railcars destined to the Facility must be received by Company upon arrival (i.e., spot on arrival). Railcars will not be held or stored in rail yards or other Union Pacific owned or controlled trackage.

- Company shall manage the inventory of inbound and outbound railcars at the Facility so as not to adversely affect Union Pacific operations, and shall cooperate with Union Pacific operational requirements regarding inventory management.

- Any third party use of tracks in the Facility, including request for new rail service, is subject to prior Union Pacific review and approval.

- Company will perform all intraplant switching at the Facility.

- Based on Company's conceptual plan dated April 17th, 2014, only unit train service is approved at the Facility.

- Company will ensure that all outbound railcars are coupled with air hoses laced.

- Company shall assemble each unit train on its track B (based on Company's conceptual plan dated April 17th, 2014), in its entirety and ready for departure.

- Interior switches must be lined for arrival of inbound train when a unit train arrival is expected.

MR.533

BALLENGEE00000408

- The Facility must have sufficient capacity to chamber full unit trains, accommodate spot on arrival, and allow trains to clear the main line without the train crew stopping to line switches. Maximum unit train size to be determined by UP's Customer Service Profile (CSP) process.

- The Facility as reflected in Company's conceptual plan dated April 17th, 2014, will accommodate inbound and outbound operations coming from and going to the east of the facility. If Company desires train operations from origins west of the facility, Industry must bear all costs of installing a west facing connection with power switches and power derails.

Once Company has satisfied the aforementioned terms and conditions, the next steps in UP's track authorization process are as follows:

1. Company must prepare the Facility's Switch Location Plan (30% drawing) and submit to UP via the Engineering Document Exchange (web application) to initiate UP's design of the signal system associated with Company's project.
2. Company will work with its UP Marketing and Sales representative to prepare a Customer Service Plan, if applicable, and determine the rail service Company would receive and the corresponding rates. Additionally, the UP Marketing and Sales representative will coordinate with other UP departments to determine any other requirements necessary for UP to provide service to Customer.
3. Company must prepare the Facility's track design/construction drawings and submit them to UP via the Engineering Document Exchange (web application) for approval.
4. Company must execute an Industrial Track Agreement with UP.

UP shall only authorize construction of the industry track upon the execution of a Industrial Track Agreement.

UP shall keep confidential all design/construction drawings, plans and other materials related to the new or expanded Facility that Company gives UP during the track construction process.

Union Pacific's offer of conditional acceptance shall expire if Company does not execute and return this MOU to Shanker Chalekode at Union Pacific Company, 1212 Corporate Drive, Ste 300, Irving,TX 75038, within 90 days from the date of this MOU.

Once executed, this MOU shall terminate twelve (12) months after execution unless Company has requested an extension of the MOU. The extension must be requested in writing and approved by Union Pacific.

Company understands that Union Pacific will not authorize construction of the planned industry tracks until the entire track authorization process is complete. Company understands that at no time prior to authorization of track construction is UP agreeing to provide rail service at Facility. Further, Company understands that Union Pacific will not operate on industry owned tracks until UP has approved the Facility track design/construction drawings and Company has fully executed an Industrial Track Agreement with Union Pacific. Additionally, Company understands that all of UP's approvals and authorizations are based on Company's representation of particular volumes and commodities that will be shipped to and/or from the Facility. Any changes in volumes or commodities may change UP's requirements to provide service to the Facility. Consequently, if volumes or commodities change after rail service has begun,

UP may not be able to meet Company's expectation for increased or additional rail service without Company making modifications to the infrastructure or constructing additional infrastructure.

ACKNOWLEDGEMENT: I HAVE READ AND UNDERSTAND UP'S REQUIREMENTS FOR NEW SERVICE AS SET FORTH ABOVE:

Centurion Logistics

By: _____

Printed Name: _Antonio Albanese_

Title: _Principal_

Date: _6/25/14_


Union Pacific Railroad Company

By: _____

Printed Name: _BRAD MOORE_
**Assistant Vice President**
Title: **Industrial Products**

Date: _7/7/2014_

MR.535
BALLENGEE00000408.03

**UNION PACIFIC RAIL ACCESS**
**Track Construction Project Contacts**

Prepared for: Centurion Logistics
Track Construction Project Location: Pecos, TX 6/12/14

Marketing and Sales Representative
Shanker Chalekode
Business Director
1212 Corporate Dr, STE 300 Irving, TX 75038
402-871-9164
Fax: 402-997-4947
skchalek@up.com

Manager of Industry & Public Projects
Steven W. Martchenke
101 S Watson Rd, Arlington, TX 76010
817-353-7625
402-501-2616
swmartch@up.com

Regional Manager Industrial Development
Aaron Brown
Regional Industrial Development Manager
1212 Corporate Dr. Ste 300, Irving, TX 75038
469 262 7059
402 233 3453
akbrown@up.com

Track Agreement Contact
Tammy Anderson
Sr Mgr Industry Track Construction
1400 Douglas St Stop 1350, Omaha, NE 68179
402 544 2305
402 233 2187
tlanderson@up.com

BALLENGEE00000408.04

MR 536

Exhibit "H"

MR.537

This is a legally binding contract, if not understood, consult an attorney.

## COMMERCIAL REAL ESTATE SALE CONTRACT

1.      **PARTIES**:  This contract ("Contract") is made by and between **MONTANE INDUSTRIES, LLC**, SELLER, and **CENTURION LOGISTICS, LLC**, or assigns, BUYER. The "Effective Date" of this Contract shall be the date the Escrow Agent acknowledges, in writing, receipt of the Earnest Money.

2.      **PROPERTY**:  Seller agrees to sell to Buyer and Buyer agrees to purchase the following described real estate located in AB 5609, BLK 4, SEC 76, H&GNNW/4 & PT SW/4, together with any improvements thereon containing approximately 183.400 acres of land, Reeves County, State of Texas, as depicted on Exhibit "A", ("Site Plan"), attached hereto. Such real estate and other property shall be collectively referred to in this Contract as the "Property". The exact size and legal description shall be determined after a survey and prior to Closing. The cost of the survey shall be borne by Seller.

3.      **EXCEPTIONS**:  The Property shall be subject to the Permitted Exceptions (as defined in paragraph 9 of this Contract), zoning ordinances and laws and the following: Nothing additional.

4.      **PURCHASE PRICE**: The "Purchase Price" shall be **One Million, Five Hundred Thousand NO/100 Dollars ($1,500,000.00)** which Buyer agrees to pay as follows: within ten (10) days after this Contract is last executed, Twenty Thousand Dollars and NO/100 ($20,000.00) as "Earnest Money" which is to be deposited in the insured trust or escrow account at **Chicago Title Insurance Company**, 2828 Routh Street, Suite 800, Dallas, Texas 75201, Attn: Michael R. Haas ("Escrow Agent") as part of the consideration of the sale; the balance of the Purchase Price to be paid at Closing in immediately available funds.

5.      **INDEPENDENT CONTRACT CONSIDERATION:** Contemporaneously with the final execution and delivery of this Contract, Buyer shall deliver to Seller and Seller hereby acknowledges the receipt of a check in the amount of One Hundred and NO/100 Dollars ($100.00), which amount the parties bargained for and agreed to as consideration for Seller's grant to Buyer of Buyer's exclusive right to purchase the Property pursuant to the terms hereof and for Seller's execution, delivery and performance of this Contract. Such consideration is in addition to and independent of any other consideration or payment provided in this Contract, is non-refundable under any circumstances, and shall be retained by Seller notwithstanding any other provisions of this Contract.

6.      **CLOSING DATE**:  Subject to all the provisions of this Contract, the closing of this Contract ("Closing") shall take place at the offices of the Escrow Agent within thirty (30) days after satisfaction of all contingencies herein stipulated. Tenant-free possession shall be delivered at Closing. Closing is contingent on a valid Memorandum of Understanding ("MOU") from Union Pacific Railroad.

MR 538

BALLENGEE00000272

7.     **EXISTING FINANCING:** Unless otherwise provided in this Contract, Seller shall make any payments required on existing mortgages or deeds of trust until Closing and upon Closing all such debts upon the Property shall be discharged from Seller's proceeds.

8.     **PRORATIONS:** The rents, income and expenses from the Property shall be prorated between Seller and Buyer as of Closing. Seller shall pay, in full, all tax liens, special assessments, and material and/or workman liens against the Property upon the date of Closing, whether or not any such liens or special assessments are payable in installments. The general ad valorem taxes becoming due and accruing during the calendar year of Closing shall be prorated between Seller and Buyer on the basis of such calendar year, as of Closing. If the amount of the general ad valorem tax cannot be ascertained at Closing, proration shall be computed on the amount for the preceding year's general ad valorem tax. If it is determined by Buyer, either prior to Closing or subsequent to Closing, that a subsequent change in the use of the Property may result in the imposition of an additional tax ("Rollback Taxes"), Seller hereby agrees that:

(i)     If such determination is made prior to Closing, Seller shall deposit at Closing with the Title Company an amount sufficient to pay one hundred percent (100%) of all estimated Rollback Taxes, together with penalties and interest, in order to satisfy all applicable taxing authorities for both the Property and any contiguous property owned by Seller; or

(ii)     If such determination is made after Closing, then any Rollback Taxes plus penalties and interest for both the Property and any contiguous property owned by Seller shall be paid by Seller to Buyer within fifteen (15) days of receipt by Seller of a statement for the Rollback Taxes.

Buyer shall obtain from the tax appraisal district established for the county in which the Property is located the amount of all Rollback Taxes, together with any penalties and interest. If the amount of Rollback Taxes has not yet been determined by the applicable tax appraisal district, then Buyer agrees to obtain from a tax service provider a calculation and furnish said calculation to the Seller, which calculation shall be used for purposes of establishing the escrow with the Title Company or making the payment to Buyer. In the event any of such calculations are found to be erroneous after Seller has made the payment required hereunder, then either party hereto who is entitled to such reimbursement or additional payment shall invoice the other party and such amount shall be paid within fifteen (15) days of receipt of a statement evidencing such corrected amount. These covenants shall not merge with the Deed to be delivered from Seller to Buyer and shall survive the Closing.

9.     **TITLE INSURANCE:** Seller shall deliver and pay for an owner's ALTA title insurance policy insuring marketable fee simple title in Buyer in the amount of the Purchase Price as of the time and date of recordation of Seller's General Warranty Deed, subject only to the Permitted Exceptions defined below. Seller shall, as soon as possible and not later than thirty (30) days after the Effective Date of this Contract, cause to be furnished to Buyer a current commitment to issue the policy (the "Title Commitment"), issued through **Chicago Title Insurance Company** ("Title Company"). Buyer shall have thirty (30) days after receipt of the Title Commitment (the "Review Period") in which to notify Seller in writing of any objections Buyer has to any matters shown or referred to in the Title Commitment. Any matters which are set forth in the Title

BALLENGEE00000272.02    MR 539

Commitment and to which Buyer does not object within the Review Period shall be deemed to be permitted exceptions to the status of Seller's title (the "Permitted Exceptions"). With regard to items to which Buyer does object within the Review Period, Seller

shall have thirty (30) days or such additional time as may be agreed to in writing by Seller and Buyer to satisfy such objections. If Seller does not cure the objections within the time specified in this paragraph, this Contract shall automatically be terminated unless Buyer elects to waive the objections on or before Closing.

10.     INSPECTIONS: Beginning on the Effective Date of this Contract and continuing for a period of Ninety (90) days thereafter, Seller shall grant Buyer reasonable access to the Property (the "Inspection Period") in order to allow Buyer and its agents, at Buyer's sole cost and expense, to inspect the Property and perform and/or obtain any tests, surveys, studies and assessments, including, but not limited to, a Phase I and Phase II Environmental Assessment involving soil and ground water borings and/or excavations as determined necessary by Buyer. Buyer agrees to repair any damage to the Property arising from these inspections and to indemnify, defend and hold Seller harmless from and against all claims, costs, demands and expenses, including without limitation, reasonable attorneys' fees, court costs and other legal expenses, resulting from these inspections. Buyer's obligations imposed by this paragraph shall survive termination of this Contract. In the event Buyer determines in its sole and absolute discretion that the Property is not suitable for Buyer's intended use within the Inspection Period, as may be extended as provided herein, Buyer may elect to terminate this Contract by written notice to Seller and Escrow Agent. If this Contract is terminated, the Earnest Money Deposit shall be distributed pursuant to the provisions of paragraph 16, and neither party shall have any further obligations hereunder. In the absence of such termination notice, this inspection condition shall be deemed satisfied, and Buyer shall be deemed to be thoroughly acquainted and satisfied with the physical condition of the Property upon Closing. Seller acknowledges and agrees that there are numerous material contingencies to Buyer's acquisition of the Property, including, but not limited to, obtaining necessary governmental approvals and permits, curb cut authorizations, necessary access rights, zoning, availability of utilities, and Buyer's determination of the economic feasibility and general suitability of the Property for Buyer's proposed use. Seller agrees to reasonably cooperate with Buyer, at no cost or expense to Seller, regarding Buyer's inspection of the Property, including, but not limited to, executing any disposal manifests or other documents related to the environmental testing performed by Buyer.

11.     EXTENSIONS: In the event Buyer is unable to satisfy any contingency in this Contract within the Inspection Period, Buyer shall have the right to extend the Inspection Period on a month-to-month basis upon written notice to Seller and the payment of Two Thousand and NO/100 Dollars ($2,000.00) per month to the Escrow Agent as Additional Earnest Money. Any such payments made by Buyer shall be non-refundable for any reason other than Seller's default, but, upon Closing, shall be applied to the Purchase Price. Buyer's right to extend the Inspection Period hereunder shall be limited to an additional three (3) months.

12.     REPRESENTATIONS: Buyer acknowledges that neither Seller nor any party on Seller's behalf has made, nor do they hereby make, any representations as to the past, present or future condition, income, expenses, operation or any other matter or thing affecting or relating to the Property except as expressly set forth in this Contract.

BALLENGEE00000272.03

MR 540

**13. DELIVERY OF DEED; PAYMENT; DISBURSEMENT OF PROCEEDS:** At or before Closing, Seller agrees to properly execute and deliver into escrow a General Warranty Deed and all other documents and funds reasonably necessary to complete the Closing. The General Warranty Deed shall convey to Buyer marketable fee simple title to the Property, free and clear of all liens and encumbrances, other than the Permitted Exceptions. At or before the Closing, Seller and Buyer each agree to deliver into escrow a cashier's check or guaranteed funds sufficient to satisfy their respective obligations under this Contract.

**14. INSURANCE; MAINTENANCE; CASUALTY; CONDEMNATION; CHANGE OF CONDITION:** Risk of loss to the Property shall be upon Seller until Closing or transfer of possession, whichever occurs last. Seller agrees to maintain Seller's current fire and extended coverage insurance, if any, on the Property until Closing. Seller shall do ordinary and necessary maintenance, upkeep and repair to the Property through Closing. If, before Closing, all or any part of the Property is taken by eminent domain, or if a condemnation proceeding has been filed or is threatened against the Property or any part thereof, or if all or any part of the Property is destroyed or materially damaged after the Inspection Period, Seller shall promptly provide written notice to Buyer of any such event. Upon notice of such occurrence, Buyer may re-inspect the Property and may, by written notice to Seller within ten (10) days after receiving Seller's notice, terminate this Contract. Unless this Contract is so terminated, it shall remain in full force and effect, and Seller shall at Closing assign and transfer to Buyer all of Seller's right, title and interest in and to any awards that may be made for any taking and any insurance proceeds payable on account of casualty. The provisions of this paragraph shall survive Closing.

**15. FOREIGN INVESTMENT:** Seller represents that Seller is not a foreign person as described in the Foreign Investment in Real Property Tax Act and agrees to deliver a certificate at Closing to that effect which shall contain Seller's tax identification number.

**16. TERMINATION:** If this Contract is terminated by either party pursuant to a right expressly given in this Contract, Buyer shall be entitled to an immediate return of the Earnest Money, and neither party shall have any further rights or obligations under this Contract except as otherwise stated in this Contract.

**17. DEFAULT AND REMEDIES:** Seller or Buyer shall be in default under this Contract if either fails to comply with any material covenant, agreement or obligation within any time limits required by this Contract. Following default by either Seller or Buyer under this Contract, the other party shall have the following remedies, subject to the provisions of paragraph 19 of this Contract:

(a) If Seller defaults, Buyer may (i) specifically enforce this Contract and recover damages suffered by Buyer as a result of the delay in the acquisition of the Property; or (ii) terminate this Contract by written notice to Seller and, at Buyer's option, pursue any remedy and damages available at law or in equity. If Buyer elects to terminate this Contract, the Earnest Money shall be returned to Buyer upon written demand.

(b) If Buyer defaults, Seller may terminate this Contract by written notice to Buyer and retain the Earnest Money as liquidated damages as Seller's sole remedy. The parties hereby

BALLENGEE00000272.04

MR 541

acknowledge that it would be extremely difficult to ascertain the extent of actual damages caused by Buyer's breach and that the Earnest Money represents as fair an approximation of such actual damages as the parties can now determine.

If, as a result of a default under this Contract, either Seller or Buyer employs an attorney to enforce its rights, the defaulting party shall, unless prohibited by law, reimburse the non-defaulting party for all reasonable attorney's fees, court costs and other legal expenses incurred by the non-defaulting party in connection with the default.

18. **DISPOSITION OF EARNEST MONEY AND OTHER FUNDS AND DOCUMENTS:** Upon delivery of the deed at Closing, the Earnest Money shall be credited against the Purchase Price. In the event a valid dispute arises over the disposition of funds or documents deposited with the Escrow Agent, the Escrow Agent shall not be obligated to disperse the disputed portion thereof nor shall Escrow Agent be required affirmatively to commence any action against Buyer or Seller or defend any action that a claimant might commence. In the event a dispute results in litigation, any attorney's fees, court costs and other legal expenses incurred by the Escrow Agent in connection with such dispute shall be reimbursed from the Earnest Money or from other funds deposited with the Escrow Agent.

19. **ENTIRE AGREEMENT AND MANNER OF MODIFICATION:** This Contract, and any attachments or addendum hereto, constitutes the complete agreement of the parties concerning the Property, and supersedes all other agreements and may be modified only by both parties initialing changes in this Contract or by written agreement.

20. **NOTICES:** All notices required under this Contract shall be deemed to be properly served if reduced to writing and sent by (i) certified or registered mail; (ii) Federal Express or similar overnight courier; (iii) facsimile transmission; or (iv) personal delivery and the date of such notice will be deemed to have been the date on which such notice is delivered or attempted to be delivered as shown by the certified mail return receipt or a commercial delivery service record, or in the case of facsimile on the date of receipt of the transmission as shown on a successful transmission confirmation receipt. All notices shall be addressed as follows, unless otherwise specified in writing:

**SELLER:**

MONTANE INDUSTRIES, LLC
3939 W. Green Oaks Blvd. #202
Arlington, Texas 76016
Email: f.arceneaux@ielpros.com
Facsimile No: 817-451-3903

**BUYER:**

CENTURION LOGISTICS, LLC,
or Assigns
17950 Preston Road, Suite 1080
Dallas, Texas 75252

22. **TIME AND EXACT PERFORMANCE ARE OF THE ESSENCE UNDER THIS CONTRACT.** Buyer and Seller hereby agree to perform each and every obligation hereunder in a prompt and timely manner; provided, however, that if the date for the performance of any action or obligation, or any time period specified hereunder occurs on a Saturday, Sunday or United States bank holiday, then such date or time period shall be extended until the next business day.

BALLENGEE00000272.05    MR 542

23. **ADDITIONAL TERMS:**

a. Seller shall cooperate with Buyer in filing and pursuing governmental approvals and in seeking and making application for curb cuts, zoning, licenses and permits as determined necessary by Buyer, provided such cooperation is at no cost or expense to Seller. It is understood that Buyer will be expending considerable time, effort and/or money in conducting the foregoing inspections, which shall constitute independent consideration to Seller for removing the Property from the market.

b. Environmental Hazards: In the event underground storage tanks, hazardous substances or hazardous waste, as defined by any federal, state or local statute, law, ordinance, or regulation are discovered on the Property prior to Closing, whether installed, placed or disposed of by Seller or a previous owner, Buyer may elect (i) to terminate this Contract, or (ii) for Buyer to be responsible for any costs and expenses related to the removal of such underground storage tanks, hazardous substances or hazardous waste, including any required remediation or monitoring, in compliance with any federal, state or local environmental regulations (the "Environmental Matters"). In the event Buyer elects to be responsible for the Environmental Matters, Seller agrees to cooperate with Buyer and execute any documents, applications, or permits regarding the Environmental Matters. Seller's agreement to cooperate with Buyer as referenced in this paragraph shall survive Closing.

c. Utilities: The closing of this transaction is contingent upon utility connections to existing water wells, natural gas line and electricity being located to the Property or in the public street or right-of-way, or other form of public utility easement, adjoining the Property and being available for the use of the Property without further cost to Buyer, except for the normal costs of connecting such utilities.

d. Assignment: Buyer may assign this Contract, provided the assignee assumes, in writing, all obligations and liabilities of Buyer under the Contract. Buyer shall be relieved of any liability hereunder.

e. At Closing Seller shall deliver the Property to Buyer free and clear of any and all leases, tenancies, or persons in possession.

f. Buyer and or assignee agree that the property is to be developed into a rail terminal and rail served industrial park. Buyer and Seller agree to enter into an access agreement (the "Access Agreement") during the inspection period whereby the terms and provisions for Seller's rights to access the Union Pacific main line through the Property will be described. Additionally, Buyer and Seller agree to enter into an option agreement (the "Option Agreement") during the inspection period whereby Buyer and Seller will set the terms for Buyer's right, not obligation, to acquire Seller's remaining 320 acres tract better described as Section 75, BLK 4, Reeves County, Texas.

BALLENGEE00000272.06    MR 543

SELLER:

MONTANE INDUSTRIES, LLC

By: _____

Farrell Ackeurey
(Printed Name)

Manager
(Title)

Date: _12 Feb 2014_

BUYER:

CENTURION LOGISTICS, LLC,
or Assigns

By: _____

(Printed Name)

Manager
(Title)

Date: _7 Feb 2014_

MR 544

BALLENGEE00000272.07

## EXHIBIT "A"

### Site Plan



MR.545

BALLENGEE00000272.08

Exhibit "I"

COMPANY AGREEMENT

OF

CENTURION PECOS TERMINAL LLC

a Texas Limited Liability Company

September 12, 2014

THE MEMBERSHIP INTERESTS REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER ANY SECURITIES LAWS, AND MAY NOT BE SOLD, PLEDGED, OR OTHERWISE TRANSFERRED ABSENT SUCH REGISTRATION OR AN EXEMPTION THEREFROM. THE TRANSFER OF MEMBERSHIP INTERESTS IS FURTHER RESTRICTED BY ARTICLE X OF THIS AGREEMENT.

MR.547

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ........................................................................................................1
    1.1.    Defined Terms ..............................................................................................1
    1.2.    Construction...................................................................................................5

ARTICLE II ORGANIZATIONAL MATTERS .........................................................................6
    2.1.    Formation......................................................................................................6
    2.2.    Name.............................................................................................................6
    2.3.    Registered Office and Agent; Principal Office.............................................6
    2.4.    Term..............................................................................................................6
    2.5.    Purposes........................................................................................................6
    2.6.    Powers...........................................................................................................6
    2.7.    Company Property .........................................................................................6
    2.8.    Consent to Admission of Members ..............................................................7
    2.9.    Status of Managers and Members..................................................................7
    2.10.   Certificates of Membership Interests ...........................................................7
    2.11.   No State Law Partnership .............................................................................7

ARTICLE III CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS.....................................7
    3.1.    Initial Capital Contributions ........................................................................7
    3.2.    Additional Capital Contributions..................................................................7
    3.3.    Capital Accounts............................................................................................7
    3.4.    No Right to Return of or Interest on Capital Account ..................................7
    3.5.    Member Loans ..............................................................................................8

ARTICLE IV ALLOCATIONS AND DISTRIBUTIONS...........................................................8
    4.1.    Allocation of Profit or Loss .........................................................................8
    4.2.    Distributions of Distributable Cash ..............................................................8
    4.3.    Withholding ..................................................................................................9
    4.4.    Limitation on Distributions...........................................................................9
    4.5.    No Right to Partition or Distributions in Kind .............................................9
    4.6.    Recovery of Erroneous Distributions ...........................................................9

ARTICLE V MANAGEMENT; ACTIVITIES OF MANAGERS AND MEMBERS .................9
    5.1.    Management and Control of Company Business ..........................................9
    5.2.    Resignation, Removal, and Replacement of Managers ...............................10
    5.3.    Actions of the Board of Managers ..............................................................11
    5.4.    Limitations on Board of Managers' Authority ...........................................11
    5.5.    Delegation of Authority; Officers................................................................12
    5.6.    Reliance .......................................................................................................13
    5.7.    Compensation and Expenses of Members and Managers ...........................13
    5.8.    Standards of Manager and Member Conduct ..............................................13

ARTICLE VI LIABILITY AND INDEMNIFICATION ...........................................................14

6.1. Limitation of Liability ........................................................................................ 14
6.2. Indemnification by Company ............................................................................ 14
6.3. Conduct Not Protected ...................................................................................... 14
6.4. Insurance ............................................................................................................ 15
6.5. Survival .............................................................................................................. 15

ARTICLE VII BOOKS AND RECORDS; REPORTS ................................................... 15
7.1. Maintenance of and Access to Books and Records ........................................... 15
7.2. Fiscal Year ......................................................................................................... 15
7.3. Financial and Operating Reports ....................................................................... 15
7.4. Tax Reports ........................................................................................................ 16
7.5. Transmission of Communications ..................................................................... 16

ARTICLE VIII TAX MATTERS .................................................................................... 16
8.1. Tax Classification .............................................................................................. 16
8.2. Company Returns .............................................................................................. 16
8.3. Tax Elections ..................................................................................................... 16
8.4. Consistent Reporting ......................................................................................... 17
8.5. Tax Proceedings ................................................................................................ 17
8.6. Information and Documents to Company ........................................................... 17
8.7. Survival .............................................................................................................. 17

ARTICLE IX MEETINGS AND VOTING OF MEMBERS ......................................... 17
9.1. Meetings ............................................................................................................. 17
9.2. Voting ................................................................................................................. 18

ARTICLE X TRANSFER OF MEMBERSHIP INTERESTS ........................................ 18
10.1. Limitation on Transfers ..................................................................................... 18
10.2. Permitted Transfer of Membership Interest ...................................................... 18
10.3. Right of First Refusal; Tag-Along Rights; Triggering Events .......................... 19
10.4. Conditions to Permitted Transfers of Membership Interests ............................. 20
10.5. Effective Date; Distributions ............................................................................ 21
10.6. Transferor's Obligations .................................................................................... 21
10.7. Assignee's Rights and Obligations .................................................................... 21
10.8. Effect and Consequences of Prohibited Transfer .............................................. 21

ARTICLE XI ADMISSION OF NEW MEMBERS ....................................................... 22
11.1. Substituted Members ......................................................................................... 22
11.2. Additional Members .......................................................................................... 22
11.3. No Required Capital Contributions ................................................................... 22

ARTICLE XII WITHDRAWAL OR REMOVAL OF MEMBERS .............................. 23
12.1. Withdrawal of Members .................................................................................... 23
12.2. Removal of Members ......................................................................................... 23
12.3. Status of Former Member .................................................................................. 23

ARTICLE XIII WINDING UP AND TERMINATION .................................................. 24

13.1.   Events Requiring Winding Up..........................................................24
13.2.   Winding Up Procedures................................................................24
13.3.   Continuation Without Winding Up..................................................25
13.4.   Liquidation of Assets and Application and Distribution of Proceeds....................25
13.5.   Certificate of Termination ...........................................................26
13.6.   Reinstatement...........................................................................26

ARTICLE XIV  VALUATION ........................................................................26
14.1.   Fair Value of Company Property ....................................................26
14.2.   Purchase Price of Membership Interest ...........................................26
14.3.   Valuation of Membership Interests.................................................26

ARTICLE XV  GENERAL PROVISIONS..........................................................26
15.1.   Amendments............................................................................26
15.2.   Notice....................................................................................27
15.3.   Governing Law; Consent to Jurisdiction .........................................27
15.4.   Waiver...................................................................................27
15.5.   Entire Agreement......................................................................27
15.6.   Successors and Assigns ..............................................................27
15.7.   Third-Parties ..........................................................................27
15.8.   Severability ...........................................................................27
15.9.   Construction...........................................................................28
15.10.  Execution of Agreement .............................................................28
15.11.  Further Assurances ...................................................................28

MR.550

# COMPANY AGREEMENT
## OF
## CENTURION PECOS TERMINAL LLC

This Company Agreement of Centurion Pecos Terminal LLC (this "Agreement") is entered into effective as of September 12, 2014 (the "Effective Date"), by the persons identified on the signature page(s) hereof.

WHEREAS, the Company was formed pursuant to a Certificate of Formation filed with the Secretary of State of the State of Texas (the "Certificate of Formation") effective on September 12, 2014 (the "Formation Date"); and

WHEREAS, the parties desire to provide for the regulation and management of the affairs of the Company according to this Agreement and the Code (as herein defined):

NOW, THEREFORE, the parties agree as follows:

## ARTICLE I
## DEFINITIONS

1.1.    Defined Terms. The following definitions, and the definitions set forth in Appendix A to this Agreement, apply to the terms used in this Agreement for all purposes.

"Additional Capital Contribution" means the sum of cash and the Fair Value of any property contributed to the Company with respect to a Membership Interest as permitted under this Agreement, but does not include an Initial Capital Contribution.

"Additional Member" means a person who acquires a Membership Interest from the Company in exchange for a Capital Contribution and is admitted to the Company as a Member pursuant to Section 11.2 after the Effective Date.

"Affiliate" means a person who directly or indirectly Controls, is Controlled by, or is under common Control with the person in question.

"Agreement" means this Company Agreement, as it may be amended, supplemented, or restated from time to time.

"Assignee" means (a) a person to whom a Membership Interest has been transferred by a Member or Assignee in a Permitted Transfer, or in a Prohibited Transfer that the Company is required by law to recognize, but who has not become a Member, and (b) a former Member as described in Section 12.3.

"Board of Managers" means all of the Managers acting together.

"CAM" means CAM Oil and Natural Gas, LLC, a Louisiana limited liability company.

"Capital Contribution" means the sum of the Initial Capital Contribution and Additional Capital Contributions, if any, with respect to a Membership Interest.

MR.551

"Centurion" means Centurion Logistics LLC, a Texas limited liability company, and a Member of the Company as of the Effective Date.

"Certificate of Formation" means the Certificate of Formation identified in the recitals to this Agreement, as such certificate may be corrected, amended, or restated.

"Certificate of Membership Interest" means a certificate representing a Member's Membership Interest in a form approved by the Board of Managers.

"Code" means the Texas Business Organizations Code.

"Company" means the limited liability company formed pursuant to the Certificate of Formation.

"Change of Control" means with respect to a Member, that the owners of such Member (as existing as of the date hereof) shall (i) cease to own, directly or indirectly, 51.0% of the outstanding ownership interests of such Member, or (ii) cease to own or exercise voting control over 51.0% of the outstanding voting interests of such Member.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise.

"Damages" means any expense or loss (including any court costs, judgment or settlement payment, penalty, fine, tax, and reasonable attorney's fees or other dispute resolution costs) paid or incurred in connection with or as a consequence of any Proceeding, net of any insurance or other recoveries received by the Indemnified Person with respect to the foregoing.

"Distributable Cash" means the cash and cash equivalents held by the Company from operations reasonably determined by the Board of Managers to be available for distribution to the Members after payment of the Company's debts, expenses, and other obligations, and after establishment and maintenance of such cash reserves as the Board of Managers determines should be retained for the reasonable current and future needs of the Company's business.

"Effective Date" is defined in the introduction to this Agreement.

"CAM Capital Contribution Balance" means, with respect to CAM, the total Capital Contribution of CAM less the cumulative distributions of cash by the Company to CAM in return of CAM's Capital Contribution pursuant to Section 4.2(a)(ii). For purposes of calculating the CAM Capital Contribution Balance, no deduction shall be made for any tax distributions made to CAM, whether pursuant to Section 4.2(b) of this Agreement or otherwise.

"CAM Preferred Return Balance" means, with respect to CAM, the cumulative accrued CAM Preferred Return less the cumulative distributions of cash by the Company to CAM in payment of the CAM Preferred Return pursuant to Section 4.2(a)(i). For purposes of calculating the CAM Preferred Return Balance, no deduction shall be made for any tax distributions made to CAM, whether pursuant to Section 4.2(b) of this Agreement or otherwise.

"Entity" means any general partnership, limited partnership, limited liability partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative, association, foreign trust, foreign business organization, or other business entity.

MR.552

"Fair Value" means, with respect to an asset, its Fair Value determined according to Section 14.1.

"Fiscal Year" is defined in Section 7.2.

"Formation Date" is defined in the recitals to this Agreement.

"Indemnified Person" means (a) a Member or Assignee; (b) a Manager, (c) a Liquidator (if any); (d) any Affiliate of the Company, a Member or Assignee, a Manager, or a Liquidator; and (e) any governing person, officer, employee, agent, or owner of the Company, a Member or Assignee, a Manager, a Liquidator, or any Affiliate of any of the foregoing. A person is an Indemnified Person whether or not such person has the status required to be an Indemnified Person at the time any Proceeding is made or maintained as described in Article VI or at the time any amendment to this Agreement is proposed under Section 15.1, provided such person had the status required to be an Indemnified Person at the time of the relevant actions referenced in the Proceeding.

"Index Rate" means the rate specified in Section 302.002 of the Texas Finance Code.

"Initial Capital Contribution" means the sum of any cash and the Fair Value of any property contributed to the Company by a Member with respect to a Membership Interest in connection with the original issuance of the Membership Interest by the Company as set forth on Exhibit A.

"CAM Preferred Return" means, with respect to CAM an amount equal to an 8% cumulative compounded annual return on the amount of CAM's unreturned total Capital Contribution accrued as of any date of determination. The CAM Preferred Return will be calculated by treating all distributions of the CAM Preferred Return pursuant to Section 4.2(a) as first being a payment of any undistributed accumulated annual return as of the distribution date and then being a repayment of any and all of CAM's Capital Contributions as of the distribution date.

"I.R.C." means the Internal Revenue Code of 1986.

"Liquidator" is defined in Section 13.2(b).

"Majority-in-Interest" means one or more Members owning collectively more than 50% of the Percentage Interests owned by all Members entitled to vote on the particular issue.

"Manager" means the person or persons designated as manager of the Company in the Certificate of Formation and any person who becomes a replacement Manager pursuant to Section 5.2. The name of the person designated as manager of the Company in the Certificate of Formation is John V. Calce.

"Mandatory Distribution" means any distribution that a Member is entitled to receive and as to which the Member has attained the status of a creditor under Section 101.207 of the Code.

"Member" means any person identified as a member on Exhibit A, and any other person who becomes a member of the Company pursuant to this Agreement, who has not ceased to be a Member. "Members" means all persons that are Members, collectively.

"Membership Interest" means a Member's or Assignee's economic interest in the Company. The term includes the Member's or Assignee's right to receive allocations of profits and losses and distributions as described in Article IV, and other rights and obligations under this Agreement or the

MR.553

Code of an Assignee who has not been admitted as a Member, but does not include any right to participate in management or any other right reserved under this Agreement or the Code exclusively to a Member.

"Offering Member" is defined in Section 10.3(c)(i).

"Percentage Interest" means, as to any Member or Assignee, the percentage interest set forth on Exhibit A.

"Permitted Transfer" means any transfer of a Membership Interest that is described in Section 10.2.

"Person" or "person" means any individual or Entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such "Person," as and where the context so permits or requires.

"Proceeding" means (a) any threatened, pending, or completed action or other proceeding, whether civil, criminal, administrative, arbitrative, or investigative; (b) an appeal of any such proceeding; and (c) an inquiry or investigation that could lead to any such proceeding.

"Prohibited Transfer" means any transfer of a Membership Interest that is not a Permitted Transfer.

"Redemption Notice" is defined in Section 10.3(c)(i).

"Redemption Option" is defined in Section 10.3(c)(i).

"Substituted Member" means a person who is admitted as a Member pursuant to Section 11.1 with respect to the transfer of an existing Membership Interest.

"Treasury Regulations" means the Treasury regulations promulgated under the I.R.C.

"Triggering Event" means the first to occur of (a) the date of a Prohibited Transfer, including any transfer to (i) a Member's trustee in bankruptcy, (ii) a purchaser at any creditor's or court sale, (iii) a Member's spouse pursuant to a decree of a divorce court, or (iv) the guardian of an incompetent Member, (b) the date of death of an individual Member, (c) the date of a Change of Control or termination of a Member that is not an individual; (d) the removal of a Member pursuant to Section 12.2; or (e) the voluntary election of a Member that is not an individual to liquidate all or substantially all of its assets and/or dissolve.

"Triggering Event Closing" is defined in Section 10.3(c)(ii).

"Triggering Event Purchase Price" means, in the case of a Membership Interest to be purchased pursuant to Section 10.3(c), the "fair market value" (as defined in this paragraph) of the Membership Interest as of the date of the Triggering Event, determined assuming an arms length sale of all of the Company's assets to a third party (as a going concern and not as a liquidation) for fair market value and the application of the proceeds of the sale according to Section 13.4. The Triggering Event Purchase Price will be determined (a) if there is in effect as of the date of the Triggering Event a valid Certificate of Fair Market Value in substantially the form attached as Schedule A executed by all Members, by reference to the fair market value for such Membership Interest as set forth in such Certificate of Fair

MR.554

Market Value, and (b) if there is no such Certificate of Fair Market Value effective with respect to the Triggering Event, (i) by agreement of the Company and the Offering Member or the Offering Member's successor in interest, as applicable, or (ii) if no such agreement is reached within 30 days after the issuance of the Redemption Notice, by an independent appraiser chosen mutually by the Company and the Offering Member or the Offering Member's successor in interest, as applicable; provided, however, that in determining the fair market value of a Member's Membership Interest, such appraiser shall take into account the CAM's Capital Contribution Balance and the CAM Preferred Return Balance and shall increase or decrease Triggering Event Purchase Price of each Member's Membership Interest accordingly. Any fair market value agreed by the Members in a Certificate of Fair Market Value shall be effective until the earlier of (A) 90 days from the date set forth in any such Certificate of Fair Market Value, or (A) the date that a new Certificate of Fair Market Value has been executed by all of the Members.

1.2.    Construction. In this Agreement, unless a clear contrary intention appears:

(a)    the singular number includes the plural number and vice versa;

(b)    reference to any person includes such person's successors and assigns but, if applicable, only if such successors and assigns are not prohibited by this Agreement, and reference to a person in a particular capacity excludes such person in any other capacity or individually;

(c)    reference to any gender includes the other gender and the neuter;

(d)    reference to any agreement or other document means such agreement or other document as amended or modified and in effect from time to time;

(e)    reference to any statute, regulation, or other legal requirement means such legal requirement as amended, modified, codified, replaced, or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder, and reference to any section or other provision of any legal requirement means that provision of such legal requirement from time to time in effect and constituting the substantive amendment, modification, codification, replacement, or reenactment of such section or other provision;

(f)    "hereunder," "hereof," "hereto," and words of similar import refer to this Agreement as a whole and not to any particular Article, Section, or other provision hereof;

(g)    "including" (and with its correlative meaning "include") means including without limiting the generality of any description preceding such term;

(h)    "or" is used in the inclusive sense of "and/or";

(i)    with respect to the determination of any period of time, "from" means "from and including" and "to" means "to but excluding"; and

(j)    references to agreements or other documents refer as well to all addenda, exhibits, schedules, or amendments thereto.

MR.555

## ARTICLE II
## ORGANIZATIONAL MATTERS

2.1. <u>Formation</u>. The Company was formed pursuant to the Certificate of Formation effective as of the Formation Date.

2.2. <u>Name</u>. The Company's name is as set forth in the Certificate of Formation. The Board of Managers may change the Company name at any time without the approval of any Member by filing a certificate of amendment to the Certificate of Formation. The Board of Managers shall provide notice of any such change to all Members. The Company's business may be conducted under its name and/or any other name or names deemed advisable by the Board of Managers. The Board of Managers shall cause to be executed and filed of record all assumed or fictitious name certificates for the Company as are required by law.

2.3. <u>Registered Office and Agent; Principal Office</u>.

(a) The street address of the initial registered office of the Company in Texas and the name of the initial registered agent of the Company are as set forth in the Certificate of Formation. The Board of Managers may change the Company's registered office or registered agent at any time by filing a Change of Registered Agent and/or Registered Office as provided in the Code. The Board of Managers shall provide notice of the change to all Members.

(b) The address of the principal office of the Company in the United States where records are to be kept or made available under Section 101.501 of the Code shall be as determined by the Board of Managers. The Board of Managers may change the Company's principal office in the United States at any time upon notice to the Members. The Company shall keep at its registered office and make available to a Member on reasonable request the street address of the Company's principal office in the United States.

2.4. <u>Term</u>. The Company will continue until terminated in accordance with <u>Article XIII</u>.

2.5. <u>Purposes</u>. The purpose for which the Company is organized is for the development and operation of the Project and the transaction of any and all lawful business for which limited liability companies may be organized under the Code.

2.6. <u>Powers</u>. Subject to any limitations in this Agreement, the Company may exercise the power to do any and all acts reasonably related to its purposes.

2.7. <u>Company Property</u>.

(a) All Company property shall be owned in the name of the Company and not in the name of any Member. No Member or Assignee will have any interest in such Company property solely by reason of the Member's status as a Member.

(b) The Board of Managers shall cause all funds of the Company to be deposited or invested in an account or accounts in the name of the Company. No funds other than the funds of the Company may be deposited therein. The funds in such accounts shall be used exclusively for the business of the Company (including distributions to the Members) and may be withdrawn only by persons approved by the Board of Managers.

MR.556

2.8. Consent to Admission of Members. Each person executing this Agreement consents to the admission as members in the Company all of the other persons who are Members as of the date such person executes this Agreement.

2.9. Status of Managers and Members. Except as otherwise provided by this Agreement, each Manager has the status, rights, and obligations of a manager in a limited liability company as set forth in the Code, and each Member has the status, rights, and obligations of a member in a limited liability company as set forth in the Code.

2.10. Certificates of Membership Interests. If provided by the Board of Managers, each Member's Membership Interest may be represented by a Certificate of Membership Interest. Each such Certificate of Membership Interest, if any, shall be numbered and registered in the records of the Company as they are issued, and shall be signed by two officers of the Company. The holder of any Certificate of Membership Interest shall promptly notify the Company of any loss or destruction of the certificate, and the Company shall cause a replacement certificate to be issued to the holder upon receipt of satisfactory evidence of the loss, destruction, or mutilation or the certificate and satisfaction of other reasonable conditions established by the Board of Managers.

2.11. No State Law Partnership. The Members intend that the Company is not a partnership or joint venture, and that no Manager or Member is a partner or a joint venturer of any other Manager or Member, for any purposes other than income tax purposes. No provision of this Agreement may be construed to suggest otherwise.

## ARTICLE III
## CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

3.1. Initial Capital Contributions. Each Member's Initial Capital Contribution is set forth on Exhibit A.

3.2. Additional Capital Contributions. No Member shall be required to make Additional Capital Contributions. No Member has the right or is permitted to make any other Additional Capital Contributions unless (a) the Board of Managers approves such Additional Capital Contribution after notice to all Members of (i) the amount of the Additional Capital Contribution to be made, (ii) the effect of the Additional Capital Contribution on each Member's Percentage Interest, and (iii) other material information relevant to the proposed Additional Capital Contribution, and (b) all Members are afforded an opportunity to participate in the Additional Capital Contribution according to their relative Percentage Interests.

3.3. Capital Accounts. The Company shall establish a separate Capital Account for each Member and Assignee. The Capital Accounts shall be maintained according to the provisions of Appendix A.

3.4. No Right to Return of or Interest on Capital Account. No Member may demand or receive the return of its Capital Contribution or any portion of its Capital Account, except as provided in this Agreement and the Code. Neither any Manager nor any Member has any personal liability for the repayment of any Capital Contributions of any Member. No interest will accrue or be paid with respect to the Capital Contributions or Capital Account of any Member.

MR.557

3.5.    Member Loans. The Company may borrow money from one or more Members to the extent the Board of Managers deems appropriate to the conduct of the Company business on terms that comply with the requirements of Section 5.8(b)(iii) (relating to related party transactions). The amount of any loan made to the Company by a Member will not constitute a Capital Contribution or otherwise affect such Member's Capital Account or Membership Interest.

## ARTICLE IV
## ALLOCATIONS AND DISTRIBUTIONS

4.1.    Allocation of Profit or Loss. Company profits and losses shall be allocated among the Members and Assignees in accordance with the provisions of Appendix A. The Members are aware of the income tax consequences of the allocations made by Appendix A and agree to be bound by the provisions of Appendix A in reporting their shares of Company income and loss for income tax purposes.

4.2.    Distributions of Distributable Cash.

(a)    Except as otherwise provided in Section 4.2(b) (relating to distributions to pay taxes), Section 4.3 (relating to withholding), Section 4.4 (relating to limitations on distributions), or Section 13.4 (relating to liquidating distributions), Distributable Cash shall be distributed to the Members as follows:

(i)    first, to CAM in payment of the CAM Preferred Return until the CAM Preferred Return Balance has been reduced to zero;

(ii)    next, to CAM in payment of CAM's Capital Contribution until the CAM Capital Contribution Balance has been reduced to zero; and

(iii)    finally, to the Members according to their Percentage Interests. The Board of Managers may provide for a record date with respect to distributions.

(b)    To the extent the Board of Managers determines that any Member or Assignee has an unfunded tax liability as a result of allocations of Company tax items for any tax year, then, to the extent the Company has funds legally available for the payment of distributions to Members, the Board of Managers shall make a special tax distribution to all such Members and Assignees pro rata according to their relative unfunded tax liabilities in the minimum amount necessary to pay any such unfunded tax liabilities. For this purpose, a Member or Assignee is deemed to have an unfunded tax liability for a tax year to the extent (i) the cumulative amount distributed to the Member or Assignee under Section 4.2(a) and advanced to the Member or Assignee under this Section 4.2(b) (and not previously recovered) from the inception of the Company through the end of the such tax year exceeds (ii) the Member's or Assignee's tax liability with respect to such Member's or Assignee's cumulative allocable share of Company tax items for all periods from the inception of the Company through the end of such tax year. Unless the Board of Managers determines otherwise, the taxes due for each Member and Assignee shall be calculated by assuming that the Member or Assignee is an individual taxed at the highest tax rate applicable to the type of income involved. Any such tax distribution shall, to the extent it exceeds the amount the Member or Assignee would otherwise be entitled to receive under Section 4.2(a), be treated as an advance against, and shall be recovered from, amounts subsequently distributable under Section 4.2(a). No interest shall be charged on any such tax distributions, and no Member or Assignee shall be personally liable for the repayment to the Company or the Members of any such tax distribution. The

MR.558

Board of Managers may make special tax distributions during the tax year in accordance with the principles of this Section 4.2(b) to the extent necessary to fund payments by Members and Assignees of estimated tax payments.

4.3.    Withholding.  The Company shall withhold from distributions, or pay on behalf of a Member or Assignee, all amounts that the Board of Managers determines the Company is required to withhold or pay on behalf of such person (including federal and state income tax withholding). All amounts so withheld from distributions are deemed to have been distributed to the person otherwise entitled to receive the amount so withheld. To the extent an amount is paid by the Company on behalf of a Member or Assignee but not withheld from a distribution, the amount paid constitutes a loan to such Member or Assignee. Such loan bears interest at the Index Rate and is repayable on demand or, at the election of the Board of Managers, is repayable out of distributions to which such Member or Assignee would otherwise be entitled.

4.4.    Limitation on Distributions.

(a)    The Company may not make a distribution to a Member or Assignee if it would render the Company insolvent, determined in accordance with Section 101.206 of the Code. A Member or Assignee who receives a distribution in violation of Section 101.206 of the Code is not required to return the distribution except as required in Section 101.206 of the Code.

(b)    The Members shall look solely to the assets of the Company for any distributions, including liquidating distributions. If the assets of the Company remaining after the payment or discharge, or the provision for payment or discharge, of the Company liabilities are insufficient to make any distributions, no Member has any recourse against the separate assets of any other Member.

4.5.    No Right to Partition or Distributions in Kind.  No Member has any right, and waives any right that it might otherwise have, to cause any Company property to be partitioned and/or distributed in kind. Except as provided in Section 13.4(d) (relating to liquidating distributions), the Company may not make any distributions in kind.

4.6.    Recovery of Erroneous Distributions.  If the Company has, pursuant to any clear and manifest accounting or similar error, distributed to any Member an amount in excess of the amount to which the Member is entitled pursuant to this Agreement, the Member shall reimburse the Company to the extent of such excess, without interest, within 30 days after demand by the Company.

## ARTICLE V
## MANAGEMENT; ACTIVITIES OF MANAGERS AND MEMBERS

5.1.    Management and Control of Company Business.

(a)    Subject to the limitations set forth in this Agreement, the Board of Managers has exclusive authority to manage and conduct the Company's business. The Board of Managers shall do all things appropriate to carry out the Company's purpose and the transactions contemplated by this Agreement. Except as otherwise provided in this Agreement, all actions that the Board of Managers may take and all determinations that the Board of Managers may make pursuant to this Agreement may be taken and made in the absolute discretion of the Board of Managers.

MR.559

(b)    Except as provided in Sections 8.5(a) (relating to tax matters), the Members may not take part in the management or control of the Company business or bind the Company in their capacity as Members. The Members shall not have the right to vote or otherwise consent or withhold consent to any actions taken by the Board of Managers except with respect to such matters as are expressly stated in this Agreement.

5.2.    Resignation, Removal, and Replacement of Managers.

(a)    Resignation. Any Manager may resign as a manager of the Company upon notice to all Members, which resignation shall be effective immediately upon delivery of such notice. A Manager is deemed to have resigned as a manager of the Company effectively immediately upon the following events:

(i)    any event specified in Section 153.155(a)(4) or Section 153.155(a)(5) of the Code (relating to bankruptcy or insolvency proceedings with respect to a general partner), applied as if the Manager were a general partner;

(ii)    if the Manager is an individual, the Manager's death, the appointment of a guardian or general conservator for the Manager, or a judicial determination that the Manager is incapable of performing the Manager's duties under the Agreement; or

(iii)    if the Manager is an entity, the termination of the Manager's existence or suspension of the Manager's right to do business.

A resignation pursuant to paragraph (ii) is not a violation of this Section 5.2(a), provided the estate or personal representative or other authorized person provides notice of the deemed resignation within 90 days after the event giving rise to the deemed resignation.

(b)    Removal.

(i)    Removal for Cause. Any Manager may be removed as manager of the Company upon the affirmative vote of one or more Members owning collectively at least 75% of the Percentage Interests if there is cause for removal as specified in Section 5.2(b)(ii) and the Company has received a written opinion of counsel that:

(A)    cause for removal as specified in Section 5.2(b)(ii) exists; and

(B)    the removal of the Manager is not prohibited under any loan agreements, contracts, or other applicable legal requirements.

(ii)    Definition of Cause. Cause for removal exists only if one or more of the following conditions has occurred:

(A)    there has been a change in Control of the Manager;

(B)    the Manager has engaged in wrongful conduct described in Section 6.3(a) that adversely and materially affected the Company business or the Members;

MR.560

(C)     except as permitted by this Agreement, the Manager has engaged in conduct relating to the Company business that has made it not reasonably practicable to carry on the Company business with the Manager;

(D)     the Manager or an Affiliate of the Manager has been convicted of a felony; or

(E)     a final judgment of a court of competent jurisdiction has been entered that the Manager's removal is necessary to comply with any requirements, conditions, or guidelines contained in any opinion, directive, order, ruling, or regulation of any federal or state agency or judicial authority or contained in any federal or state statute; or

(F)     the Manager commits a material breach of any provision of this Agreement, which breach is not cured within 30 days of notice thereof.

5.3.     Election of Replacement Manager. If the Manager resigns or is removed as the manager of the Company, within 90 days following such resignation or removal a Majority-in-Interest may elect a replacement Manager of the Company effective as of the date of the former Manager's resignation or removal. The replacement Manager shall file any required amendments to this Agreement to reflect the resignation or removal of the former Manager and the election of the replacement Manager. If the Members fail to elect a replacement Manager within 90 days following the resignation or removal of the former Manager, the Company shall be wound-up according to Article XIII.

5.4.     Actions of the Board of Managers.

(a)     Except as set forth herein, meetings of the Board of Managers shall be held in any manner allowed by the Act, including by means of conference telephone or similar communication equipment if each Manager participating in the meeting can hear and be heard by all other Managers participating in the meeting.

(b)     For purposes of establishing a quorum at any such meeting of the Board of Managers, it is necessary that all Managers appointed by the Members be present.

(c)     Approval by the unanimous vote or written consent of the Managers shall be required to approve any action by the Board of Managers. In the event an action is approved by the Board of Managers, the Managers, individually or collectively, shall be authorized to carry out such action on behalf of the Company.

(d)     Any action of the Board of Managers to be taken by written consent must be signed by all of the Managers to be effective.

5.5.     Limitations on Board of Managers' Authority. The Board of Managers may not do any of the following acts without the approval of all Members:

(a)     knowingly do any act in contravention of this Agreement or, when acting on behalf of the Company, engage in, or cause or permit the Company to engage in, any activity that is not consistent with the purposes of the Company;

MR.561

(b) except as otherwise provided in this Agreement, knowingly do any act that would make it impossible to carry on the Company business; or

(c) cause the Company to (i) not be taxable as a partnership for federal income tax purposes, or (ii) take a position inconsistent with such treatment.

(d) cause the Company to (i) make a general assignment for the benefit of creditors, (ii) file a voluntary bankruptcy petition, or (iii) seek an order for relief or declaration of insolvency in a federal or state bankruptcy or insolvency proceeding;

(e) file a pleading seeking for the Company, or admitting or failing to contest the material allegations of a petition filed by any other person seeking for the Company, a proceeding of the type described by subparagraph (d) immediately above;

(f) except as provided in Article XIII, seek, consent to, or acquiesce in the appointment of a trustee, receiver, or liquidator of the Company or of all or a substantial part of the Company's properties;

(g) cause the Company to issue any Membership Interest or admit any Member other than pursuant to Section 2.8 or Article XI;

(h) cause the Company to acquire any equity or debt securities of any Member or any Affiliate of a Member, or otherwise make loans to any Member or any Affiliate of a Member;

(i) cause the Company to acquire from any person any equity or debt securities or assets of any corporation, limited liability company, partnership, association, business, or business division, whether by stock purchase, asset purchase, contribution, or other business combination (excluding investments and asset acquisitions in the ordinary course of the Company's business and transactions contemplated by this Agreement);

(j) cause the Company to participate in any merger, consolidation, transfer, continuance, or conversion of the Company with or into any other person;

(k) cause the Company to participate in any reorganization in which Membership Interests are exchanged for or converted into cash, securities of any other person, or other property; or

(l) sell or otherwise dispose of all or substantially all of the Company property, except in connection with winding up the Company as permitted in this Agreement.

5.6.     Delegation of Authority; Officers.

(a) The Board of Managers may cause the Company to hire such employees and agents as the Board of Managers deems appropriate for the conduct of the Company's business.

(b) The Board of Managers may establish offices and appoint officers of the Company, and may delegate to such officers any of its authority hereunder, as the Board of Managers deems appropriate. The officers may be appointed for such terms and may exercise such powers and authority and perform such duties as determined by the Board of Manager. An officer need not be a Member of the Company. Any two or more offices may be held by the same person. An officer may be removed, with or without cause, at any time by the Board of Managers. Each officer will hold office

MR.562

until his successor is chosen and is qualified in his stead, or until his death, resignation, or removal from office. Any vacancy in an office because of death, resignation, removal, or otherwise may be filled by a person appointed by the Board of Managers. An officer is subject to the same standards of conduct as apply to a Manager as described in Section 5.9.

5.7.    Reliance.  Persons dealing with the Company may rely conclusively on the authority of the Board of Managers as set forth in this Agreement. Every document executed by any Manager with respect to any business or property of the Company is conclusive evidence in favor of any person relying on the document that (a) at the time of the execution and delivery of the document this Agreement was effective, (b) the document was executed in accordance with this Agreement and is binding on the Company, and (c) the Manager was authorized to execute and deliver the document on behalf of the Company.

5.8.    Compensation and Expenses of Members and Managers.  Members and Managers are not entitled to any salary, fee, or other remuneration (other than distributions with respect to the Member's Membership Interest) for providing property or services or other consideration to or for the benefit of the Company in their capacity as a Member or Manager, except that each Manager is entitled to reimbursement from the Company for reasonable out-of-pocket expenses paid or incurred on behalf of the Company, including reasonable charges for services provided by employees of the Manager and overhead expenses. The Company shall pay all out-of-pocket costs incurred in organizing the Company. This Section 5.8 does not limit or enlarge a Manager's or a Member's rights to liability protection or indemnification under Article VI, and does not limit the Company's ability to enter into transactions with Members in their capacities other than as Members in accordance with Section 5.9(iii).

5.9.    Standards of Manager and Member Conduct.

(a)    In General.  The Board of Managers shall manage and conduct the Company's business in good faith and in a manner the Managers reasonably believe to be in the Company's best interest. A Manager does not violate this Section 5.8(a) unless the Manager engages in conduct described in Section 6.3(a) (relating to improper conduct).

(b)    Outside Activities of Manager and Members; Noncompetition Covenants.

(i)    Each Manager shall devote to the Company's affairs only such time and resources as the Manager deems necessary for the conduct and winding up of the Company business.

(ii)    Except as provided herein, the Managers and Members or their Assignees may engage in or have an interest in other business ventures of every nature and description, independently or with others, including the ownership and operation of businesses similar to or in competition with, directly or indirectly, the Company, and neither the Company nor any Member or Assignee has, solely as a result of such person's interest in the Company, any right to acquire any rights in or to any such other business venture or to the income or profits derived from any such other business venture. A Manager or Member or Assignee has no duty to disclose any such similar or competing business venture to the Company or any Member or Assignee, or to offer to the Company or any Member or Assignee any prior opportunity to acquire an interest in such other business venture.

MR.563

(iii)    Related Party Transactions.    Except as otherwise provided in this Agreement, the Board of Managers, when acting on behalf of the Company, may purchase property from, sell property to, or otherwise deal with any Manager, Member, or Assignee, acting on its own behalf, or any Affiliate of any Manager, Member, or Assignee, but any such transaction shall be on terms that are no less favorable to the Company than if the transaction had been entered into with an independent third party. No provision of this Agreement requires disclosure of any transaction to, and approval of the transaction by, any disinterested governing persons of the Company or the Members as provided in Section 101.255 of the Code.

## ARTICLE VI
## LIABILITY AND INDEMNIFICATION

6.1.    Limitation of Liability.    No Member or Manager is liable for any debts, obligations, or liabilities of the Company. Subject to Section 6.3, an Indemnified Person is not liable to the Company or any other Indemnified Person for any Damages arising from any Proceeding relating to the conduct of the Company's business or relating to any act or omission by the Indemnified Person, including any act or omission constituting negligence, within the scope of the Indemnified Person's authority in the course of the Company's business, or for any misconduct or negligence on the part of any other person who is an employee or agent of the Company.

6.2.    Indemnification by Company.    To the fullest extent permitted by applicable law and subject to Section 6.3, the Company indemnifies and holds harmless each Indemnified Person from and against any Damages arising from any Proceeding relating to the conduct of the Company's business or to any act or omission by such Indemnified Person, including any act or omission constituting negligence, within the scope of the Indemnified Person's authority in the course of the Company's business or for any misconduct or negligence on the part of any other person that is an employee or agent of the Company. An Indemnified Person's expenses paid or incurred in defending itself against any Proceeding shall be reimbursed as paid or incurred. The right to indemnification conferred in this Article VI is not exclusive of any other right that any person may have or hereafter acquire under any statute, agreement, vote of Members, or otherwise.

6.3.    Conduct Not Protected.

(a)    This Article VI does not operate to limit liability or to indemnify a person to the extent the person is found liable pursuant to a final judgment of a court of competent jurisdiction for:

(i)    an act or omission that involves gross negligence, intentional misconduct, or a knowing violation of law;

(ii)    a transfer or attempted transfer of all or a portion of a Membership Interest in a Prohibited Transfer, a Manager's resignation in violation of Section 5.2(a), or a Member ceasing to be a Member in violation of Section 12.1(a);

(iii)    a willful or reckless material breach of this Agreement or any other agreement relating to the Company's business; or

(iv)    an act or omission for which indemnification is prohibited by law.

MR.564

(b)     No provision of this Agreement requires the Company to pay or incur any amount for which indemnification is not permitted under this Article VI.

(c)     Any payments made to or on behalf of a person who is later determined not to be entitled to such payments shall be repaid by the person to the Company. The Company may require, as a condition to the payment of any amounts pursuant to Section 6.2, that the Indemnified Person provide to the Company (i) a written affirmation by the Indemnified Person of the person's good faith belief that the person has met the standard of conduct necessary for indemnification under this Section; and (ii) a written undertaking by or on behalf of the Indemnified Person to repay the amount paid or reimbursed if the person has not met that standard or if indemnification is otherwise prohibited by law.

6.4.     Insurance.  The Company may maintain insurance to protect any person against any expense, liability, or loss, whether or not the Company would have the power to indemnify such person against such expense, liability, or loss under the Code.

6.5.     Survival.  The indemnities provided for in this Agreement survive the transfer of an Indemnified Person's Membership Interest, the termination of the person's status as a Member or other status giving rise to classification as an Indemnified Person, and the termination of this Agreement and the Company.

## ARTICLE VII
## BOOKS AND RECORDS; REPORTS

7.1.     Maintenance of and Access to Books and Records.  The Company shall maintain such books and records regarding the Company's business and properties as is reasonable, including all books and records required under the Code.  Each Member shall have access thereto during ordinary business hours to the extent and under the conditions provided in the Code.

7.2.     Fiscal Year.  The Company shall adopt the calendar year as its fiscal year for financial and tax accounting purposes (such fiscal year of the Company being referred to as the "Fiscal Year").

7.3.     Financial and Operating Reports.  As soon as practicable after the end of each Fiscal Year, but in any event not later than 90 days after the end of the Fiscal Year, the Board of Managers shall deliver to each Member an annual report containing the following:

(a)     a Company balance sheet as of the end of such Fiscal Year, and Company statements of income, cash flows, and changes in Members' equity for such Fiscal Year, each in reasonable detail and prepared according to United States generally accepted accounting principles;

(b)     a general description of the Company's activities during such Fiscal Year, including a description of the amount and circumstances of any indemnification payments paid or requested pursuant to Section 6.2, a description of any material insurance claims or recoveries during the fiscal quarter, and a description of any Proceedings involving the Company; and

(c)     a statement of changes in the Member's Capital Account (showing the balance in the Member's Capital Account as of the beginning of the Fiscal Year, contributions or distributions during the year, allocations of profits and losses during the year, any other adjustments to the Capital Account balances during the year, and the balance in the Capital Account as of the end of the year).

MR.565

7.4.    Tax Reports.

(a)    Not later than the date (including extensions) for filing the Company's tax return with the Internal Revenue Service (Form 1065), the Board of Managers shall deliver to each person who was a Member or Assignee at any time during the period covered by the return all information necessary for the preparation of such person's United States federal income tax returns, including a Form 1065 Schedule K-1 (if applicable).

(b)    Upon the written request of any Member or Assignee, the Board of Managers shall deliver to such person information necessary for the preparation of any tax returns that must be filed by such person, including information necessary for estimating and paying estimated taxes.

7.5.    Transmission of Communications.    Each person who holds a Membership Interest on behalf of, or for the benefit of, another person or persons shall be responsible for conveying any report, notice, or other communication received concerning the Company's affairs to such other person or persons.

## ARTICLE VIII
## TAX MATTERS

8.1.    Tax Classification.    The Members intend that the Company be classified as a partnership for federal income tax purposes. The Board of Managers shall take all actions reasonably necessary or appropriate to ensure the Company is so classified (including the filing of elections or tax returns). No Manager, officer, or Member shall take any action inconsistent with the classification of the Company as a partnership for federal income tax purposes.

8.2.    Company Returns.    The Board of Managers shall cause the Company to file such tax returns as may be required by law.

8.3.    Tax Elections.

(a)    General.    Except as otherwise provided in this Agreement, the Board of Managers shall cause the Company to timely make or revoke all elections, and take all tax reporting positions, necessary or desirable for the Company as determined by the Board of Managers. No election shall be made to have the Company excluded from the application of any provision of Subchapter K of the I.R.C. or any equivalent tax provision in any other tax jurisdiction. The Company shall make the election referred to in I.R.C. Section 754 upon the request of any Member in connection with a transfer of the Member's Membership Interest in accordance with this Agreement.

(b)    Safe Harbor Election for Compensatory Membership Interests.    If Proposed Treasury Regulation 1.83-3(l) is adopted as a temporary or final regulation, the Company shall make the safe harbor election described in such regulations, and the Company and each Member (including any person to whom an interest in the Company is transferred in connection with the performance of services) shall comply with all requirements of the safe harbor with respect to all Membership Interests transferred in connection with the performance of services while the election remains effective. The Board of Managers shall prepare, execute, and file any required documentation to cause the election to be effective. The Board of Managers may terminate the safe harbor election at any time if it determines in good faith that it is in the best interests of the Company and the Members to do so.

MR.566

8.4.     Consistent Reporting. Each Member shall, on the Member's tax returns, treat each partnership item (as defined in I.R.C. Section 6231(a)(3)) in a manner consistent with the treatment of the item on the Company's return in all respects, including the amount, timing, and character of the item. No Member shall file a request for an administrative adjustment of partnership items under I.R.C. Section 6227(a) if such request would cause the Member's treatment of the item to be inconsistent with the treatment of the item on the Company's return.

8.5.     Tax Proceedings.

(a)     John V. Calce shall be the Company's tax matters partner as defined in I.R.C. Section 6231, and shall take such actions as are required to be designated the tax matters partner under applicable Treasury Regulations. The tax matters partner shall represent the Company in connection with all proceedings with any tax authority related to the Company's tax returns and taxes payable, including administrative examinations and appeals and judicial proceedings. Subject to Section 8.5(c), the tax matters partner has the exclusive right to conduct such proceedings and to determine whether the Company (either on its own behalf or on behalf of the Members) will contest or continue to contest adjustments proposed or imposed by any tax authority. The tax matters partner shall keep the Members informed on a timely basis of all material developments with respect to any such Proceeding. Each Member shall cooperate with the tax matters partner and do or refrain from doing all things reasonably requested by the tax matters partner with respect to the conduct of any Company tax Proceeding.

(b)     The tax matters partner may not bind any other Member to a settlement agreement relating to taxes without obtaining the written concurrence of such Member.

(c)     Any deficiency for taxes imposed on a Member (including penalties, additions to tax or interest imposed with respect to such taxes) shall be paid by such Member and, if paid or required to be paid by the Company, is recoverable from such Member pursuant to Section 4.3 or by other legal means.

8.6.     Information and Documents to Company. Each Member shall timely provide to the Company all information and documents that such Member is required to provide by applicable tax requirements, and shall also provide to the Company upon request such additional information and documents as the Board of Managers may reasonably request in connection with the Company's compliance with applicable tax requirements or filing of any permitted tax elections.

8.7.     Survival. This Article VIII shall survive the termination of the Company and the termination of any Member's interest in the Company and remain binding for such period of time as is necessary to resolve all tax matters with applicable taxing authorities.

## ARTICLE IX
## MEETINGS AND VOTING OF MEMBERS

9.1.     Meetings.

(a)     Meetings of the Members may be called at any time by the Board of Managers, or by one or more Members holding at least 25% of the Percentage Interest held by the Members. Meetings shall be held at the Company's principal place of business or at such other reasonable place set forth in the notice of the meeting.

(b)    Any action that may be taken at a Members' meeting may be taken without holding a meeting if Members having at least the minimum Percentage Interest that would be necessary to take the action at a meeting, in which each Member entitled to vote on the action is present and votes, sign a written consent or consents stating the action taken.

(c)    Except as otherwise provided in this Agreement, meeting notices and procedures, including procedures for obtaining written consents in lieu of a meeting, shall be in conformity with Chapters 6 and 101(H) of the Code. Sections 101.353 through 101.356 of the Code (relating to quorum and minimum voting requirements) shall not apply to the extent such provisions are inconsistent with this Agreement. The Board of Managers is solely responsible for convening and conducting meetings of the Members, conducting the solicitation of consents, determining the validity and effect of responses to any solicitation of consents, and determining other matters regarding meetings, voting, and consents.

(d)    Notice of the results of any vote taken at a meeting, or the results of any solicitation of consents in lieu of a meeting, shall be given to the Members not later than with the delivery of the next following report of financial information given pursuant to Section 7.3.

9.2.    Voting. A Member may vote at a meeting in person, or by a proxy executed in writing by the Member and received by the Board of Managers prior to the time when the votes of Members are to be counted. The provisions of the Code pertaining to the validity and use of proxies by shareholders of a corporation govern the validity and use of proxies given by Members. Only Members of record on the date of the meeting (or if the vote is conducted without a meeting then on the date of the notice soliciting the Member consents) may vote.

## ARTICLE X
## TRANSFER OF MEMBERSHIP INTERESTS

10.1.    Limitation on Transfers.

(a)    The term "transfer," when used in this Agreement in reference to a transfer of a Membership Interest, means an assignment (whether voluntarily, involuntarily, or by operation of law and whether or not effective under this Agreement) of all or any portion of a Member's or Assignee's Membership Interest, or any interest therein, to another person, and includes a sale, assignment, conveyance, gift, exchange, abandonment, or other disposition, a transfer by merger or other business combination, a transfer pursuant to bankruptcy, insolvency, incapacity, divorce, or death, and any pledge, hypothecation, or other encumbrance.

(b)    No Member may transfer all or any portion of its Membership Interest unless the transfer is a Permitted Transfer. A transfer of a Membership Interest that is not a Permitted Transfer is a Prohibited Transfer.

10.2.    Permitted Transfer of Membership Interest.

(a)    A transfer of a Membership Interest is a Permitted Transfer only if the transfer satisfies the conditions set forth in Section 10.4 and is described in one or more of the following paragraphs of this Section:

(i)    the transfer is approved by the other Members;

MR.568

(ii)        the transfer occurs in accordance with the procedures set forth in <u>Section 10.3</u>;

(iii)      if the Member is a corporation, the transfer is to a member of the Member's affiliated group (as defined in I.R.C. Section 1504(a));

(iv)      if the Member is a trustee of one or more employee benefit plans, the transfer is to a co-trustee or a successor trustee to such plans; or

(v)      if the Member is an individual, the transfer is of a community property or other interest from the Member's spouse or former spouse to the Member pursuant to the death of the Member's spouse or termination of the marital relationship of the Member and the spouse.

(b)      Upon a Permitted Transfer by a Member of all of its Membership Interest, the Member ceases to be a Member as of the effective date of the transfer determined according to <u>Section 10.5</u>.

10.3.    <u>Right of First Refusal; Tag-Along Rights; Triggering Events</u>.

(a)      In the event a Member desires to sell all or any portion of its Membership Interest to another Person, the selling Member shall first offer to sell such interest to the other Members on the terms on which it is prepared to sell such interest to such Person by sending written notice to each other Member describing the offer and its terms. Additionally, upon receipt of an offer from a third party to purchase all or any portion of a Member's interest in the Company, which such Member desires to accept, such Member shall promptly deliver a copy of the third party offer to each other Member. Each other Member will have 15 business days from the date of receipt of notice of the proposed sale of a Member's Membership Interest or the third party offer, as the case may be, to notify the selling Member in writing that such other Member elects to (i) purchase the selling Member's Membership Interest upon the terms and conditions of the proposed sale or third party offer, or (ii) sell in the contemplated transfer, at the same price in the same form of consideration and on the same terms (including if the transfer is made to another Member making an election under clause (i), Membership Interests representing a Percentage Interest in the Company equal to the product of (A) the quotient determined by dividing the Percentage Interest owned by such party by the aggregate Percentage Interests owned by all parties participating in such transfer, and (B) the aggregate Percentage Interests to be sold in the contemplated transfer, as the case may be. If the other Members fail to give notification within 15 business days of an election to purchase the selling Member's Membership Interest or participate in the contemplated transfer, then the selling Member shall be permitted, for a period of 90 days, to sell all of its Membership Interest to the third party upon the terms and conditions of the proposed sale or third party offer, as the case may be.

(b)      If more than one Member makes an election to purchase the selling Member's Membership Interest under <u>Section 10.3(a)(i)</u>, each of the purchasing Members shall purchase a portion of the selling Member's Membership Interest that is proportional to that Member's Percentage Interest.

(c)      (i) Upon the occurrence of a Triggering Event with respect to any Member (the "Offering Member"), Company shall have the right but not the obligation to purchase all of the Offering Member's Membership Interest in the Company at the time of the Triggering Event (the "Redemption Option"). Within 60 days after the Company receives written notice of the occurrence of (and date of) the Triggering Event, the Company shall provide written notice of its election of the Redemption Option

MR.569

to the Offering Member or the Offering Member's successor in interest, as applicable (the "Redemption Notice"). In the event the Company elects to exercise the Redemption Option, the Company shall purchase, and the Offering Member or the Offering Member's successor interest, as applicable, shall sell, all of the Membership Interest owned by the Offering Member at the time of the Triggering Event at a price equal to the Triggering Event Purchase Price.

(ii)   A closing (a "Triggering Event Closing") shall be held 60 days after the later of the date of the Redemption Notice or the date that the Triggering Event Purchase Price has been established.

(iii)   At the Triggering Event Closing, the Offering Member or Offering Member's successor in interest, as applicable, shall deliver to the Company an assignment of Membership Interest owned by the Offering Member, duly endorsed for transfer to the Company.

(iv)   At the Triggering Event Closing, the Company shall pay the Triggering Event Purchase Price to the Offering Member or the Offering Member's successor in interest, as applicable, in immediately available funds (by wire, certified or bank cashier's check or other means acceptable) and the parties shall execute such documentation as may be necessary or desirable, as determined by the Company, in the Company's sole discretion, to effectuate the transfer of such Offering Member's or Offering Member successor in interest's Membership Interest.

10.4.   Conditions to Permitted Transfers of Membership Interests. A transfer shall not be a Permitted Transfer unless the Board of Managers determines that all of the following conditions are satisfied:

(a)   The transfer complies with all applicable laws, including any applicable securities laws.

(b)   The transfer will not cause the Company to be treated as other than a partnership for United States federal income tax purposes.

(c)   The transfer will not cause the Company to be subject to regulation under the Investment Company Act of 1940.

(d)   The transfer will not cause any assets of the Company to be deemed "plan assets" under the Employee Retirement Income Security Act of 1974.

(e)   The transfer will not result in a termination of the Company under I.R.C. Section 708, unless the Board of Managers determines that such termination will not have an adverse impact on the Members.

(f)   The transfer will not cause the application of the tax-exempt use property rules of I.R.C. Sections 168(g)(1)(B) and 168(h) to the Company or its Members, unless the Board of Managers determines that such rules will not have an adverse impact on the Members.

(g)   The transferor and transferee have delivered to the Company any documents that the Board of Managers requests to confirm that the transfer satisfies the requirements of this Agreement.

MR.570

to give effect to the transfer, and to confirm the transferee's agreement to be bound by this Agreement as an Assignee.

(h)     If requested by the Board of Managers, the Company has received a transfer fee in an amount determined by the Board of Managers to be sufficient to reimburse the Company for the estimated expenses likely to be incurred by the Company in connection with such transfer.

10.5.    Effective Date; Distributions.

(a)     A Permitted Transfer of a Membership Interest is effective as of the first day of the calendar month following the calendar month during which the Board of Managers receives notice of such transfer (in such form and manner as the Board of Managers may require) unless the Board of Managers determines that the transfer should be effective as of an earlier or later date (for example, on any date the transfer is effective as a matter of state law, or where the notice of transfer specifies that the transfer is to be effective on a future date).

(b)     Distributions with respect to a transferred Membership Interest that are made before the effective date of the transfer shall be paid to the transferor, and distributions made after such date shall be paid to the Assignee.

(c)     Effective as of the effective date of a transfer of a Membership Interest, the Board of Managers shall amend Exhibit A to reflect the reduction in the transferor's Percentage Interest and to reflect the Assignee's Percentage Interest.

(d)     Neither the Company nor the Board of Managers has any liability for making allocations and distributions to the Members determined in accordance with this Section 10.5, whether or not the Board of Managers or the Company has knowledge of any transfer of any Membership Interest.

10.6.    Transferor's Obligations.    The transferor of a Membership Interest who ceases to be a Member continues to be obligated with respect to its Membership Interest or its status as a former Member as provided in the Code and applicable law.

10.7.    Assignee's Rights and Obligations.    Unless an Assignee becomes a Member pursuant to Article XI, such Assignee shall not be entitled to any of the rights granted to a Member (other than as required by the Code), and shall have no right to participate in the management of the business of the Company or to become a Member, unless the Members specifically approve the admission of such Assignee as a Member or such assignment or transfer is accomplished in accordance with the permissive provisions of this Agreement.    An Assignee not admitted as a Member hereunder shall have no membership rights and shall not be a Member with regard to the Membership Interests transferred to such Assignee (other than as required by the Code).

10.8.    Effect and Consequences of Prohibited Transfer.

(a)     Except as otherwise required by law, the Company and the Board of Managers shall treat a Prohibited Transfer as void and shall recognize the transferor as continuing to be the owner of the Membership Interest purported to be transferred. If the Company is required by law to recognize a Prohibited Transfer, the transferee shall be treated as an Assignee with respect to the Membership

MR.571

Interest transferred and may not be treated as a Member with respect to the Membership Interest transferred unless admitted as a Member in accordance with Article XI.

(b)     The Company may remove the transferor and Assignee with respect to a Prohibited Transfer as provided in Article XII.

(c)     The transferor and transferee with respect to a Prohibited Transfer shall be jointly and severally liable to the Company for, and shall indemnify and hold the Company harmless against, any expense, liability, or loss incurred by the Company (including reasonable legal fees and expenses) as a result of such transfer, their removal and liquidation of their Membership Interests (if applicable), and the efforts to enforce the indemnity granted in this Section 10.8(c).

## ARTICLE XI
## ADMISSION OF NEW MEMBERS

11.1.   Substituted Members.   An Assignee of a Membership Interest shall be admitted as a Substituted Member with respect to such Membership Interest on the date on which all of the following conditions are satisfied:

(a)     The Board of Managers has approved in writing the admission of the Substituted Member.

(b)     The Assignee has delivered to the Company any agreements and other documents that the Board of Managers requests to confirm such Assignee as a Member in the Company and such Assignee's agreement to be bound by this Agreement as a Member.

(c)     If requested by the Board of Managers, the Company has received an admission fee in an amount determined by the Board of Managers to be sufficient to reimburse the Company for the estimated expenses likely to be incurred by the Company in connection with the admission of the Assignee as a Substituted Member.

11.2.   Additional Members.   The Board of Managers shall admit a person as an Additional Member upon satisfaction of all of the following conditions.

(a)     A Majority-in-Interest has approved the admission of the Additional Member after notice to all Members of (i) the Initial Capital Contribution to be made by the proposed Additional Member, (ii) the effect of the admission on each Member's Percentage Interest, and (iii) other material information relevant to the proposed admission.

(b)     The admission of the proposed Additional Member satisfies the applicable conditions of Section 10.4.

(c)     The proposed Additional Member has delivered to the Company any agreements and other documents that the Board of Managers requests to confirm the person as a Member in the Company and the person's agreement to be bound by this Agreement as a Member.

11.3.   No Required Capital Contributions.   A person may be admitted as a Member, including as the sole Member, and may acquire a Membership Interest without making a contribution to the Company or assuming an obligation to make a contribution to the Company.

MR.572

## ARTICLE XII
## WITHDRAWAL OR REMOVAL OF MEMBERS

12.1.  Withdrawal of Members.

(a)  No Member may withdraw from the Company or otherwise cease to be a Member except upon the following events:

(i)  a transfer of all of the Member's Membership Interest in a Permitted Transfer; or

(ii)  removal of the Member as a Member as provided in Section 12.2 of this Agreement.

(b)  A Member shall be deemed to withdraw from the Company upon the occurrence of an event specified in Section 12.1(a).

12.2.  Removal of Members.

(a)  A Member may be removed as a Member by the Board of Managers under the following circumstances:

(i)  the Member has transferred or attempted to transfer all or any portion of its Membership Interest in a Prohibited Transfer;

(ii)  the Member has materially breached the terms of this Agreement; ; or

(iii)  the Board of Managers determines that removal is necessary to comply with any requirements, conditions, or guidelines contained in any opinion, directive, order, ruling, or regulation of any United States federal or state agency or judicial authority or contained in any United States federal or state statute.

(b)  If the Board of Managers proposes to remove a Member pursuant to this Section, the Board of Managers shall notify the Member in writing of the proposed removal, and if applicable shall provide such Member a reasonable opportunity to cure the event giving rise to removal. The removal of the Member is effective at such time as determined by the Board of Managers in accordance with applicable law and taking into account the Member's opportunity to cure the event giving rise to removal.

12.3.  Status of Former Member.  A Member who withdraws or has been removed from the Company or otherwise ceases to be a Member has the status of an Assignee with respect to any Membership Interest held by such former Member. Except as provided in Section 10.3(c) (relating to optional redemption of a Member's Membership Interest upon the occurrence of a Triggering Event) or Article XIII (relating to winding up and termination), such former Member is not entitled to receive any payments under Section 101.205 of the Code.

MR.573

## ARTICLE XIII
## WINDING UP AND TERMINATION

13.1.    Events Requiring Winding Up.  The Company shall commence winding up procedures in accordance with this Agreement and the Code upon the first to occur of the following events:

(a)    the Members unanimously vote to wind up and terminate the Company;

(b)    a decree by a court requiring the winding up of the Company;

(c)    the termination of membership of the last remaining Member; or

(d)    the resignation or removal of all Managers if the Members fail to appoint any replacement Manager as provided in Section 5.3.

13.2.    Winding Up Procedures.

(a)    On the occurrence of an event requiring winding up of the Company, unless there is an action to continue the Company without winding up in accordance with Section 13.3, the Board of Managers (or other Liquidator as provided below) shall, as soon as reasonably practicable, wind up the Company's business and affairs (including disposing of the Company's assets and applying the proceeds as provided in Section 13.4) and terminate the Company in accordance with this Agreement and the Code.  The Company shall cease to carry on its business (except to the extent necessary to wind up its business), collect and sell its property to the extent the property is not to be transferred or distributed in kind, and perform any other act required to wind up its business and affairs.

(b)    If the Board of Managers has wrongfully caused the winding up of the Company or if there is no Manager, (i) a Majority-in-Interest may vote to elect a person or persons to accomplish the winding up of the Company, or (ii) if the Members fail to elect a person to accomplish winding up the Company, then any Member or Assignee may petition a court to wind up the Company as provided in Section 11.054 of the Code. The person or persons winding up the Company, whether the Board of Managers or an elected or court appointed person or persons, is referred to in this Agreement as the "Liquidator."

(c)    The Liquidator may determine the time, manner, and terms of any sale or sales of Company property pursuant to such winding up. The Liquidator (if not the Board of Managers) is entitled to receive reasonable compensation for its services; may exercise all of the powers conferred upon the Board of Managers under this Agreement to the extent necessary or desirable in the good faith judgment of the Liquidator to perform its duties; and with respect to acts taken or omitted while acting in such capacity on behalf of the Company, is entitled to the limitation of liability and indemnification rights set forth in Article VI.

(d)    The Liquidator shall provide quarterly reports to the Members and Assignees during the winding up procedure showing the assets and liabilities of the Company, providing information and documents required by the Members and Assignees to comply with their tax reporting obligations, and such other information as the Liquidator deems appropriate. Within a reasonable time after completing the winding up, the Liquidator shall give each Member and Assignee a final statement setting forth the assets, liabilities, and reserves of the Company as of the date of completion of winding up.

MR.574

13.3.   Continuation Without Winding Up.

(a)     If there is a decision to wind up and terminate the Company as described in Section 13.1(a), the Company may be continued as provided in Section 101.552 of the Code.

(b)     If there is a termination of the continued membership of the last remaining Member as described in Section 13.1(e), then prior to completion of the winding up process but not later than 90 days after the event of termination, the Board of Managers may continue the Company by admitting one or more Members effective as of the occurrence of the event of termination. Any Assignee whose Percentage Interest would be diminished by reason of the admission of an Additional Member under the circumstances described in this Section must approve the admission of the Additional Member.

13.4.   Liquidation of Assets and Application and Distribution of Proceeds.

(a)     In General.  On winding up the Company, the Liquidator shall dispose of the Company's properties and apply and distribute the proceeds, or transfer the Company properties, in the following order of priority:

(i)     to creditors (including Members who are creditors) in accordance with their relative rights and priorities to satisfy the liabilities of the Company, including expenses associated with the winding up and termination of the Company, but excluding any Company liability for any unpaid Mandatory Distributions;

(ii)    to Members, Assignees, and former Members to satisfy the Company's liability for any unpaid Mandatory Distributions; and

(iii)   to Members and Assignees as provided in Section 4.2(a).

(b)     No Member Deficit Restoration Obligation.  No Member is liable to the Company or any other person for the repayment of any deficit in the Member's Capital Account, except as provided in Section 101.206 of the Code.

(c)     Reserves.   In the discretion of the Liquidator, a pro rata portion of the distributions that would otherwise be made pursuant to Section 13.4(a)(ii) and (iii) may be withheld to provide a reasonable reserve for Company liabilities (contingent or otherwise) and future expenses, including a reasonable reserve for any claims for indemnification under Article VI and for any future expenses associated with any tax audit or other Proceeding that is pending or may arise.

(d)     Payments and Distributions to Members in Kind.  The Liquidator may not make any payments or distributions to Members or Assignees pursuant to Section 13.4(a)(ii) or (iii) other than in cash unless all Members and Assignees receiving the property approve the transfer in kind. The Liquidator shall determine the Fair Market Value of any property transferred to Members or Assignees in kind according to the valuation procedures set forth in Article XIV.

(e)     Character of Liquidating Distributions.  Except as otherwise required by the I.R.C., amounts paid to Members pursuant to this Section 13.4 shall be treated as made in exchange for the interest of the Member in Company property pursuant to I.R.C. Section 736(b)(1), including the interest of such Member in Company goodwill.

MR.575

13.5. <u>Certificate of Termination</u>. The Liquidator shall file a Certificate of Termination of a Domestic Entity on the completion of the winding up of the Company.

13.6. <u>Reinstatement</u>. If the Company is terminated, it may be reinstated in the manner provided in the Code.

## ARTICLE XIV
## VALUATION

14.1. <u>Fair Value of Company Property</u>. The Fair Value of property contributed to the Company by a Member as part of such Member's Initial Capital Contribution is the amount of such Member's Initial Capital Contribution, as set forth on <u>Exhibit A</u>, minus the amount of any cash contributed to the Company as part of such Member's Initial Capital Contribution. In all other cases, the Fair Value of an asset as of any date is its fair market value as determined by the Board of Managers in good faith using any reasonable valuation method. If any affected Member does not agree with the valuation set by the Board of Managers, the Fair Value shall be determined using procedures similar to those set forth in <u>Section 14.2</u>, and the cost of any such determination shall be borne entirely by the affected Member unless the Board of Managers or a Majority-in-Interest of all Members other than the affected Member approves an alternative allocation of such costs.

14.2. <u>Purchase Price of Membership Interest</u>.

(a)     For purposes of any redemption of a Membership Interest pursuant to <u>Section 10.3(c)</u>, the purchase price shall be the Triggering Event Purchase Price.

(b)     If the Offering Member and the Company cannot cooperatively designate an appraiser within 15 days following the date of the Redemption Notice, then the Offering Member and the Company shall each select an appraiser, and such two (2) appraisers shall select a third appraiser who shall select the appraiser to perform such appraisal. The cost of each appraisal shall be shared equally by the Company and the Offering Member.

14.3. <u>Valuation of Membership Interests</u>. For all purposes of this Agreement other than the valuation of Membership Interests in connection with a Triggering Event, the fair market value of the Membership Interests shall be determined by the Managers pursuant to an independent third party appraisal of the assets of the Company. The Board of Managers shall no less than annually cause the assets of the Company to be appraised by an independent third party.

## ARTICLE XV
## GENERAL PROVISIONS

15.1. <u>Amendments</u>.

(a)     <u>In General</u>. Subject to the following exceptions and limitations, this Agreement may be amended only with the written approval of all Members.

(b)     <u>Exceptions and Limitations</u>. The Board of Managers may amend <u>Exhibit A</u> from time to time to reflect the admission and withdrawal of Members, and changes to any Member's Percentage Interest, in accordance with this Agreement. No amendment of <u>Article VI</u> (relating to liability and indemnification) may adversely affect the rights or obligations of any Indemnified Person without the Indemnified Person's prior written approval.

MR.576

15.2.  Notice.  Any notice, report, or other communication required or permitted to be made to any person by this Agreement shall be in writing and is deemed given when (a) delivered to the person by hand, (b) the third business day after delivery to the United States Postal Service (or other designated delivery service as defined in I.R.C. Section 7502(f)), postage prepaid, in an envelope properly addressed to the person at the person's address set forth in the Company's records as of the date of delivery, or (c) successfully transmitted by facsimile or electronic message to the person's facsimile phone number or e-mail address (as applicable) set forth in the Company's records as of the date of transmission.  Any communication to the Board of Managers or the Company may be delivered to the Company's registered office designated pursuant to Section 2.3.

15.3.  Governing Law; Consent to Jurisdiction.  This Agreement is governed by and shall be construed under the laws of the State of Texas without regard to legal requirements that would require the application of the law of any other jurisdiction. Any Proceeding arising out of or relating to this Agreement or the Company's activities or properties may be brought in the state courts of Dallas County, Texas or, if it has or can acquire jurisdiction, in the United States District Court located in Dallas County, Texas. Each Member and Assignee irrevocably submits to the exclusive jurisdiction of each such court in any such Proceeding, waives any objection it may now or hereafter have to venue or to convenience of forum, agrees that all claims in respect of the Proceeding shall be heard and determined only in any such court and agrees not to bring any such Proceeding in any other court. The Company or any Member or Assignee may file a copy of this Agreement with any court as written evidence of the agreement between the parties irrevocably to waive any objections to venue or to convenience of forum. Process in any Proceeding referred to in the second sentence of this Section may be served on any party anywhere in the world.

15.4.  Waiver.  Any failure by a party to insist upon the strict performance of any covenant or condition of this Agreement, or to exercise any right or remedy upon a breach of any such covenant or condition, does not constitute waiver of any such covenant or condition or any breach thereof. A party will not be deemed to have waived any right or remedy under this Agreement unless that party has signed a written document to that effect, and any such waiver is applicable only with respect to the specific provision and instance for which it is given.

15.5.  Entire Agreement.  This Agreement supersedes all prior agreements, whether written or oral, between the parties with respect to its subject matter and constitutes a complete and exclusive statement of the agreement between the parties with respect to its subject matter.

15.6.  Successors and Assigns.  No Member or Assignee may assign any of its rights or delegate any of its obligations under this Agreement except as expressly permitted in this Agreement.

15.7.  Third-Parties.  Other than as provided in Section 5.7 (relating to reliance on authority of the Board of Managers) and Article VI (relating to rights of Indemnified Persons), none of the provisions of this Agreement are for the benefit of or enforceable by any creditors of the Company or other persons not a party to this Agreement, except such benefits as inure to a successor or permitted assign in accordance with Section 15.6.

15.8.  Severability.  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

MR.577

15.9. Construction. The language in this Agreement is to be construed according to its fair meaning and is not to be strictly construed for or against any party. Nothing in this Agreement is to be construed as authorizing or requiring any action that is prohibited by the Code or other applicable law, or as prohibiting any action that is required by the Code or other applicable law.

15.10. Execution of Agreement. This Agreement may be executed in counterparts, each of which will be deemed to be an original copy of this Agreement, and all of which together constitute one agreement. Any signature to this Agreement evidenced by a facsimile or other electronic transmission of such signature shall be binding on the parties to the same extent as if such signature were an original.

15.11. Further Assurances. The parties shall execute and deliver all documents, provide all information, and take or refrain from taking action as may be necessary or appropriate to achieve the purposes of this Agreement.

**[This Space Left Blank Intentionally. Signature Page Follows.]**

MR.578

Executed as of the Effective Date set forth above, by and among the persons signing below.

**MEMBERS:**

**CENTURION LOGISTICS LLC**

By: _____
Marc Marrocco
Title: Manager

**CAM OIL AND NATURAL GAS, LLC**

By: _____
Name: Karen W. Hardtner
Title: Chief Operating Officer

_____
John V. Calce

**MANAGER:**

MR.579

# COMPANY AGREEMENT
## OF
## CENTURION PECOS TERMINAL LLC

### EXHIBIT A
### MEMBERS' CONTRIBUTIONS AND PERCENTAGE INTERESTS

#### Effective as of the Effective Date

| MEMBER NAME AND ADDRESS | Initial Capital Contribution | Initial Percentage Interest |
|---|---|---|
| Centurion Logistics LLC<br>17950 Preston Road<br>Suite 1080<br>Dallas, Texas 75252 | $400.00 | 40.00% |
| CAM Oil and Natural Gas, LLC<br>800 Spring Street<br>Suite 205<br>Shreveport, Louisiana 71101 | $600.00 | 60.00% |

MR.580

# COMPANY AGREEMENT
# OF
# CENTURION PECOS TERMINAL LLC

## APPENDIX A
## PRINCIPLES OF ALLOCATION

A.1   Introduction. This Appendix sets forth principles under which items of income, gain, loss, deduction and credit shall be allocated among the Members. This Appendix also provides for the determination and maintenance of Capital Accounts, generally in accordance with Treasury Regulations promulgated under I.R.C. Section 704(b), for purposes of determining such allocations. For purposes of this Appendix, an Assignee shall be treated in the same manner as a Member.

A.2   Definitions. Capitalized terms used in this Appendix have the meanings set forth below or in the Agreement.

"Adjusted Capital Account Deficit" means any deficit balance in a Member's Capital Account as of the end of a taxable year, after giving effect to the following adjustments:

     (i)   Credit to the Capital Account any amounts the Member is obligated to restore pursuant to the Agreement or is deemed to be obligated to restore pursuant to (a) Treasury Regulations Section 1.704-1(b)(2)(ii)(c) (relating to obligations to pay partner promissory notes and other obligations to make contributions to the Company), or (b) the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) (relating to partnership minimum gain) and 1.704-2(i)(5) (relating to partner nonrecourse debt minimum gain); and

     (ii)   Debit to such Capital Account the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition is intended to comply with Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Capital Account" has the meaning set forth in Section A.3.

"Depreciation" means, for each taxable year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such taxable year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such taxable year, Depreciation is an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such taxable year bears to such beginning adjusted tax basis. If the adjusted basis for federal income tax purposes of an asset at the beginning of such taxable year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Board of Managers.

"Gross Asset Value" means an asset's adjusted basis for federal income tax purposes, except as follows:

MR.581

(i)     The initial Gross Asset Value of an asset contributed by a Member to the Company is the gross Fair Value of such asset, as determined by the contributing Member and the Board of Managers and as set forth on Exhibit A.

(ii)     The Gross Asset Values of Company assets shall be adjusted to equal their respective gross Fair Values (taking I.R.C. § 7701(g) into account), as determined by the Board of Managers, as of the following times:  (A) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution; (B) the distribution by the Company to a Member of more than a *de minimis* amount of property as consideration for an interest in the Company; (C) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); and (D) in connection with the grant of an interest in the Company (other than a *de minimis* interest) as consideration for the provision of services to or for the benefit of the Company by a Member acting in a member capacity or in anticipation of being a Member.  Adjustments pursuant to clauses (A), (B), and (D) above are required only if the Board of Managers determines that such adjustments are necessary to accurately reflect the relative economic interests of the Members in the Company.

(iii)     The Gross Asset Value of a Company asset distributed to a Member shall be adjusted to equal the gross Fair Value (taking I.R.C. § 7701(g) into account) of such asset on the date of distribution as determined by the distributee and the Board of Managers.

(iv)     The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to I.R.C. Section 734(b) or I.R.C. Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m). Gross Asset Values shall not be adjusted pursuant to this paragraph (iv) to the extent that an adjustment is required pursuant to paragraph (ii).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraphs (i), (ii), or (iv) of this definition, the asset's Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Net Profit and Net Loss.

"Net Profit" and "Net Loss" mean, for each taxable year or other relevant period, an amount equal to the Company's taxable income or loss for such taxable year or other relevant period, determined in accordance with I.R.C. Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to I.R.C. Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(i)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profit or Net Loss shall be added to such taxable income or loss.

(ii)     Any expenditures of the Company described in I.R.C. Section 705(a)(2)(B) or treated as I.R.C. Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profit or Net Loss, shall be subtracted from such taxable income or loss.

MR.582

(iii)    If the Gross Asset Value of any Company asset is adjusted pursuant to subparagraph (ii) or (iii) of the Section A.2 definition of Gross Asset Value, the amount of such adjustment shall be taken into account as gain or loss from disposition of the asset for purposes of computing Net Profit and Net Loss.

(iv)    Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of (unreduced by any liabilities attributable thereto), notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value.

(v)    In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation computed in accordance with the definition of Depreciation in Section A.2.

(vi)    To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to I.R.C. Section 734(b) is required pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Membership Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Net Profit or Net Loss.

"Nonrecourse Deductions" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(1) and shall be determined according to the provisions of Treasury Regulations Section 1.704-2(c).

"Nonrecourse Liability" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"Partner Nonrecourse Debt" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(4).

"Partner Nonrecourse Debt Minimum Gain" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(2) and shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

"Partner Nonrecourse Deductions" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(1) and shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(2).

"Partnership Minimum Gain" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(2) and shall be determined in accordance with Treasury Regulations Section 1.704-2(d).

A.3    Capital Accounts.    The Company shall determine and maintain Capital Accounts. "Capital Account" means an account of each Member determined and maintained throughout the full term of the Company in accordance with the capital accounting rules of Treasury Regulations Section 1.704-1(b)(2)(iv). Without limiting the generality of the foregoing, the following rules apply:

(a)    The Capital Account of each Member shall be credited with (i) an amount equal to such Member's Capital Contributions and the Fair Value of property contributed (if permitted hereunder) to the Company by such Member, (ii) such Member's share of the Company's Net Profit,

MR.583

and (iii) the amount of any Company liabilities assumed by such Member or that are secured by property distributed to such Member.

(b)     The Capital Account of each Member shall be debited by (i) the amount of cash and the Fair Value of property distributed to such Member, (ii) such Member's share of the Company's Net Loss, and (iii) the amount of any liabilities of such Member assumed by the Company or that are secured by any property contributed by such Member to the Company.

(c)     Upon the transfer by a Member of all or part of an interest in the Company after the Effective Date, the Capital Account of the transferor that is attributable to the transferred interest carries over to the transferee and the Capital Accounts of the Members shall be adjusted to the extent provided in Treasury Regulations Section 1.704-1(b)(2)(iv)(m).

(d)     In determining the amount of any liability for purposes of Sections A.3(a) and A.3(b), I.R.C. Section 752(c) and any other applicable provisions of the I.R.C. and the Treasury Regulations shall be taken into account.

(e)     Except as otherwise required by Treasury Regulations Section 1.704-1(b)(2)(iv), adjustment to Capital Accounts in respect of Company income, gain, loss, deduction, and I.R.C. Section 705(a)(2)(B) expenditures (or items thereof) shall be made with reference to the federal tax treatment of such items (and, in the case of book items, with reference to the federal tax treatment of the corresponding tax items) at the Company level, without regard to any mandatory or elective tax treatment of such items at the Member level.

(f)     The provisions of this Appendix and of the Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b)(2)(iv), and shall be interpreted and applied in a manner consistent with such Treasury Regulations. If the Board of Managers determines that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including debits or credits relating to liabilities that are secured by contributions or distributed property or that are assumed by the Company or any Member), are computed in order to comply with such Treasury Regulations, the Board of Managers may make such modification if it is not likely to have a material effect on the amounts distributed or to be distributed to any Member pursuant to the Agreement. The Board of Managers shall make any adjustments that are necessary or appropriate (i) to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g), and (ii) if unanticipated events (for example, the acquisition by the Company of oil or gas properties) might otherwise cause this Agreement not to comply with Treasury Regulations Section 1.704-1(b).

(g)     The provisions of the proposed Treasury Regulations published on January 22, 2003 (68 Fed. Reg. 2930), as they may subsequently be modified or adopted as temporary or final Treasury Regulations, shall apply with respect to any noncompensatory options issued by the Company.

A.4     Allocations of Net Profit and Net Loss

A.4.1   In General

After giving effect to the special allocations set forth in Sections A.4.2 and A.4.3 hereof, Net Profit and Net Loss (and to the extent necessary, individual items of income, gain, loss, or deduction) for

MR.584

any period shall be allocated to the Members in such amounts as may be necessary to cause each Member's Capital Account (as adjusted through the end of such period) to equal, as nearly as possible, the sum (which may be either a positive or negative amount) of (i) the amount such Member would receive if all Company assets on hand at the end of such period were sold for cash at their Gross Asset Values, all Company liabilities were satisfied in cash according to their terms (limited in the case of any Nonrecourse Liability and Partner Nonrecourse Debt to the Gross Asset Value of the property securing such liabilities), all obligations (if any) of Members to contribute additional capital to the Company were satisfied, and any remaining cash was distributed to the Members under Section 4.2 as of the last day of such period, minus (ii) the Member's share of Partnership Minimum Gain and Partner Nonrecourse Debt Minimum Gain computed immediately prior to such deemed sale of assets.

A.4.2   Regulatory Allocations. The following special allocations shall be applied in the order in which they are listed. Such ordering is intended to comply with the ordering rules in Treasury Regulations Section 1.704-2(j) and shall be applied consistently therewith.

(a)   Minimum Gain Chargeback.   Except as otherwise provided in Treasury Regulations Section 1.704-2(f), anything to the contrary in this Section A.4 notwithstanding, if there is a net decrease in Partnership Minimum Gain during any taxable year, each Member shall be allocated items of income and gain for that taxable year (and, if necessary, subsequent taxable years) equal to that Member's share of the net decrease in Partnership Minimum Gain determined in accordance with Treasury Regulations Section 1.704-2(g)(2).   This Section A.4.2(a) is intended to comply with the minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith, including that no chargeback shall be required to the extent the requirements for requesting a waiver described in Treasury Regulations Section 1.704-2(f)(4) are met or the requirements for any other exception prescribed by or pursuant to Treasury Regulations Section 1.704-2(f) are met.

(b)   Partner Nonrecourse Debt Minimum Gain Chargeback.   Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), anything to the contrary in this Section notwithstanding, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain during a taxable year, then, in addition to the amounts, if any, allocated pursuant to paragraph 4.2(a), any Member with a share of that Partner Nonrecourse Debt Minimum Gain (determined in accordance with Treasury Regulations Section 1.704-2(i)(5)) as of the beginning of the taxable year shall be allocated items of Company income and gain for that taxable year (and, if necessary, for subsequent taxable years) equal to that Member's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(i)(4).   This Section A.4.2(b) is intended to comply with the chargeback of partner nonrecourse debt minimum gain required by Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith, including that no chargeback shall be required to the extent the requirements for any exceptions provided in Treasury Regulation Section 1.704-2(i)(4) are met.

(c)   Qualified Income Offset.   If any Member unexpectedly receives any adjustment, allocation, or distribution described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5), or (6), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible.   An allocation pursuant to the foregoing sentence shall be made only to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in Section A.4 have been tentatively made as if this Section A.4.2(c) were not in this Appendix. This allocation is intended to constitute a "qualified income

MR.585

offset" within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(3) and shall be construed in accordance with the requirements thereof.

(d)     Gross Income Allocation. If a Member has an Adjusted Capital Account Deficit at the end of any taxable year, each such Member shall be specially allocated items of Company income and gain in the amount of such Adjusted Capital Account Deficit as quickly as possible; provided that an allocation pursuant to this clause shall be made only if and to the extent that the Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section A.4 have been made as if this Section A.4.2(d) were not in this Appendix.

(e)     Nonrecourse Deductions. Nonrecourse Deductions for any taxable year shall be allocated among the Members in accordance with their Percentage Interests.

(f)     Partner Nonrecourse Deductions. Partner Nonrecourse Deductions for any taxable year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i)(1).

(g)     Basis Adjustments. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to I.R.C. Section 734(b) or I.R.C. Section 743(b) is required under Treasury Regulations Section 1.704-1(b)(2)(iv)(m) to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Treasury Regulations.

A.4.3   Curative Allocations. The allocations set forth in Section A.4.2 hereof (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations. The Members intend that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section A.4.3. Therefore, any other provisions of this Section A.4 (other than the Regulatory Allocations) notwithstanding, the Board of Managers shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner the Board of Managers determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section A.4.1. In exercising its discretion under this Section A.4.3, the Board of Managers shall take into account future Regulatory Allocations under Sections A.4.2(a) and A.4.2(b) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections A.4.2(e) and A.4.2(f).

A.4.4   Other Allocation Rules

(a)     Net Profit, Net Loss, and other items shall be allocated to the Members pursuant to this Appendix A as of the last day of each taxable year, and at such times as the Gross Asset Values of Company Property are adjusted pursuant to subparagraph (ii) of the definition of Gross Asset Value.

(b)     If during any taxable year any Member's Percentage Interest changes, each Member's share of Net Profit, Net Loss, and other items for such taxable year shall be determined

MR.586

according to their varying interests and I.R.C. Section 706(d), using any conventions permitted by law and selected by the Board of Managers.

(c)     For purposes of determining a Member's share of Company "excess nonrecourse liabilities" within the meaning of Treasury Regulations Section 1.752-3(a)(3), the Members' shares of Company profits shall be deemed to be in proportion to their respective Percentage Interests.

(d)     To the extent permitted by Treasury Regulations Section 1.704-2(h)(3), the Board of Managers may treat any distribution of the proceeds of a Nonrecourse Liability or a Partner Nonrecourse Debt (that would otherwise be allocable to an increase in Partnership Minimum Gain) as a distribution that is not allocable to an increase in Partnership Minimum Gain to the extent the distribution does not cause or increase an Adjusted Capital Account Deficit for any Member.

A.5     Tax Allocations

(a)     In General.  Except as otherwise provided in this Section A.5, each item of income, gain, loss, and deduction of the Company for federal income tax purposes shall be allocated among the Members in the same manner as such items are allocated for book purposes under the Agreement and this Appendix.

(b)     Contributed or Revalued Property.  In accordance with I.R.C. Section 704(c) and the related Treasury Regulations, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Gross Asset Value. If the Gross Asset Value of any Company asset is adjusted pursuant to subparagraph (ii) of the definition of Gross Asset Value in Section A.2 hereof, subsequent allocations of income, gain, loss, and deductions with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under I.R.C. Section 704(c) and the related Treasury Regulations.  Any elections or other decisions relating to allocations pursuant to this Section A.5 shall be made by the Board of Managers in any manner that reasonably reflects the purpose and intention of this Appendix and the Agreement.

(c)     Credits.  Except as otherwise required by Treasury Regulations Section 1.704-1(b)(4)(ii), items of tax credit and tax credit recapture shall be allocated among the Members in accordance with their Percentage Interests.

(d)     Effect of Tax Allocations.  Allocations pursuant to this Section A.5 are solely for purposes of U.S. federal, state, and local taxes and shall not affect any Member's Capital Account or share of Net Profit, Net Loss, or other items or distributions pursuant to any provision of this Appendix and the Agreement.

MR.587

## SCHEDULE A
## CERTIFICATE OF FAIR MARKET VALUE

In accordance with the provisions of the definition of "Triggering Event Purchase Price" of the Company Agreement of Centurion Pecos Terminal LLC (the "Company"), effective as of September 12, 2014, the liquidating value of the Membership Interests is as follows:

| | | |
|---|---|---|
| 1 | Estimated fair market value of Company assets | $ |
| 2 | Less: estimated selling expenses | $ |
| 3 | Less: liabilities | $ |
| 4 | Less: reserves | $ |
| 5 | Equals: total distributable proceeds (Sum of lines 1-4) | $ |
| 6 | Less: CAM Preferred Return Balance | $ |
| 7 | Less: CAM Capital Contribution Balance | $ |
| 8 | Equals: residual distribution amount (Sum of lines 5 – 7) | $ |
| 9 | Residual distribution amount per percentage point of Percentage Interest (line 8 ÷ 100) | $ |
| 10 | **Liquidating Value of CAM Membership Interest** | |
| 11 | CAM Preferred Return Balance (line 6) | $ |
| 12 | CAM Capital Contribution Balance (line 7) | $ |
| 13 | CAM Percentage Interest (line 9 x 60.00) | $ |
| 14 | Total (Sum of lines 11 – 13) | $ |
| 15 | **Liquidating Value of Centurion Membership Interest** | |
| 16 | Centurion Percentage Interest (line 9 x 40.00) | |

**[This Space Left Blank Intentionally. Signature Page Follows.]**

IN WITNESS WHEREOF, the Members have executed this Certificate of Fair Market Value as of the date first written above.

**MEMBERS:**

**CENTURION LOGISTICS LLC**

By:_____

Name:_____

Title:_____

**CAM OIL AND NATURAL GAS, LLC**

By:_____

Name:_____

Title:_____

# Exhibit "J"

MR.590

RECORDATION REQUESTED BY:
Texas Capital Bank, National Association
Premier Office, Commercial Banking
5910 N. Central Expressway, Suite 150
Dallas, TX 75206

WHEN RECORDED MAIL TO:
Texas Capital Bank, National Association
Attn : Loan Operations
2350 Lakeside Blvd, Suite 800
Richardson, TX 75082

SEND TAX NOTICES TO:
Centurion Pecos Terminal LLC
17950 Preston Road, Ste. 1080
Dallas, TX 75252

SPACE ABOVE THIS LINE IS FOR RECORDER'S USE ONLY

THIS DEED OF TRUST is dated September 16, 2014, among Centurion Pecos Terminal LLC, whose address is 17950 Preston Road, Ste. 1080, Dallas, TX 75252 ("Grantor"); Texas Capital Bank, National Association, whose address is Premier Office, Commercial Banking, 5910 N. Central Expressway, Suite 150, Dallas, TX 75206 (referred to below sometimes as "Beneficiary"); and John Hudgens, whose address is 2000 McKinney Avenue, Suite 700, Dallas, TX 75201 (referred to below as "Trustee").

CONVEYANCE AND GRANT. For valuable consideration, Grantor conveys to Trustee in trust, with power of sale, for the benefit of Lender as Beneficiary, the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; and all easements, rights of way, and appurtenances; all water and water rights; and all other rights, royalties, and profits relating to the real property, including without limitation such rights as Grantor may have in all minerals, oil, gas, geothermal and similar matters, (the "Real Property") located in Reeves County, State of Texas:

See Exhibit "A", which is attached to this Deed of Trust and made a part of this Deed of Trust as if fully set forth herein.

The Real Property or its address is commonly known as Tract of land located in Section 76, Block 4, H&GN Railroad Company Survey, Pecos, TX.

CROSS-COLLATERALIZATION. In addition to the Note, this Deed of Trust secures all obligations, debts and liabilities, plus interest thereon, of either Grantor or Borrower to Lender, or any one or more of them, as well as all claims by Lender against Borrower and Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Borrower or Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise. However, this Deed of Trust shall not secure, and the "Indebtedness" shall not include, any obligations arising under Subchapters E and F of Chapter 342 of the Texas Finance Code, as amended.

Grantor hereby absolutely assigns to Lender (also known as Beneficiary in this Deed of Trust) all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property. In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

THIS DEED OF TRUST, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE (A) PAYMENT OF THE INDEBTEDNESS AND (B) PERFORMANCE OF ANY AND ALL OBLIGATIONS UNDER THE NOTE, THE RELATED DOCUMENTS, AND THIS DEED OF TRUST. THIS DEED OF TRUST IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:

GRANTOR'S REPRESENTATIONS AND WARRANTIES. Grantor warrants that: (a) this Deed of Trust is executed at Borrower's request and not at the request of Lender; (b) Grantor has the full power, right, and authority to enter into this Deed of Trust and to hypothecate the Property; (c) the provisions of this Deed of Trust do not conflict with, or result in a default under any agreement or other instrument binding upon Grantor and do not result in a violation of any law, regulation, court decree or order applicable to Grantor; (d) Grantor has established adequate means of obtaining from Borrower on a continuing basis information about Borrower's financial condition; and (e) Lender has made no representation to Grantor about Borrower (including without limitation the creditworthiness of Borrower).

GRANTOR'S WAIVERS. Grantor waives all rights or defenses arising by reason of any "one action" or "anti-deficiency" law, or any other law which may prevent Lender from bringing any action against Grantor, including a claim for deficiency to the extent Lender is otherwise entitled to a claim for deficiency, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale.

PAYMENT AND PERFORMANCE. Except as otherwise provided in this Deed of Trust, Borrower and Grantor shall pay to Lender all Indebtedness secured by this Deed of Trust as it becomes due, and Borrower and Grantor shall strictly perform all their respective obligations under the Note, this Deed of Trust, and the Related Documents.

VENDOR'S LIEN. The debt evidenced by the Note is in part or total payment of the purchase price of the Property; the debt is secured by both this Deed of Trust and by a vendor's lien on the Property, which is expressly retained in the deed of the Property to Grantor. This Deed of Trust does not waive the vendor's lien, and the two liens and the rights created by this instrument shall be cumulative. Lender may elect to foreclose under either of the liens without waiving the other or may foreclose under both. The deed wherein the vendor's lien is retained is incorporated into this Deed of Trust.

POSSESSION AND MAINTENANCE OF THE PROPERTY. Borrower and Grantor agree that Borrower's and Grantor's possession and use of the Property shall be governed by the following provisions:

Possession and Use. Until the occurrence of an Event of Default, Grantor may (1) remain in possession and control of the Property; (2) use, operate or manage the Property; and (3) collect the Rents from the Property.

Duty to Maintain. Grantor shall maintain the Property in tenantable condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

Compliance With Environmental Laws. Grantor represents and warrants to Lender that: (1) During the period of Grantor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property; (2) Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing, (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (3) Except as previously disclosed to and acknowledged by Lender in writing, (a) neither Grantor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Grantor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Deed of Trust. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Grantor or to any other person. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Property for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Deed of Trust or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Grantor's ownership or interest in the Property, whether or not the same was or

BALLENGEE00002065

MR 591

should have been known to Grantor. The provisions of this section of the Deed of Trust, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Deed of Trust and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**Nuisance, Waste.** Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent. This restriction will not apply to rights and easements (such as gas and oil) not owned by Grantor and of which Grantor has informed Lender in writing prior to Grantor's signing of this Deed of Trust.

**Removal of Improvements.** Grantor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Grantor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Grantor's compliance with the terms and conditions of this Deed of Trust.

**Compliance with Governmental Requirements.** Grantor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property, including without limitation, the Americans With Disabilities Act. Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Grantor agrees neither to abandon or leave unattended the Property. Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**DUE ON SALE - CONSENT BY LENDER.** Lender may, at Lender's option, declare immediately due and payable all sums secured by this Deed of Trust upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. If any Grantor is a corporation, partnership or limited liability company, transfer also includes any change in ownership of more than twenty-five percent (25%) of the voting stock, partnership interests or limited liability company interests, as the case may be, of such Grantor. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law or by Texas law.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Deed of Trust:

**Payment.** Grantor shall pay when due (and in all events prior to delinquency) all taxes, special taxes, assessments, charges (including water and sewer), fines and impositions levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Grantor shall maintain the Property free of all liens having priority over or equal to the interest of Lender under this Deed of Trust, except for the lien of taxes and assessments not due and except as otherwise provided in this Deed of Trust.

**Right to Contest.** Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and Lender's reasonable attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialman's lien, or other lien could be asserted on account of the work, services, or materials. Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Deed of Trust.

**Maintenance of Insurance.** Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a fair value basis for the full insurable value covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Grantor shall also procure and maintain comprehensive general liability insurance in such coverage amounts as Lender may request with Trustee and Lender being named as additional insureds in such liability insurance policies. Additionally, Grantor shall maintain such other insurance, including but not limited to hazard, business interruption, and boiler insurance, as Lender may reasonably require. Policies shall be written in form, amounts, coverages and basis reasonably acceptable to Lender, with losses made payable to Lender. GRANTOR MAY FURNISH THE REQUIRED INSURANCE WHETHER THROUGH EXISTING POLICIES OWNED OR CONTROLLED BY GRANTOR OR THROUGH EQUIVALENT INSURANCE FROM ANY INSURANCE COMPANY AUTHORIZED TO TRANSACT BUSINESS IN THE STATE OF TEXAS. If Grantor fails to provide any required insurance or fails to continue such insurance in force, Lender may, but shall not be required to, do so at Grantor's expense, and the cost of the insurance will be added to the Indebtedness. If any such insurance is procured by Lender, Grantor will be so notified, and Grantor will have the option of furnishing equivalent insurance through any insurer authorized to transact business in Texas. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. Should the Real Property be located in an area designated by the Administrator of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain Federal Flood Insurance, if available, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Property. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. Whether or not Lender's security is impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If Lender elects to apply the proceeds to restoration and repair, Grantor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration if Grantor is not in default under this Deed of Trust. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Deed of Trust, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Grantor as Grantor's interests may appear.

**Grantor's Report on Insurance.** Upon request of Lender, however not more than once a year, Grantor shall furnish to Lender a report on each existing policy of insurance showing: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured, the then current replacement value of such property, and the manner of determining that value; and (5) the expiration date of the policy. Grantor shall, upon request of Lender, have an independent appraiser satisfactory to Lender determine the cash value replacement cost of the Property.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Property or if Grantor fails to comply with any provision of this Deed of Trust or any Related Documents, including but not limited to Grantor's failure to discharge or

BALLENGEE00002065.02
MR 592

pay when due any amounts Grantor is required to discharge or pay under this Deed of Trust or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Property and paying all costs for insuring, maintaining and preserving the Property. All such expenditures paid by Lender for such purposes will then bear interest at the Note rate from the date paid by Lender to the date of repayment by Grantor. To the extent permitted by applicable law, all such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Deed of Trust also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Deed of Trust:

**Title.** Grantor warrants that: (a) Grantor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Deed of Trust, and (b) Grantor has the full right, power, and authority to execute and deliver this Deed of Trust to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Trustee or Lender under this Deed of Trust, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance With Laws.** Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Deed of Trust shall survive the execution and delivery of this Deed of Trust, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full.

**CONDEMNATION, JUDGMENTS AND AWARDS.** The following provisions relating to condemnation proceedings, judgments, decrees and awards for injury to the Property are a part of this Deed of Trust:

**Proceedings.** If any proceeding in condemnation is filed, Grantor shall promptly notify Lender in writing, and Grantor shall promptly take such steps as may be necessary to defend the action and obtain the award. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

**Application of Net Proceeds.** To the extent permitted by applicable law, all judgments, decrees and awards for injury or damage to the Property, or any part of the Property, and awards pursuant to proceedings for condemnation of the Property, are hereby absolutely assigned to Lender, and if all or any part of the Property is condemned by eminent domain proceedings or by any proceeding or purchase in lieu of condemnation, Lender may at its election require that all or any portion of the net proceeds of the award be applied to the Indebtedness or the repair or restoration of the Property. The net proceeds of the award, judgment or decree shall mean the award after payment of all reasonable costs, expenses, and attorneys' fees incurred by Trustee or Lender in connection with the condemnation.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Deed of Trust as a security agreement are a part of this Deed of Trust:

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Grantor shall take whatever action is requested by Lender to perfect and continue Lender's security interest in the Rents and Personal Property. In addition to recording this Deed of Trust in the real property records, Lender may, at any time and without further authorization from Grantor, file executed counterparts, copies or reproductions of this Deed of Trust as a financing statement. Grantor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantor shall not remove, sever or detach the Personal Property from the Property. Upon default, Grantor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient to Grantor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender to the extent permitted by applicable law.

**Addresses.** The mailing addresses of Grantor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Deed of Trust may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Deed of Trust.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Deed of Trust:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Borrower's and Grantor's obligations under the Note, this Deed of Trust, and the Related Documents, and (2) the liens and security interests created by this Deed of Trust as first and prior liens on the Property, whether now owned or hereafter acquired by Grantor. Unless prohibited by law or Lender agrees to the contrary in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**Attorney-In-Fact.** If Grantor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Grantor and at Grantor's expense. For such purposes, Grantor hereby irrevocably appoints Lender as Grantor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** If Borrower and Grantor pay all the Indebtedness when due, and Grantor otherwise performs all the obligations imposed upon Grantor under this Deed of Trust, Lender shall execute and deliver to Grantor a release of this Deed of Trust lien and suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. However, it is agreed that the payment of all the Indebtedness and performance of such obligations shall not terminate this Deed of Trust unless the liens and interests created hereby are released by Lender by a proper recordable instrument. Any filing fees required by law shall be paid by Grantor, if permitted by applicable law.

**EVENTS OF DEFAULT.** Each of the following, at Lender's option, shall constitute an Event of Default under this Deed of Trust:

**Payment Default.** Borrower fails to make any payment when due under the Indebtedness.

**Other Defaults.** Borrower or Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Deed of Trust or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower or Grantor.

**Compliance Default.** Failure to comply with any other term, obligation, covenant or condition contained in this Deed of Trust, the Note or in any of the Related Documents.

**Default on Other Payments.** Failure of Grantor within the time required by this Deed of Trust to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien.

**Default in Favor of Third Parties.** Should Borrower or any Grantor default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or Grantor's ability to repay the Indebtedness or Borrower's or Grantor's ability to perform their respective obligations under this Deed of Trust or any of the Related Documents.

VOL 1109 PG 0170

BALLENGEE00002065.03

MR.593

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or Grantor or on Borrower's or Grantor's behalf under this Deed of Trust or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Deed of Trust or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.** The dissolution of Grantor's (regardless of whether election to continue is made), any member withdraws from the limited liability company, or any other termination of Borrower's or Grantor's existence as a going business or the death of any member, the insolvency of Borrower or Grantor, the appointment of a receiver for any part of Borrower's or Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower or Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or Grantor or by any governmental agency against any property securing the Indebtedness. This includes a garnishment of any of Borrower's or Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower or Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower or Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Breach of Other Agreement.** Any breach by Borrower or Grantor under the terms of any other agreement between Borrower or Grantor and Lender that is not remedied within any grace period provided therein, including without limitation any agreement concerning any indebtedness or other obligation of Borrower or Grantor to Lender, whether existing now or later.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Borrower's or Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Right to Cure.** If any default, other than a default in payment is curable, it may be cured if Grantor, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within ten (10) days; or (2) if the cure requires more than ten (10) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Deed of Trust, at any time thereafter, Trustee or Lender may exercise any one or more of the following rights and remedies:

**Election of Remedies.** Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Deed of Trust, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**Accelerate Indebtedness.** Lender may declare the unpaid principal balance of the Indebtedness due and payable. In no event will Borrower or Grantor be required to pay any unearned interest.

**Foreclosure.** If Lender invokes the power of sale, Trustee, at the request of Lender, may sell all or any portion of the Property at public auction to the highest bidder for cash at the location within the courthouse designated by the County Commissioners Court, or if no such area has been designated, at the area designated in the notice of sale within the courthouse, between the hours of 10:00 A.M. and 4:00 P.M. on the first Tuesday of any month, after the Trustee or its agent has given notice of the time and place of sale and of the property to be sold as required by the Texas Property Code, as then amended.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code.

**Collect Rents.** As additional security for the payment of the Indebtedness, Grantor hereby assigns to Lender all Rents as defined in the Definitions section of this Deed of Trust. Lender shall have the right at any time, and even though no Event of Default shall have occurred under this Deed of Trust, to collect and receive the Rents. Lender shall provide any notice required by applicable law with regard to such enforcement of its right to collect and receive the Rents. In addition, if the Property is vacant, Lender may rent or lease the Property. Lender shall not be liable for its failure to rent the Property, to collect any Rents, or to exercise diligence in any matter relating to the Rents; Lender shall be accountable only for Rents actually received. Lender neither has nor assumes any obligation as lessor or landlord with respect to any occupant of the Property. Rents so received shall be applied by Lender first to the remaining unpaid balance of the Indebtedness, in such order or manner as Lender shall elect, and the residue, if any, shall be paid to the person or persons legally entitled to the residue.

**Trustee's Powers.** Grantor hereby jointly and severally authorizes and empowers Trustee to sell all or any portion of the Property together or in lots or parcels, as Trustee may deem expedient, and to execute and deliver to the purchaser or purchasers of such Property good and sufficient deeds of conveyance of fee simple title, or of lesser estates, and bills of sale and assignments, with covenants of general warranty made on Grantor's behalf. In no event shall Trustee be required to exhibit, present or display at any such sale any of the Property to be sold at such sale. The Trustee making such sale shall receive the proceeds of the sale and shall apply the same as provided below. Payment of the purchase price to Trustee shall satisfy the liability of the purchaser at any such sale of the Property, and such person shall not be bound to look after the application of the proceeds.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Tenancy at Sufferance.** If Grantor remains in possession of the Property after the Property is sold as provided above or Lender otherwise becomes entitled to possession of the Property upon default of Borrower or Grantor, Grantor shall become a tenant at sufferance of Lender or the purchaser of the Property and shall, at Lender's option, either (1) pay a reasonable rental for the use of the Property, (2) vacate the Property immediately upon the demand of Lender, or (3) if such tenants refuse to surrender possession of the Property upon demand, the purchaser shall be entitled to institute and maintain the statutory action of forcible entry and detainer and procure a writ of possession thereunder, and Grantor expressly waives all damages sustained by reason thereof.

**Other Remedies.** Trustee or Lender shall have any other right or remedy provided in this Deed of Trust or the Note or available at law or in equity.

**Sale of the Property.** To the extent permitted by applicable law, Borrower and Grantor hereby waives any and all rights to have the Property marshalled. In exercising its rights and remedies, the Trustee or Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property. Trustee may convey all or any part of the Property to the highest bidder for cash with a general warranty binding Grantor, subject to prior liens and to other exceptions to conveyance and warranty. Grantor waives all requirements of appraisement, if any. The affidavit of any person having knowledge of the facts to the effect that proper notice as required by the Texas Property Code was given shall be prima facie evidence of the fact that such notice was in fact given. Recitals and statements of fact in any notice or in any conveyance to the purchaser or purchasers of the Property in any foreclosure sale under this Deed of Trust shall be prima facie evidence of the truth of such facts, and all prerequisites and requirements necessary to the validity of any such sale shall be presumed to have been performed. Any sale under the powers granted by this Deed of Trust shall be a perpetual bar against Grantor, Grantor's heirs, successors, assigns and legal representatives.

**Proceeds.** Trustee shall pay the proceeds of any sale of the Property (a) first, to the expenses of foreclosure, including reasonable fees or charges paid to the Trustee, including but not limited to fees for enforcing the lien, posting for sale, selling, or releasing the Property, (b) then to Lender the full amount of the Indebtedness, (c) then to any amount required by law to be paid before payment to Grantor, and (d) the balance, if any, to Grantor.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Deed of Trust, Lender shall be entitled

VOL 1109 PG 0171

BALLENGEE00002065.04

MR.594

to recover such sum as the court may adjudge reasonable as Lender's attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including Lender's reasonable attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees, title insurance, and fees for the Trustee, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law. In the event of foreclosure of this Deed of Trust, Lender shall be entitled to recover from Borrower or Grantor Lender's reasonable attorneys' fees and actual disbursements that Lender necessarily incurs in pursuing such foreclosure.

**POWERS AND OBLIGATIONS OF TRUSTEE.** The following provisions relating to the powers and obligations of Trustee are part of this Deed of Trust:

**Powers of Trustee.** In addition to all powers of Trustee arising as a matter of law, Trustee shall have the power to take the following actions with respect to the Property upon the written request of Lender and Grantor: (a) join in preparing and filing a map or plat of the Real Property, including the dedication of streets or other rights to the public; (b) join in granting any easement or creating any restriction on the Real Property; and (c) join in any subordination or other agreement affecting this Deed of Trust or the interest of Lender under this Deed of Trust.

**Obligations to Notify.** Trustee shall not be obligated to notify any other lienholder of the Property of the commencement of a foreclosure proceeding or of the commencement of any other action to which Lender may avail itself as a remedy, except to the extent required by applicable law or by written agreement.

**Trustee.** In addition to the rights and remedies set forth above, with respect to all or any part of the Property, the Trustee shall have the right to foreclose by notice and sale, and Lender shall have the right to foreclose by judicial foreclosure, in either case in accordance with and to the full extent provided by applicable law.

**Substitute Trustee.** Lender, at Lender's option, from time to time, and more than once, may appoint in writing a successor or substitute trustee, with or without cause, including the resignation, absence, death, inability, refusal or failure to act of the Trustee. The successor or substitute trustee may be appointed without ever requiring the resignation of the former trustee and without any formality except for the execution and acknowledgment of the appointment by the beneficiary of this Deed of Trust. The successor or substitute trustee shall then succeed to all rights, obligations, and duties of the Trustee. This appointment may be made on Lender's behalf by the President, any Vice President, Secretary, or Cashier of Lender.

**NOTICES.** Any notice required to be given under this Deed of Trust, including without limitation any notice of default and any notice of sale shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Deed of Trust. Any party may change its address for notices under this Deed of Trust by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Deed of Trust:

**Amendments.** This Deed of Trust, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Deed of Trust. No alteration of or amendment to this Deed of Trust shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Annual Reports.** If the Property is used for purposes other than Grantor's residence, Grantor shall furnish to Lender, upon request, a certified statement of net operating income received from the Property during Grantor's previous fiscal year in such form and detail as Lender shall require. "Net operating income" shall mean all cash receipts from the Property less all cash expenditures made in connection with the operation of the Property.

**Caption Headings.** Caption headings in this Deed of Trust are for convenience purposes only and are not to be used to interpret or define the provisions of this Deed of Trust.

**Merger.** There shall be no merger of the interest or estate created by this Deed of Trust with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Governing Law. This Deed of Trust will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of law provisions. This Deed of Trust has been accepted by Lender in the State of Texas.**

**Joint and Several Liability.** All obligations of Borrower and Grantor under this Deed of Trust shall be joint and several, and all references to Grantor shall mean each and every Grantor, and all references to Borrower shall mean each and every Borrower. This means that each Grantor signing below is responsible for all obligations in this Deed of Trust. Where any one or more of the parties is a corporation, partnership, limited liability company or similar entity, it is not necessary for Lender to inquire into the powers of any of the officers, directors, partners, members, or other agents acting or purporting to act on the entity's behalf, and any obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Deed of Trust.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Deed of Trust unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Deed of Trust shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Deed of Trust. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Deed of Trust, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Payment of Interest and Fees.** Notwithstanding any other provision of this Deed of Trust or any provision of any Related Document, Grantor does not agree or intend to pay, and Lender does not agree or intend to charge, collect, take, reserve or receive (collectively referred to herein as "charge or collect"), any amount in the nature of interest or in the nature of a fee for the Indebtedness which would in any way or event (including demand, prepayment, or acceleration) cause Lender to contract for, charge or collect more for the Indebtedness than the maximum Lender would be permitted to charge or collect by any applicable federal or Texas state law. Any such excess interest or unauthorized fee will, instead of anything stated to the contrary, be applied first to reduce the unpaid principal balance of the Indebtedness, and when the principal has been paid in full, be refunded to Grantor.

**Severability.** If a court of competent jurisdiction finds any provision of this Deed of Trust to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Deed of Trust. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Deed of Trust shall not affect the legality, validity or enforceability of any other provision of this Deed of Trust.

**Successors and Assigns.** Subject to any limitations stated in this Deed of Trust on transfer of Grantor's interest, this Deed of Trust shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Deed of Trust and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Deed of Trust or liability under the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Deed of Trust.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Deed of Trust. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not

VOL 1109 PG 0172

MR.595

BALLENGEE00002065.05